## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-----------------------------------------------------------------x
|  |  |
| --- | --- |
| In re | : Chapter 11 |
| | : |
| **ELECTRICAL COMPONENTS** | : Case No. 10-11054 (KJC) |
| **INTERNATIONAL, INC. *et al.*,**[1] | : |
| | : |
| **Debtors.** | : **Joint Administration Requested** |
| | : |

-----------------------------------------------------------------x

## DEBTORS' MOTION FOR ENTRY OF ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SUPERPRIORITY AND PRIMING BASIS PURSUANT TO SECTIONS 105, 361, 362 AND 364 OF THE BANKRUPTCY CODE, (II) GRANTING PRIMING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO SECTION 364(c) AND (d) OF THE BANKRUPTCY CODE, (III) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO SECTIONS 361, 362, 363, AND 364 OF THE BANKRUPTCY CODE, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) PRESCRIBING FORM AND MANNER OF NOTICE AND SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Electrical Components International, Inc. ("**ECI**"), and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each debtor's federal tax identification number, are: Electrical Components International, Inc. (4361); FP-ECI Holdings Company (4246) ("**Holdings**"); ECM Holding Company (7759) ("**ECM Holding**"); Noma O.P., Inc. (5495) ("**Noma**"). The address for each of the Debtors is 1 City Place Drive, Suite 450, St. Louis, Missouri, 63141.

## Bankruptcy Rule 4001 Concise Statement[2]

1.    By this motion (the "**Motion**"), the Debtors request, pursuant to sections 105(a), 361, 362, 363, 364, 365 and 507 and 552 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the corresponding local rules of this District (the "**Local Rules**"), entry of the proposed interim order (the "**Interim Order**")[3] and the Final Order (as hereinafter defined) (I) authorizing postpetition financing, cash advances and other extensions of credit (collectively, the "**DIP Loans**") in an aggregate principal amount of up to $25.0 million in the form of a delayed draw term loan facility consisting of (A) a $17.0 million commitment (the "**Interim Commitment**") to be made available to the Debtors in one drawing upon the first practicable date following entry of this Interim Order and (B) an additional $8.0 million commitment (the "**Additional Commitment**" and, together with the Interim Commitment, the "**DIP Commitments**") to be made available to the Debtors in one drawing upon or following entry of an order of this Court (the "**Final Order**") granting final authorization of the DIP Loans, pursuant to sections 105(a), 363 and 364 of the Bankruptcy Code, from the Postpetition Lenders (as defined below) by entering into that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement on a super-priority and priming basis (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Postpetition Credit Agreement**"), substantially in the form

---

[2]    All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Postpetition Credit Agreement or, the Prepackaged Plan or the Interim Order (all as defined below), as applicable.

[3]    Certain of the principal parties in these cases have been reviewing the form of Interim Order and have made and may make further comments. To the extent there is any difference between the proposed Interim Order filed herewith and any Interim Order submitted to the Court for approval, the Debtors will submit a marked version of the attached Interim Order and highlight any changes before the Court.

annexed to the Motion as Exhibit A, among Electrical Components International, Inc. ("**Borrower**"), as borrower, Holdings and certain other direct and indirect affiliates of ECI (including all of the Debtors), as guarantors (collectively, the "**Guarantors**" and together with ECI, the "**Postpetition Loan Parties**"), the lenders from time to time parties thereto (the "**Postpetition Lenders**"), and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities and together with its successors, the "**Postpetition Agent**", and together with the Postpetition Lenders and other holders of Secured Obligations, the "**Postpetition Secured Parties**"); (II) authorizing the Debtors to execute and enter into the Postpetition Credit Agreement and all other agreements, documents, notes or instruments required to be delivered by or in connection with the Postpetition Credit Agreement, including, without limitation, the Loan Documents (as described in the Motion) (collectively, the "**Postpetition Financing Documents**"); (III) authorizing and directing each Debtor to grant, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, priming liens and super-priority administrative claims to and on behalf of and for the benefit of the Postpetition Agent and the Postpetition Lenders in all DIP Collateral in accordance with the Postpetition Financing Documents, the Interim Order and the Final Order to secure any and all of the Postpetition Obligations, (IV) authorizing the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**") and the proceeds of the DIP Loans, subject to the terms and conditions set forth in the Postpetition Credit Agreement, the Interim Order and the Final Order, (V) granting adequate protection to the Debtors' Prepetition Secured Parties (as defined below), whose liens and security interests are being primed by the DIP Loans, as more fully set forth in the Postpetition Financing Documents, the Interim Order and the Final Order; and (VI) modifying and vacating the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to

implement and effectuate the terms and provisions of the Postpetition Financing Documents, the

Interim Order and the Final Order and to permit the Postpetition Agent to enforce the Liens

securing the Obligations arising under the Postpetition Financing Documents, the Interim Order

and the Final Order and to pursue the rights and remedies thereunder.

2.      Material provisions of the Debtors' proposed debtor-in-possession

financing are set out in the following sections of the Postpetition Credit Agreement, the security

agreement related to the Postpetition Credit Agreement (the "**Postpetition Security**

**Agreement**") and/or the proposed Interim Order:[4]

(a)     <u>Borrowings</u>. The Prepetition Lenders agree to provide a debtor-in-possession delayed draw term loan facility to the Borrower in aggregate principal amount of up to $25 million (the "<u>DIP Loans</u>") to (i) pay the transaction costs related to the closing of the DIP Loans, and (ii) thereafter to finance the Bankruptcy Cases of the Borrower and for other general corporate purposes, in all cases subject to the Budget.

All obligations of the Borrower under the DIP Loans will be unconditionally guaranteed by each existing and subsequently acquired or organized domestic subsidiary of the Borrower (the "<u>Guarantors</u>").

Postpetition Credit Agreement Section 1.01 definitions of "Term Loan Commitment", and "Guarantor", and Sections 2.02, and 7.01.

(b)     <u>Interest Rate</u>. At Borrower's option, loans will bear interest based on the Base Rate or, so long as no event of default has occurred and is continuing, the London Interbank Offered Rate ("**LIBOR**"), as described below:

(i) Interest calculated using the Base Rate option will be at the Base Rate plus the applicable Interest Margin per annum,

---

[4]      The summaries and descriptions of the terms and conditions of the Postpetition Credit Agreement, the Postpetition Security Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Postpetition Credit Agreement and Interim Order. In the event there is a conflict between this Motion and the Postpetition Credit Agreement or Interim Order, the Postpetition Credit Agreement or Interim Order, as applicable, shall control in all respects.

calculated on the basis of the actual number of days elapsed in a year of 365 days and payable monthly in arrears. The Base Rate is defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1% and the prime commercial lending rate of UBS AG, as established from time to time at its Stamford Branch. There is a Base Rate floor of 3.0% per annum.

(ii) Interest calculated at the LIBOR Rate option will be determined for periods to be selected by Borrower of one, two or three months (*provided, however,* that no Interest Period shall extend beyond the Scheduled Maturity Date) and will be at an annual rate equal to LIBOR for the corresponding deposits of U.S. dollars, plus the applicable Interest Margin. LIBOR will be determined by the Postpetition Agent at the start of each Interest Period and will be fixed through such period. Interest will be paid at the end of each Interest Period and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for maximum statutory reserve requirements (if any). There is a LIBOR floor of 2.0% per annum.

Postpetition Credit Agreement Section 1.01 definitions of "Alternate Base Rate" and "Adjusted LIBOR Rate", and Section 2.06.

(c)     Default Rate. During the continuance of an event of default, interest will accrue (i) on unpaid principal or interest on any loan, at a rate of 2.0% *per annum* plus the rate otherwise applicable to such loan and (ii) in the case of any other unpaid amount, at a rate of 2.0% *per annum* plus the non-default interest rate then applicable to Base Rate loans under the financing. Default interest shall be payable on demand.

Postpetition Credit Agreement Sections 2.06(c), and 2.06(d).

(d)     Maturity. The Maturity Date shall be the earliest of (i) the date on which all the DIP Loans have been repaid in full in cash, (ii) the six-month anniversary of the Commencement Date, (iii) the closing date of a sale under Section 363 of the Bankruptcy Code of all or substantially all of the Borrower's assets in the Bankruptcy Cases, (iv) the effective date of a confirmed plan of reorganization in any Bankruptcy Case pursuant to Chapter 11 of the Bankruptcy Code, (v) the date of a conversion of the Bankruptcy Cases to a liquidation pursuant to Chapter 7 of the Bankruptcy Code or a dismissal of the Bankruptcy Case, and (vi) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an event of default.

Postpetition Credit Agreement Section 1.01 definition of "Maturity Date".

(e)    <u>Events of Default</u>.  Events of Default include provisions relating to:

- failure to make payments of interest, fees or other amounts when due;
- material inaccuracy of representations and warranties;
- violations of covenants;
- cross-default to post-petition material indebtedness;
- termination of the exclusive period for the Borrower to file a plan of reorganization in the Bankruptcy Cases;
- dismissal of the Bankruptcy Cases or conversion to a Chapter 7 case (except as consented to by DIP Agent and Required Lenders);
- appointment of a chapter 11 trustee or a responsible officer or examiner with expanded powers relating to the operation of the business of any Borrower or Guarantor;
- the Interim Order no longer being in full force and effect, be reversed, vacated or stayed or amended, supplemented or otherwise modified without the consent of the Administrative Agent and Required Lenders prior to the entry of the Final Order;
- the Final Order not having been entered by the Bankruptcy Court on or before the date which is the earlier of (i) 36 days after the completion of Solicitation and (ii) 30 days after the Commencement Date;
- any reversal, vacation or stay, or any amendment, supplement or other modification to the Final Order without the consent of the Postpetition Agent and required lenders under the Postpetition Credit Agreement (the "**Postpetition Required Lenders**");
- the entry of an order in any of the Bankruptcy Cases granting any other super priority administrative claim or lien equal or superior to that granted to the Postpetition Agent;
- the occurrence of a "Termination Event" as defined in the Plan Support Agreement entered into prior to the commencement of the Bankruptcy Cases (without regard to, and whether or not, any related notice has been delivered, any related cure period has expired or the Plan Support Agreement has actually been effectively terminated in accordance with its terms);
- any amendment or modification of any term of the Plan Support Agreement, or any waiver of any material right thereunder, without the consent of Postpetition Agent and Postpetition Required Lenders;
- any Collateral becoming subject to surcharge or marshaling;
- the entry of an order by the Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien on any Collateral having a value in excess of $1.0 million;
- the Borrower seeking to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code (unless such financing is proposed to refinance and pay the obligations in full in cash under the financing and the First Lien Prepetition Credit Facilities with the termination of all related lending commitments thereunder), granting

any lien other than certain Permitted Liens upon or affecting any cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Postpetition Agent and Required Lenders, or files any action or challenge against the Postpetition Agent or Postpetition Lenders or First Lien Prepetition Lenders;

- the entry of any order, other than the DIP Orders (as defined in the Plan Support Agreement), by the Bankruptcy Court invalidating, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, the enforceability, priority, characterization or validity of any of the liens securing the First Lien Debt (as defined in the Plan Support Agreement) or any of the Claims (as defined in the Plan Support Agreement) arising under the First Lien Credit Agreement (as defined in the Plan Support Agreement);

- any of the ECI Parties (as defined in the Plan Support Agreement) filing, propounding or otherwise supporting any plan of reorganization other than the Prepackaged Plan;

- the filing of any motion or pleading by the ECI Parties with the Bankruptcy Court that is not consistent with the Plan Support Agreement, the Plan or the Term Sheets (as defined in the Plan Support Agreement) (in each case with such amendments and modifications as have been agreed to by the ECI Parties and the applicable Requisite Consenting Parties (as defined in the Plan Support Agreement) and consented to by the Postpetition Agent and Postpetition Required Lenders), the Postpetition Lenders (as defined in the Plan Support Agreement) or the Exit Lenders (as defined in the Plan Support Agreement), as applicable) and such motion or pleading not being withdrawn prior to the earlier of (A) five (5) Business Days after the ECI Parties receive written notice from the applicable Requisite Consenting Parties, the Postpetition Lenders or the Exit Lenders, as applicable, that such motion or pleading is inconsistent with the Plan Support Agreement, the Plan or the Term Sheets, as applicable, and (B) the entry of an order of the Bankruptcy Court approving such motion;

- the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining or otherwise preventing the consummation of a material portion of the Transactions (as defined in the Postpetition Credit Agreement);

- failure to timely achieve any Milestones (as defined in the Postpetition Credit Agreement);

- ERISA events;

- material monetary and non-monetary judgments;

- actual or asserted impairment of any guarantee or security document or security interests, in each case, in connection with the DIP Facility; and

- a change of control.

Postpetition Credit Agreement Section 8.01.

(f)      Liens.  The Postpetition Agent and the Postpetition Lenders will receive, through the Postpetition Financing Documents, the Interim Order and the Final Order: (i) a super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses and any and all other claims of any kind, and (ii) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, a first priority priming lien on and security interest in all of the right, title and interest of the Postpetition Loan Parties in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time (each defined in the DIP Security Agreement and collectively, the "**Pledged Collateral**"):  (i) all Accounts; (ii) all Equipment, Goods, Inventory, and Fixtures; (iii) all Documents, Instruments, and Chattel Paper; (iv) all Letters of Credit and Letter-of-Credit Rights; (v) all Securities Collateral; (vi) all Investment Property; (vii) all Intellectual Property Collateral; (viii) the Commercial Tort Claims (as described in Schedule 12 to the DIP Security Agreement); (ix) all General Intangibles; (x) all Money and all Deposit Accounts; (xi) all Supporting Obligations; (xii) all books and records relating to the Pledged Collateral; (xiii) all Avoidance Actions (upon entry of the Final Order); (xiv) and to the extent not covered by clauses (i) through (xiii) of this sentence, all other personal property of the Postpetition Loan Parties, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Postpetition Loan Parties from time to time with respect to any of the foregoing.

The Postpetition Agent's and Postpetition Lenders' liens and super-priority status are subject to a carve out (the "**Carve-Out**") and other exceptions as set forth in the Interim Order.

The Carve-Out shall mean: (i) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. §1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below); (ii) (x) all unpaid fees, costs and disbursements set forth in the Budget incurred by professionals retained by the Debtors or the Committee in these Cases (collectively, the "**Professionals**") (but excluding the fees and expenses of professionals retained by the individual members of any Committee), in each case, that are incurred prior to the delivery by the Postpetition Agent of a Carve-Out Trigger Notice, are finally allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code, and that remain unpaid after application of available funds remaining in the Debtors' estates for payment of such Professionals, and (y) all unpaid fees, costs

and disbursements of Professionals (but excluding the fees and expenses of professionals retained by individual members of any Committee) that are incurred after the delivery of a Carve-Out Trigger Notice, are finally allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code, and that remain unpaid after application of available funds remaining in the Debtors' estates for payment of such Professionals in an aggregate amount not to exceed $1,000,000 (the **"Carve-Out Cap"**).

Postpetition Credit Agreement 2.20; Interim Order ¶¶ 8, 9, 10(a).

(g)     Adequate Protection – Prepetition Secured Parties. As discussed more fully below, the Prepetition Agent and the Prepetition Lenders (as defined below) shall receive the following, among other things, as and for adequate protection subject to the Carve-Out:

- As adequate protection of the respective interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral, to the extent of any diminution in the value of the Prepetition First Lien Collateral (including Cash Collateral) from and after the Commencement Date, whether as a result of the imposition of the automatic stay, priming of the First-Priority Prepetition Liens, use of the Prepetition First Lien Secured Parties' Cash Collateral or otherwise, the Prepetition First Lien Agent, for its benefit and the benefit of the other Prepetition First Lien Secured Parties, shall be granted, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, replacement Liens upon all the DIP Collateral (the **"First Lien Adequate Protection Liens"**) subject and subordinate only to the DIP Liens, the Carve-Out and the Prepetition Senior Liens on all DIP Collateral.

- Subject to the Carve-Out and the DIP Super-Priority Claims, as additional adequate protection of the interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral, the Prepetition First Lien Secured Parties shall be entitled to allowed administrative priority claims pursuant to section 507(b) of the Bankruptcy Code (the **"First Lien Adequate Protection Claims"**) for any diminution in value of the Prepetition First Lien Collateral (including Cash Collateral) from and after the Commencement Date, whether as a result of the imposition of the automatic stay, priming of the First-Priority Prepetition Liens, use of the Prepetition First Lien Secured Parties' Cash Collateral or otherwise. The First Lien Adequate Protection Claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code, or otherwise (whether incurred in the Cases or any Successor

Cases or any other proceeding related hereto or thereto), provided that (x) the Second Lien Adequate Protection Claims (as defined below) shall be subject to and subordinate in all respects in right of payment and otherwise, to the First Lien Adequate Protection Claims and (y) the First Lien Adequate Protection Claims shall be subject to and subordinate in all respects in right of payment and otherwise, to the Carve-Out, the DIP Super-Priority Claims and Payment in Full of the Postpetition Obligations.

- As further adequate protection of the respective interests of Prepetition First Lien Secured Parties, the Debtors shall, upon entry of the Interim Order, on a calendar monthly basis thereafter during the term of this Interim Order and in accordance with the terms of the Interim Order, promptly pay in cash all accrued but unpaid reasonable costs and expenses of the Prepetition First Lien Agent, including, without limitation, reasonable documented, out-of-pocket fees and expenses of legal counsel and other professionals selected by the Prepetition First Lien Agent, one alternative firm of legal counsel selected by Prepetition First Lien Agent in the event of any actual or potential conflict of interest, and, in each case, one local counsel selected by the Prepetition First Lien Agent for each applicable jurisdiction regardless of whether such amounts accrued prior to the Commencement Date and all without further motion, fee application or order of the Court.

- As adequate protection of the respective interests of the Prepetition Second Lien Secured Parties in the Prepetition Second Lien Collateral, to the extent of any diminution in the value of the Prepetition Second Lien Collateral (including Cash Collateral) from and after the Commencement Date, whether as a result of the imposition of the automatic stay, priming of the Second-Priority Prepetition Liens, use of the Prepetition Second Lien Secured Parties' Cash Collateral or otherwise, the Prepetition Second Lien Agent, for its benefit and the benefit of the other Prepetition Second Lien Secured Parties, shall be entitled to replacement liens (the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the "**Adequate Protection Liens**") subject and subordinate only to the DIP Liens, the First-Priority Prepetition Liens, the First Lien Adequate Protection Liens, the Carve-Out and the Prepetition Senior Liens, on all DIP Collateral.

- Subject to the Carve-Out, the DIP Super-Priority Claims and the First Lien Adequate Protection Claims, as additional adequate protection of the interests of the Prepetition Second Lien Secured Parties in the Prepetition Second Lien Collateral, the Prepetition Second Lien Secured Parties shall be entitled to allowed administrative expense priority claims under section 507(b) of the Bankruptcy Code (the "**Second Lien Adequate Protection Claims**", and together with the

First Lien Adequate Protective Claims, the "**Adequate Protection Claims**") for any diminution in value of the Prepetition Second Lien Collateral (including Cash Collateral) from and after the Commencement Date, whether as a result of the imposition of the automatic stay, priming of the Second-Priority Prepetition Liens, use of the Prepetition Second Lien Secured Parties' Cash Collateral or otherwise. The Second Lien Adequate Protection Claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code, or otherwise (whether incurred in the chapter 11 cases or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto), provided that the Second Lien Adequate Protection Claims shall be subject to and subordinate in all respects in right of payment and otherwise, to the Carve-Out, the DIP Super-Priority Claims, the First Lien Adequate Protection Claims and the Payment in Full of the Postpetition Obligations.

- As further adequate protection of the respective interests of Prepetition Second Lien Secured Parties, the Debtors shall, upon entry of the Interim Order, on a calendar monthly basis thereafter during the term of the Interim Order and in accordance with the terms of the Interim Order, promptly pay in cash all accrued but unpaid reasonable costs and expenses of the Prepetition Second Lien Agent, including, without limitation, reasonable documented, out-of-pocket fees and expenses of legal counsel and other professionals selected by the Prepetition Second Lien Agent, one alternative firm of legal counsel selected by the Prepetition Second Lien Agent in the event of any actual or potential conflict of interest, and, in each case, one local counsel selected by the Prepetition Second Lien Agent for each applicable jurisdiction regardless of whether such amounts accrued prior to the Commencement Date and all without further motion, fee application or order of the Court.

- In accordance with the Interim Order, the Adequate Protection Liens shall be deemed to be perfected automatically upon entry of the Interim Order, without the necessity of the filing of any UCC-1 financing statement, state or federal notice, mortgage or other similar instrument or document in any state or public record or office and without the necessity of taking possession or "control" (within the meaning of the Uniform Commercial Code) of any DIP Collateral.

- In determining the relative priorities and rights of the Prepetition Agents and other Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Agents

and other Prepetition Secured Parties with respect to the Adequate Protection Liens and the Adequate Protection Claims), pursuant to Section 510 of the Bankruptcy Code, such priorities and rights shall continue to be governed by the Intercreditor Agreement, and nothing in the Interim Order or the Postpetition Financing Documents shall impair, diminish or otherwise affect the terms of the Intercreditor Agreement.

Postpetition Credit Agreement Section 2.24; Interim Order ¶ 33.

(h)     Fees. The Borrower will pay the following fees on account of the DIP Loans:

- Commitment Fee. Borrower agrees to pay to the Postpetition Agent for the account of each Postpetition Lender a commitment fee (a "**Commitment Fee**") equal to 1.00% per annum on the average daily unused amount of each DIP Commitment of such Postpetition Lender during the period from and including the date of the entry of the Interim Order but excluding the date on which such DIP Commitment terminates. Accrued Commitment Fees shall be payable in arrears (A) on the last Business Day of each month, commencing on the first such date to occur after the date hereof, and (B) on the date on which such DIP Commitment terminates. Commitment Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

- Exit Fee. Borrower agrees to pay to the Postpetition Agent, an exit fee equal to 1.50% of the original aggregate DIP Commitments of all of the Postpetition Lenders in respect of the DIP Loans (the "**Exit Fee**"), for the account of the Lenders, due and payable on the Maturity Date. For the avoidance of doubt, the Exit Fee is equal to 1.50% of $25,000,000.

- Other Fees. Borrower agrees to pay to the Postpetition Agent the Arrangement Fee, the Agency Fee and the Upfront Fee payable in the amounts and at times separately agreed upon between Borrower and the Postpetition Agent pursuant to the DIP Facility Fee Letter.

All Fees shall be fully earned and paid on the dates due, in immediately available funds, to the Postpetition Agent for distribution, and once paid, none of the Fees shall be refundable under any circumstances.

Postpetition Credit Agreement Section 2.05.

3. The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) are set forth at the following sections of the Interim Order:

(a) Name of Each Entity with Interest in Cash Collateral. Interim Order ¶ D, E, F.

(b) Purposes of Use of Cash Collateral. Interim Order ¶ 5.

(c) Liens, Cash Payments, or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral. Interim Order ¶ 33.

4. In addition, the provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set out at the following sections of the Postpetition Credit Agreement and the Interim Order:

(a) **_Grant of Priority or a Lien on Property of the Estate._** Postpetition Credit Agreement Section 1.01 definitions of "Collateral," "Security Agreement," "Requisite Priority," and "Security Documents", Sections 2.20, 3.21, 5.12, 6.02, 6.21, and Schedule 6.02(c); Interim Order ¶¶ 8, 9.

(b) **_Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case._** Postpetition Credit Agreement Section 2.24; Interim Order ¶ 33.

(c) **_Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case._** Interim Order Stipulations ¶¶ D, E.

(d) **_Waiver or Modification of the Automatic Stay._** Postpetition Credit Agreement Section 8.01; Interim Order ¶¶ 21, 26, 31.

(e) **_Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit._** Postpetition Credit Agreement Sections 3.13 and 6.01.

(f) **_Establishment of Deadlines for Filing a Plan, for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order._** Postpetition Credit Agreement Section 5.16 and Schedule 5.16.

(g) **_Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien._** Interim Order ¶ 26.

(h)     ***Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate.*** Postpetition Credit Agreement Sections 2.23 and 10.03; Interim Order ¶¶ D, E, and 34.

(i)     ***Indemnification of Any Entity***. Postpetition Credit Agreement Section 10.03.

(j)     ***Release, Waiver or Limitation on Rights under Section 506(c).*** Postpetition Credit Agreement Sections 2.20(b); 2.20(f); 3.25(b) and 8.01(n)(xviii); Interim Order ¶ 11.

(k)     ***Liens Granted on Claims Arising Under Chapter 5.*** Postpetition Credit Agreement Section 1.01 definition of "Avoidance Actions" and Section 2.20(c); Interim Order ¶ 8.

## Background

5.     On March 30, 2010 (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Further, a motion pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for joint administration of the Debtors' chapter 11 cases is pending before this Court.

6.     Prior to the Commencement Date, the Debtors solicited votes on the Joint Prepackaged Plan of Reorganization of Electrical Components International, Inc., *et al.* Under Chapter 11 of the Bankruptcy Code (the "**Prepackaged Plan**") through a disclosure statement distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code (the "**Disclosure Statement**").

## ECI's Businesses

7.     The Debtors and their wholly-owned non-Debtor subsidiaries (the "**Companies**") are leading designers, manufacturers and marketers of wire harnesses and

providers of value-added assembly services to North American, European, and Asian "white goods" appliance manufacturers. The Companies also produce specialty wire harnesses for an expanding customer base in diverse markets including transportation; heating, ventilation and air conditioning ("**HVAC**"); construction and agriculture; vending and industrial. Wire harnesses are configurations of wires, cables, connectors, terminals and plugs that can be found in many electronic products, including home appliances; transportation vehicles, automotive components and HVAC systems; construction and agricultural equipment; and vending and industrial machines.

8.      The Companies are suppliers to over 90 original equipment manufacturers in numerous end markets, including industry leaders Bosch, Chrysler, Case, Delphi, Electrolux, EZ GO, General Electric, General Motors, Haier, Mabe, Nissan, Whirlpool and Xerox. The Companies are the largest supplier of wire harnesses to the white goods appliance market in North America.

9.      The Companies have a low-cost global footprint with eleven facilities strategically located in five countries. Approximately 98% of their 8,750 employees are located in low-cost regions, with six facilities in Mexico, two facilities in China and one facility in Poland. The Companies also have one facility in Canada and one in Germany, which serve those specific local customer bases. The Companies' manufacturing facilities are strategically located to take advantage of low-cost manufacturing environments and to better serve their customers.

10.      As of the Commencement Date, the Debtors' outstanding indebtedness consisted of (i) approximately $261.4 million outstanding principal amount, plus all accrued and unpaid interest thereon, under the Amended and Restated First Lien Credit Agreement, dated as of September 23, 2008 (the "**First Lien Credit Agreement**"), secured by a first priority lien on

substantially all of the Debtors' assets and (ii) $60.0 million outstanding principal amount, plus all accrued and unpaid interest thereon, under the Amended and Restated Second Lien Credit Agreement, dated as of September 23, 2008 (the "**Second Lien Credit Agreement**"), secured by a second priority lien on substantially all of the Debtors' assets. There is no established public trading market for the Debtors' capital stock. Francisco Partners, L.P. and certain of its affiliates own approximately 98% of the shares of each of the preferred stock and common stock of Holdings.

11.    Holdings is the parent corporation of ECI and is a holding company. ECM Holding is a wholly-owned subsidiary of ECI and is the holding company for a number of international operating subsidiaries. Noma is a wholly-owned subsidiary of ECI that does not hold any operating assets, but is a contract party to certain royalty agreements and other intellectual property arrangements. All business operations are carried out by ECI and its non-Debtor subsidiaries. ECI's principal executive offices are located at 1 City Place Drive, Suite 450, St. Louis, Missouri 63141.

12.    As of the Commencement Date, the Debtors had approximately 122 employees in the United States and the Debtors' and their non-debtor subsidiaries' unaudited consolidated financial statements reflected approximately $460,000,000 of net sales for the 12-month period ended December 31, 2009. As of January 31, 2010, the Debtors and their non-debtor subsidiaries had total assets of approximately $363,646,000 and total liabilities of approximately $435,699,000.

**The ECI Prepackaged Plan**

13.    As described in more detail in the Webster Declaration, prior to the Commencement Date, the Debtors engaged in negotiations over the terms of a financial restructuring with its core creditor and equity holder groups. These negotiations culminated in

US_ACTIVE:\43349286\04\43562.0006
RLF1 3555557V.1

the agreement of (i) certain holders (the "**Consenting First Lien Lenders**") of more than 66 2/3% of the outstanding principal amount of indebtedness (the "**First Lien Lender Loans**") under First Lien Credit Agreement; (ii) UBS AG, Stamford Branch, solely in its capacity as Administrative Agent and Collateral Agent (the "**First Lien Agent**") under the First Lien Credit Agreement; (iii) certain holders (the "**Consenting Second Lien Lenders**") of more than 66 2/3% of the outstanding principal amount of indebtedness (the "**Second Lien Lender Loans**") under the Second Lien Credit Agreement; (iv) NexBank, SSB, solely in its capacity as Administrative Agent and Collateral Agent (the "**Second Lien Agent**"); (v) BlackRock Kelso Capital Corporation, Sankaty Credit Opportunities II, L.P., Sankaty Credit Opportunities III, L.P., Sankaty Credit Opportunities IV, L.P. and Sankaty Credit Opportunities (Offshore Master) IV, L.P. (collectively, the "**Equity Investors**"); and (vi) certain holders (the "**Consenting Equity Holders**" and, together with the Consenting First Lien Lenders, the Consenting Second Lien Lenders and the Equity Investors, the "**Consenting Parties**") of more than 98% of the aggregate outstanding shares of each class of capital stock of Holdings to enter into the Plan Support Agreement, dated as of February 12, 2010 (the "**Plan Support Agreement**") with the Debtors, pursuant to which the Consenting Parties agreed to vote in favor of the Prepackaged Plan provided that certain conditions and milestones were satisfied.

      14.    Concurrently with the execution of the Plan Support Agreement, (i) the Debtors, the Consenting First Lien Lenders and the First Lien Agent entered into the Forbearance Agreement, dated as of February 12, 2010, with respect to certain specified defaults and events of default under the First Lien Credit Agreement (the "**First Lien Forbearance Agreement**") and (ii) the Debtors, the Consenting Second Lien Lenders and the Second Lien Agent entered into the Forbearance Agreement, dated as of February 12, 2010, with respect to

certain specified defaults and events of default under the Second Lien Credit Agreement (the "**Second Lien Forbearance Agreement**").

15.     In addition, the Debtors, UBS Loan Finance LLC, UBS Securities LLC, General Electric Capital Corporation, GE Capital Markets, Inc. and the lenders party thereto (the "**DIP Lenders**") executed a DIP Facility Commitment Letter dated as of February 12, 2010 (the "**DIP Facility Commitment Letter**") pursuant to which the DIP Lenders committed to fund the debtor-in-possession facility of the Debtors in an aggregate principal amount up to $25,000,000 (the "**DIP Facility**").

16.     The Plan Support Agreement also provided that (i) the Equity Investors committed to purchase (x) 22,500,000 shares of the equity of the Reorganized Debtors (the "**New Common Stock**") at $1.00 per share and (y) between 10,000,000 and 15,000,000 shares of New Common Stock at $1.00 per share for which the holders of First Lien Lender Loans exercised the Cash Election (as described below), and (ii) certain of the Consenting First Lien Lenders committed to fund the tranche A term loan facility in an aggregate principal amount of $32,500,000 (the "**Tranche A Term Loan Facility**").

17.     In accordance with the terms of the Plan Support Agreement, on March 6, 2010, the Debtors commenced a solicitation of votes from all classes entitled to vote under the Bankruptcy Code.  The Prepackaged Plan has been accepted in excess of the statutory thresholds specified in sections 1126(c) and 1126(d) of the Bankruptcy Code by all of the impaired classed of claims against the Debtors.

18.     Under the terms of the Prepackaged Plan, each holder of a claim pursuant to the First Lien Credit Agreement (a "**First Lien Lender Claim**") will be entitled to receive its *pro rata* share of: (i) 50,000,000 shares of New Common Stock unless such holder makes a Cash

Election (as described below) and (ii) the tranche B term loans to be issued by certain of the Reorganized Debtors in the aggregate principal amount of $145,000,000. Pursuant to Section 4.2(b)(ii) of the Prepackaged Plan, each holder of the First Lien Lender Loans could elect to receive cash on account of all or a portion of its distribution of New Common Stock in an amount equal to $1.00 per share of New Common Stock (the "**Cash Election**"); provided, that such holders of First Lien Lender Loans could not elect to receive cash in an amount in excess of $15,000,000 in the aggregate. In connection with the solicitation of votes, the holders of First Lien Lender Claims made their Cash Election and have elected to receive $10,359,764 in cash for a portion of their shares of New Common Stock. As a result, the holders of the First Lien Lender Claims will receive an aggregate of 39,640,236 shares, or 54.68%, of New Common Stock. The Equity Investors will purchase the remaining shares and will receive an aggregate of 32,859,764 shares, or 45.32%, of New Common Stock (exclusive of shares of New Common Stock they will receive on account of their First Lien Lender Claims, if any).

19. In addition, the Prepackaged Plan provides that each holder of a claim pursuant to the Second Lien Credit Agreement (a "**Second Lien Lender Claim**") will be entitled to receive its *pro rata* share of $10,000,000 in cash.

20. The Prepackaged Plan also provides for the payment in full of (i) allowed administrative expense claims, (ii) federal, state, and local tax claims, (iii) other priority non-tax claims and (iv) claims related to the DIP Facility. Other secured claims are unimpaired under the Prepackaged Plan and holders of the other secured claims will either (i) be reinstated; (ii) receive cash in an amount equal to such allowed claims; or (iii) receive the collateral securing the other secured claim. Trade creditors and other holders of general unsecured claims against the Debtors are unimpaired under the Prepackaged Plan and will receive (i) if such claim is due and owing on

US_ACTIVE:\43349286\04\43562.0006
RLF1 3555557V.1

the Effective Date, payment in full in cash (x) on the later of the Effective Date and the date such claim becomes allowed or (y) otherwise paid in accordance with the terms of the applicable agreement; (ii) if such claim is not due and owing on the Effective Date, payment in full in cash when and as such claim becomes due and owing in the ordinary course of business; or (iii) treatment that leaves unaltered such holder's legal, equitable, and contractual rights.

21.     Under the Prepackaged Plan, each holder of preferred equity interests in Holdings will receive its *pro rata* share of the Rights (as defined in the Prepackaged Plan) to share in the equity value of the Reorganized Debtors if specified thresholds are achieved. Holders of common equity interests in Holdings will not receive a distribution.

22.     The Prepackaged Plan contemplates a comprehensive financial restructuring of the Debtors' capital structure that will allow the Debtors to deleverage their balance sheet by reducing the amount of the Debtors' outstanding debt by approximately 50% through a short and consensual chapter 11 case. After distributions under the Prepackaged Plan, the Reorganized Debtors will emerge from chapter 11 with up to $45,000,000 in new cash from the Equity Investors and Exit Facility and be poised for future growth and stability.

## Jurisdiction and Venue

23.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

24.     By this Motion, the Debtors request that the Court authorize ECI, as the borrower, to obtain the DIP Loans from the lenders party to the Postpetition Credit Agreement (collectively, the "**Postpetition Lenders**"), pursuant to the terms of this Motion, the DIP Orders, and the Postpetition Credit Agreement.

25.      Pending entry of the Final Order, the Debtors request that the Court

authorize the Borrower, on an interim basis, to (i) borrow up to $17 million from the DIP Loans,

(ii) use cash collateral as provided in the Interim Order, and (iii) provide adequate protection in

favor of the Prepetition Lenders as described herein and in the Interim Order.  Moreover, the

Debtors request that the Court approve the proposed notice of the Final Hearing and the

adequacy of the proposed service thereof, and schedule the Final Hearing.

### Prepetition Funding of the Debtors' Operations

**A.**      The Prepetition Credit Agreements and the Prepetition Lenders

26.      On September 23, 2008, ECI entered into that certain Amended and

Restated First Lien Credit Agreement, by and among ECI, Holdings, the subsidiary guarantors

party thereto, the lenders party thereto (the "**Prepetition First Lien Lenders**"), and UBS AG,

Stamford Branch (the "**Prepetition First Lien Agent**"), as administrative agent and as collateral

agent (as amended or otherwise modified from time to time, the "**First Lien Credit

Agreement**").  The obligations of ECI under the First Lien Credit Agreement are guaranteed by

each of Holdings, ECM Holding and Noma.  The indebtedness outstanding under the First Lien

Credit Agreement is comprised of revolving loans in an aggregate principal amount of

approximately $35.0 million and term loans in an aggregate principal amount of approximately

$226.4 million.  The First Lien Credit Agreement is secured by a first priority security interest in

substantially all of the assets of the Companies and a first priority pledge of 66% of the

Companies' equity interests in their first-tier foreign subsidiaries.  The priority of the security

interests and related creditor rights between the First Lien Credit Agreement and the Second Lien

Credit Agreement are set forth in that certain Intercreditor Agreement, dated as of May 1, 2006,

among the First Lien Administrative Agent (as Collateral Agent under the First Lien Credit

Agreement), the Second Lien Administrative Agent (as Collateral Agent under the Second Lien

Credit Agreement) and ECI (as amended from time to time, the "**Intercreditor Agreement**"). The First Lien Credit Agreement matures with respect to revolving loans thereunder on May 1, 2012 and with respect to term loans thereunder on May 1, 2013.

27.     On September 23, 2008, ECI entered into that certain Amended and Restated Second Lien Credit Agreement, by and among ECI, Holdings, the subsidiary guarantors party thereto, the lenders party thereto (the "**Prepetition Second Lien Lenders**," and with the Prepetition First Lien Lenders, the "**Prepetition Lenders**"), and NexBank, SSB, (the "**Prepetition Second Lien Agent**" and together with the Prepetition First Lien Agent, the Prepetition Lenders and other holders of Secured Obligations, the "**Prepetition Secured Parties**") as successor administrative agent and collateral agent (as amended or otherwise modified from time to time, the "**Second Lien Credit Agreement**" and together with the First Lien Credit Agreement, the "**Prepetition Credit Agreements**"). The obligations of ECI under the Second Lien Credit Agreement are guaranteed by each of Holdings, ECM Holding and Noma. The indebtedness outstanding under the Second Lien Credit Agreement is comprised of term loans in an aggregate principal amount of $60.0 million. The Second Lien Credit Agreement is secured by a second priority security interest in substantially all of the assets of the Companies and a second priority pledge of 66% of the Companies' equity interests in their first-tier foreign subsidiaries. The priority of the security interests and related creditor rights between the First Lien Credit Agreement and the Second Lien Credit Agreement are set forth in the Intercreditor Agreement. The Second Lien Credit Agreement matures on May 1, 2014.

### Debtors' Proposed Postpetition Financing

**A.**     Need for Postpetition Financing

28.     The Debtors may lack sufficient unencumbered funds with which to operate their businesses during the pendency of these chapter 11 cases. As described more fully

in the *Declaration of David J. Webster in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief* (the "**Webster Declaration**"), the Debtors' ability to maintain business relationships with their customers, pay their employees, and satisfy other critical operating expenses is essential to the Debtors' ability to successfully reorganize, and the cash collateral requested in this Motion is not sufficient to operate the Debtors' businesses throughout the pendency of these chapter 11 cases.

**B.**     Background of the Postpetition Credit Agreement

29.     To provide the Debtors with the funding necessary to fulfill their administrative and operational obligations throughout the duration of their prepackaged chapter 11 cases, the Debtors require a postpetition lending facility. Thus, prior to the Commencement Date, the Borrower and Rothschild surveyed various sources of postpetition financing, including financing from the Prepetition Lenders and unrelated third parties. The Borrower and Rothschild approached six (6) parties including the Prepetition Lenders having the capability of providing a facility of the size required. Rothschild received no interest from any of the contacted parties.

30.     The Postpetition Lenders, who also comprise certain of the Prepetition Lenders, were willing to extend postpetition financing on the terms and conditions described herein. The Borrower concluded that the Postpetition Credit Agreement proposed by the Postpetition Lenders is desirable because, among other things, the Postpetition Credit Agreement permits the Borrower to secure the postpetition financing required for their reorganization under the Prepackaged Plan. Consequently, the Borrower has determined that the Postpetition Lenders' proposed DIP Loans are the best financing option available under the circumstances.

**C.**     Negotiations

31.     The Borrower and Postpetition Agent engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the Postpetition Credit Agreement. Importantly, the Postpetition Credit Agreement provides that the Borrower may draw funds immediately (on an interim basis) to meet their administrative and operational obligations in the period leading up to confirmation of the Debtors' chapter 11 cases.

**D.**     Use of the DIP Loans

32.     Pursuant to the Postpetition Credit Agreement, the Borrower may use the proceeds of the DIP Loans, subject to the Budget, to pay the transaction costs related to the closing of the DIP Loans and thereafter finance the chapter 11 cases and for other general corporate purposes.

33.     Each of the proposed uses of the DIP Loans confers a direct benefit upon the Borrower. Among other things, the DIP Loans allow the Borrower to finance the ordinary costs of operations, maintain business relationships with vendors, suppliers and customers, make payroll, make capital expenditures, and satisfy other working capital and operational needs.

**E.**     Provisions to be Highlighted Pursuant to Local Rule 4001-2

34.     The Debtors believe the following provisions of the Postpetition Credit Agreement must be highlighted pursuant to Local Rule 4001-2 of the Local Rules:

> ***Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Prepetition Lien.*** Interim Order Stipulations ¶ D(iv).
>
> ***Waiver of Rights of Estate Under Section 506(c) as to the Final Order***. Interim Order ¶ 11.
>
> ***Granting Liens Solely on Debtors' Section 544, 545, 546, 547, 548, and 549 Claims and Causes of Action***. Postpetition Credit Agreement Section 1.01 definition of "Avoidance Action," and Sections 2.20(c) and 6.02(f); Interim Order ¶ 8.

35.     The provisions of the Postpetition Credit Agreement were extensively negotiated. The Postpetition Credit Agreement enables the Borrower to obtain the financing

necessary to maintain its operations, pursue reorganization, and maximize the value of their estates.

**F.**     Proposed Adequate Protection and Use of Cash Collateral

36.     In order to address their working capital needs and fund their reorganization efforts, the Debtors also require the use of Cash Collateral of the Prepetition Lenders. Coupled with the proceeds of the DIP Loans, the use of Cash Collateral will provide the Debtors with necessary additional capital to operate their businesses, pay their employees, maximize value, and successfully reorganize under chapter 11.

37.     The Prepetition Lenders have consented to or have not objected to the Debtors' use of Cash Collateral in the ordinary course of business, subject to the Adequate Protection Liens and expense reimbursement discussed below and the other terms and conditions set forth in the Interim Order. Furthermore, subject to entry of the Final Order, (i) the Prepetition First Lien Lenders and the Prepetition First Lien Agent under the First Lien Credit Agreement have agreed to forbear from exercising any and all rights and remedies under the First Lien Credit Agreement and under applicable law against any non-debtor affiliate or subsidiary of any Debtor and (ii) the Prepetition Second Lien Lenders and the Prepetition Second Lien Agent under the Second Lien Credit Agreement have agreed to forbear from exercising any and all rights and remedies under the Second Lien Credit Agreement and under applicable law against any non-debtor affiliate or subsidiary of any Debtor, *provided that* such forbearance shall terminate upon the earliest of (i) an Event of Default, (ii) a material breach of the Interim Order or (iii) approval of such termination by the Court after notice and a hearing. The Debtors will demonstrate at the Final Hearing that the proposed adequate protection discussed below satisfies the requirements of sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code.

38.     The Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection. As adequate protection, the Prepetition Secured Parties shall be granted the Adequate Protection Liens to secure the Prepetition Secured Parties' claim for any diminution of the value of their interests in the Prepetition Collateral under the Prepetition Credit Agreements to the extent that there is a diminution in the value of their interests in the Prepetition Collateral from and after the Commencement Date resulting from (i) the use of such collateral and cash constituting proceeds of such collateral, (ii) the imposition of the Postpetition Lenders' priming liens, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "**Adequate Protection Obligations**").

39.     The Adequate Protection Lien shall be (i) subject and subordinate only to (i) the DIP liens under the Postpetition Credit Agreement (the "**DIP Liens**") and any liens to which such liens are junior and (ii) the Carve-Out. The Adequate Protection Liens are and shall be valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination, at the time and date of the entry of the Interim Order. Upon the request of the Postpetition Agent, the Prepetition Secured Parties, without any further consent of any party, are authorized and directed to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the Agent to further validate, perfect, preserve and enforce the DIP Liens, and to provide additional evidence of perfection.

40.     The foregoing adequate protection to the Prepetition Lenders is appropriate because, among other things, the Debtors will continue to use the Cash Collateral and other Prepetition Collateral in the Debtors' ongoing business and operating facilities until the entry of the Final Order. Such adequate protection is also being proposed for the purpose of, among other things, protecting the Prepetition Lenders' claims, obligations, and collateral

interests from such use and the potential depreciation and deterioration of the Cash Collateral and Prepetition Collateral as a result of such use and as consideration for the Prepetition Lenders' consent to the use of such collateral under the terms of the Interim Order.

## The DIP Loans Should Be Authorized

41.    Approval of the Postpetition Credit Agreement will provide the Borrower with immediate and ongoing access to borrowing availability to pay the Debtors' current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs, in all cases subject to the Budget. Unless these expenditures are made, the Debtors would be forced to cease operations, which would result in irreparable harm to their businesses and going concern value and would jeopardize the Debtors' ability to reorganize. The credit provided under the DIP Loans and the use of Cash Collateral will enable the Debtors to continue to satisfy their clients' needs, provide customer care, pay their employees, and operate their businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Loans will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the Postpetition Credit Agreement will be viewed favorably by the Debtors' employees and clients, thereby promoting a successful reorganization.

42.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is

subject to a lien. 11 U.S.C. § 364. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

43.     The Debtors' liquidity needs can be satisfied only if the Borrower is immediately authorized (i) to borrow up to $17 million under the DIP Loans on an interim basis, (ii) to borrow up to $25 million on a final basis and (iii) to use such proceeds to fund their operations, subject to the Budget. The Borrower has been unable to (A) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a super-priority administrative expense claim pursuant to section 364(c)(1), (iv) without granting priming liens pursuant to section 364(d), and (B) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Therefore, the Borrower proposes to obtain the Financing set forth in the Postpetition Credit Agreement by providing, *inter alia*, super-priority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

44.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Borrower negotiated the DIP Loans with the Postpetition Lenders extensively and at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., Bray v. Shenandoah*

*Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

45.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

46.     Substantially all of the Borrower's assets are encumbered and, despite the diligent efforts of the Debtors and Rothschild, the Debtors have been unable to procure the required funding absent the proposed super-priority claims and priming liens. The Debtors have negotiated the best terms available to obtain funding they need to maintain sufficient liquidity to preserve their assets over the course of their prepackaged chapter 11 cases. The Debtors submit

that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Loans reflects the exercise of their sound business judgment.

47.     This Court has recently granted similar relief under similar circumstances in several cases. *See, e.g., In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008); *In re Hoop Holdings Inc.*, Case No. 08-10544 (BLS) (Bankr. D. Del. Apr. 16, 2008); *In Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 21, 2006).

48.     The terms and conditions of the DIP Loans are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the Postpetition Lenders and all obligations incurred under the DIP Loans should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Use of Cash Collateral Should Be Approved

49.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the use of the Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Lenders in the Debtors' Cash Collateral will be protected by the adequate protection set forth above. The Consenting Lenders have consented to or have not objected to the use of the Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtors' request to use Cash Collateral in the operation of their businesses and administration of the chapter 11 cases should be approved.

## The Proposed Adequate Protection Should Be Authorized

50.     Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used by a debtor in possession,

the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate

protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates

the forms of adequate protection, which include periodic cash payments, additional liens,

replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate

protection must be decided on a case-by-case basis. *See MNBank Dallas, N.A. v. O'Conner (In*

*re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472

(8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of

the requirement is to protect a secured creditor from diminution in the value of its interest in the

particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d

552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure

that the creditor receives the value for which he bargained prebankruptcy.") (internal citations

omitted).

51.     The Consenting Lenders have agreed to the Debtors' use of Cash

Collateral and the Borrower's entry into the Postpetition Credit Agreement in consideration for

the adequate protection provided to them under the Postpetition Credit Agreement. Moreover,

the liens and other protections offered to the Prepetition Lenders will, taken together, sufficiently

protect their interest in any collateral taken as security under the Prepetition Credit Agreements.

Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to

satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

## The Automatic Stay Should Be Modified on a Limited Basis

52.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Borrower to (i) grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the Postpetition Lenders to exercise, upon the occurrence and during the continuance of an event of default and after three (3) business days' notice thereof, all rights and remedies under the Postpetition Credit Agreement; and (iii) implement the terms of the proposed DIP Orders.

53.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

54.     Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

55.     Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use Cash Collateral, (b) authorize the Borrower to borrow up to $17 million under the DIP Loans on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest and (c) schedule the Final Hearing.

56. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their businesses on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Loans will provide necessary assurance to the Debtors' vendors, employees, and clients of the Debtors' ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' businesses, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

### The Debtors Satisfy Bankruptcy Rule 6003

57. Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Commencement Date. FED. R. BANKR. P. 6003. As described above and in the Webster Declaration, the Debtors' business operations depend on the DIP Loans. The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

### Waiver of Bankruptcy Rules 4001(a)(3), 6004(a), and (h)

58. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 4001(a)(3) and 6004(h).

## Notice

59. No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on (i) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (ii) the Office of the United States Trustee for the District of Delaware; (iii) counsel to the Prepetition First Lien Agent; (iv) counsel to the Prepetition Second Lien Agent; (v) counsel to the Postpetition Agent; (vi) the Office of the United States Attorney for the District of Delaware; (vii) all other parties with recorded liens of record on assets of the Debtors as of the Commencement Date (other than the Prepetition Secured Lenders); (viii) the Internal Revenue Service; (ix) all financial institutions at which the Debtors maintain deposit accounts; (x) the landlords for non-residential real properties occupied by the Debtors as of the Commencement Date; and (xi) all parties signatory to the Plan Support Agreement (collectively, the "**Notice Parties**"). As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request entry of an interim order, substantially similar to the proposed form of order attached hereto, granting the relief requested herein and such other and further relief as the Court may deem just.

Dated: March 31, 2010
     Wilmington, Delaware

_____

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Chun I. Jang (No. 4790)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Stephen A. Youngman
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

Proposed Attorneys for Debtors
and Debtors in Possession

US_ACTIVE:\43349286\04\43562.0006
RLF1 3555557V.1