# EXHIBIT K

SECURITY AGREEMENT

## DEBTOR-IN-POSSESSION SECURITY AGREEMENT

By

## ELECTRICAL COMPONENTS INTERNATIONAL, INC.,
### as Borrower

and

## THE GUARANTORS PARTY HERETO

and

## UBS AG, STAMFORD BRANCH,
### as Collateral Agent

---

**Dated as of [_____], 2010**

# TABLE OF CONTENTS

**Page**

PREAMBLE ........................................................................................................1
RECITALS ........................................................................................................1
AGREEMENT ....................................................................................................2


ARTICLE I
DEFINITIONS AND INTERPRETATION

SECTION 1.1.   Definitions............................................................................2
SECTION 1.2.   Interpretation.........................................................................8
SECTION 1.3.   Resolution of Drafting Ambiguities.......................................8
SECTION 1.4.   Perfection Certificate ............................................................9


ARTICLE II
GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1.   Grant of Security Interest......................................................9
SECTION 2.2.   Filings ................................................................................10


ARTICLE III
PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF PLEDGED COLLATERAL

SECTION 3.1.   Delivery of Certificated Securities Collateral.......................11
SECTION 3.2.   Perfection of Uncertificated Securities Collateral ................11
SECTION 3.3.   Financing Statements and Other Filings; Maintenance of Perfected
               Security Interest .................................................................11
SECTION 3.4.   Other Actions......................................................................12
SECTION 3.5.   Joinder of Additional Guarantors..........................................15
SECTION 3.6.   Supplements; Further Assurances .........................................15


ARTICLE IV
REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 4.1.   Title....................................................................................16
SECTION 4.2.   Validity of Security Interest.................................................17
SECTION 4.3.   Defense of Claims; Transferability of Pledged Collateral.......17
SECTION 4.4.   Other Financing Statements...................................................17
SECTION 4.5.   Location of Inventory and Equipment ...................................18
SECTION 4.6.   Due Authorization and Issuance ...........................................18
SECTION 4.7.   Consents, etc. ......................................................................18
SECTION 4.8.   Pledged Collateral ...............................................................18
SECTION 4.9.   Insurance .............................................................................18
SECTION 4.10.  Secured, Super-Priority Obligations. .....................................19

i

## ARTICLE V
## CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.   Pledge of Additional Securities Collateral ........................................... 19
SECTION 5.2.   Voting Rights; Distributions, etc. ..................................................... 19
SECTION 5.3.   Defaults, etc. ........................................................................... 21
SECTION 5.4.   Certain Agreements of Pledgors as Issuers and Holders of Equity Interests ... 21

## ARTICLE VI
## CERTAIN PROVISIONS CONCERNING INTELLECTUAL
## PROPERTY COLLATERAL

SECTION 6.1.   Grant of Intellectual Property License .............................................. 21
SECTION 6.2.   Protection of Collateral Agent's Security ........................................... 22
SECTION 6.3.   After-Acquired Property ............................................................... 22
SECTION 6.4.   Litigation .............................................................................. 23

## ARTICLE VII
## CERTAIN PROVISIONS CONCERNING RECEIVABLES

SECTION 7.1.   Maintenance of Records ............................................................... 23
SECTION 7.2.   Legend .................................................................................. 23
SECTION 7.3.   Modification of Terms, etc. .......................................................... 24
SECTION 7.4.   Collection .............................................................................. 24

## ARTICLE VIII
## TRANSFERS

SECTION 8.1.   Transfers of Pledged Collateral ...................................................... 24

## ARTICLE IX
## REMEDIES

SECTION 9.1.   Remedies ................................................................................ 24
SECTION 9.2.   Notice of Sale ......................................................................... 26
SECTION 9.3.   Waiver of Notice and Claims .......................................................... 27
SECTION 9.4.   Certain Sales of Pledged Collateral .................................................. 27
SECTION 9.5.   No Waiver; Cumulative Remedies ....................................................... 28
SECTION 9.6.   Certain Additional Actions Regarding Intellectual Property ......................... 28

## ARTICLE X
## APPLICATION OF PROCEEDS

SECTION 10.1.  Application of Proceeds ............................................................... 29

# ARTICLE XI
## MISCELLANEOUS

SECTION 11.1.   Concerning Collateral Agent ...........................................................................29
SECTION 11.2.   Collateral Agent May Perform; Collateral Agent Appointed Attorney-in-Fact.....................................................................................................................30
SECTION 11.3.   Continuing Security Interest; Assignment ......................................................31
SECTION 11.4.   Termination; Release ......................................................................................31
SECTION 11.5.   Modification in Writing ..................................................................................32
SECTION 11.6.   Notices ............................................................................................................32
SECTION 11.7.   Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial.........................................................................................................32
SECTION 11.8.   Severability of Provisions...............................................................................32
SECTION 11.9.   Execution in Counterparts...............................................................................32
SECTION 11.10.  Business Days ..................................................................................................32
SECTION 11.11.  No Credit for Payment of Taxes or Imposition ..............................................32
SECTION 11.12.  No Claims Against Collateral Agent ...............................................................33
SECTION 11.13.  No Release .......................................................................................................33
SECTION 11.14.  Obligations Absolute ......................................................................................33
SECTION 11.15.  Agreement Subject to Orders...........................................................................34

EXHIBIT 1     Form of Issuer's Acknowledgement
EXHIBIT 2     Form of Securities Pledge Amendment
EXHIBIT 3     Form of Joinder Agreement

NY\1619323.7

## DEBTOR-IN-POSSESSION SECURITY AGREEMENT

This DEBTOR-IN-POSSESSION SECURITY AGREEMENT dated as of [_____], 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "<u>Agreement</u>") made by ELECTRICAL COMPONENTS INTERNATIONAL, INC., a Delaware corporation (the "<u>Borrower</u>"), as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, and the Guarantors from to time time party hereto (the "<u>Guarantors</u>"), as pledgors, assignors and debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code (the Borrower, together with the Guarantors, in such capacities and together with any successors in such capacities, the "<u>Pledgors</u>," and each, a "<u>Pledgor</u>"), in favor of UBS AG, STAMFORD BRANCH, in its capacity as collateral agent pursuant to the DIP Credit Agreement (as hereinafter defined), as pledgee, assignee and secured party (in such capacities and together with any successors in such capacities, the "<u>Collateral Agent</u>").

## RECITALS:

A.  On [_____], 2010 (the "<u>Petition Date</u>"), the Borrower and the Guarantors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") (each a "<u>Chapter 11 Case</u>" and collectively, the "<u>Chapter 11 Cases</u>"). From and after the Petition Date, the Borrower and the Guarantors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.  The Borrower, the Guarantors, the Collateral Agent and the lending institutions listed therein (the "<u>Lenders</u>") have, in connection with the execution and delivery of this Agreement, entered into that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of [_____], 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>").

C.  Each Guarantor has, pursuant to the DIP Credit Agreement, unconditionally guaranteed the Secured Obligations.

D.  The Borrower and each Guarantor will receive substantial benefits from the execution, delivery and performance of the obligations under the DIP Credit Agreement and the other Loan Documents and each is, therefore, willing to enter into this Agreement.

E.  This Agreement is given by each Pledgor in favor of the Collateral Agent for the benefit of the Secured Parties (as hereinafter defined) to secure the payment and performance of all of the Secured Obligations.

F.  It is a condition to (i) the obligations of the Lenders to make the Loans under the DIP Credit Agreement and (ii) the performance of the obligations of the Secured Parties under Hedging Agreements that constitute Secured Obligations that each Pledgor execute and deliver the applicable Loan Documents, including this Agreement.

G. The execution, delivery and performance of this Agreement and the grant of a security interest, pledge and Lien on all of the Pledged Collateral (as hereinafter defined) of Pledgors and the proceeds thereof to secure the Secured Obligations have been authorized pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code by the Interim Order and, after the entry thereof by the Bankruptcy Court, will have been so authorized by the Final Order;

H. From and after the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Secured Obligations will constitute allowed super-priority administrative expense claims in each of the Chapter 11 Cases, having priority over all administrative expense claims and unsecured claims against the Pledgors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out (as defined in the DIP Credit Agreement); and

I. To supplement the Orders without in any way diminishing or limiting the effect of the Orders or the security interest, pledge and Lien granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interest, pledge, and Lien.

## **AGREEMENT:**

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Pledgor and the Collateral Agent hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

SECTION 1.1.    Definitions.

(a)    Unless otherwise defined herein or in the DIP Credit Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC; provided that in any event, the following terms shall have the meanings assigned to them in the UCC:

"Account Debtor"; "Accounts"; "Bank"; "Chattel Paper"; "Commercial Tort Claim"; "Commodity Account"; "Commodity Contract"; "Commodity Intermediary"; "Documents"; "Electronic Chattel Paper"; "Entitlement Order"; "Equipment"; "Financial Asset"; "Fixtures"; "Goods", "Inventory"; "Letter-of-Credit Rights"; "Letters of Credit"; "Money"; "Payment Intangibles"; "Proceeds"; " Records"; "Securities Account"; "Securities Intermediary"; "Supporting Obligations"; and "Tangible Chattel Paper."

2

(b)     Terms used but not otherwise defined herein that are defined in the DIP Credit Agreement shall have the meanings given to them in the DIP Credit Agreement.

(c)     The following terms shall have the following meanings:

"Agreement" shall have the meaning assigned to such term in the Preamble hereof.

"Avoidance Actions" shall mean all claims and causes of action arising under all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, 553 or 724(a) of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar federal or state law.

"Borrower" shall have the meaning assigned to such term in the Preamble hereof.

"Collateral Agent" shall have the meaning assigned to such term in the Preamble hereof.

"Collateral Support" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Pledged Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Commodity Account Control Agreement" shall mean a commodity account control agreement in a form that is reasonably satisfactory to the Collateral Agent.

"Contracts" shall mean, collectively, with respect to each Pledgor, the Acquisition Documents, all sale, service, performance, equipment or property lease contracts, agreements and grants and all other contracts, agreements or grants (in each case, whether written or oral, or third party or intercompany), between such Pledgor and third parties, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof.

"Control" shall mean (i) in the case of each Deposit Account, "control," as such term is defined in Section 9-104 of the UCC, (ii) in the case of any Security Entitlement, "control," as such term is defined in Section 8-106 of the UCC, and (iii) in the case of any Commodity Contract, "control," as such term is defined in Section 9-106 of the UCC.

"Control Agreements" shall mean, collectively, the Deposit Account Control Agreement, the Securities Account Control Agreement and the Commodity Account Control Agreement.

"Copyrights" shall mean, collectively, with respect to each Pledgor, all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Pledgor, in each case, whether now owned or hereafter created or acquired by or assigned to such Pledgor (excluding any copyrighted subject matter created hereafter by such Pledgor for a third party to

3

be owned by such third party in the ordinary course of such Pledgor's business), together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof; (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Deposit Account Control Agreement" shall mean an agreement in a form that is reasonably satisfactory to the Collateral Agent establishing the Collateral Agent's Control with respect to any Deposit Account.

"Deposit Accounts" shall mean, collectively, with respect to each Pledgor, (i) all "deposit accounts" as such term is defined in the UCC and in any event shall include all accounts and sub-accounts relating to any of the foregoing accounts and (ii) all cash, funds, checks, notes and instruments from time to time on deposit in any of the accounts or sub-accounts described in clause (i) of this definition.

"DIP Credit Agreement" shall have the meaning assigned to such term in Recital A hereof.

"Distributions" shall mean, collectively, with respect to each Pledgor, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Pledged Securities, from time to time received, receivable or otherwise distributed to such Pledgor in respect of or in exchange for any or all of the Pledged Securities or Intercompany Notes.

"Excluded Property" shall mean

(a)     any permit or license issued by a Governmental Authority to any Pledgor or any agreement to which any Pledgor is a party, in each case, only to the extent and for so long as the terms of such permit, license or agreement or any Requirement of Law applicable thereto, validly prohibit the creation by such Pledgor of a security interest in such permit, license or agreement in favor of the Collateral Agent (after giving effect to Sections 9-406(d), 9-407(a), 9-408(a) or 9-409 of the UCC (or any successor provision or provisions) or any other applicable law (including the Bankruptcy Code) or principles of equity), and

(b)     Equipment owned by any Pledgor on the date hereof or hereafter acquired that is subject to a Lien securing a Purchase Money Obligation or Capital Lease Obligation permitted to be incurred pursuant to the provisions of the DIP Credit Agreement if the contract or other agreement in which such Lien is granted (or the documentation providing for such Purchase Money Obligation or Capital Lease Obligation) validly prohibits the creation of any other Lien on such Equipment;

4

provided, however, that Excluded Property shall not include any Proceeds, substitutions or replacements of any Excluded Property referred to in clause (a) or (b) (unless such Proceeds, substitutions or replacements would constitute Excluded Property referred to in clause (a) or (b)).

"First Priority" shall mean, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is the most senior Lien to which such Collateral is subject (except as otherwise expressly set forth in the DIP Credit Agreement and subject to Senior Liens, the Carve Out and to the Liens permitted under Section 6.02(j) (with respect to Capital Lease Obligations) and Section 6.02(t) of the Credit Agreement).

"General Intangibles" shall mean, collectively, with respect to each Pledgor, all "general intangibles," as such term is defined in the UCC, of such Pledgor and, in any event, shall include (i) all of such Pledgor's rights, title and interest in, to and under all Contracts and insurance policies (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract), (ii) all know-how and warranties relating to any of the Pledged Collateral or the Mortgaged Property, (iii) any and all other rights, claims, choses-in-action and causes of action of such Pledgor against any other person and the benefits of any and all collateral or other security given by any other person in connection therewith, (iv) all guarantees, endorsements and indemnifications on, or of, any of the Pledged Collateral or any of the Mortgaged Property, (v) all lists, books, records, correspondence, ledgers, printouts, files (whether in printed form or stored electronically), tapes and other papers or materials containing information relating to any of the Pledged Collateral or any of the Mortgaged Property, including all customer or tenant lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, appraisals, recorded knowledge, surveys, studies, engineering reports, test reports, manuals, standards, processing standards, performance standards, catalogs, research data, computer and automatic machinery software and programs and the like, field repair data, accounting information pertaining to such Pledgor's operations or any of the Pledged Collateral or any of the Mortgaged Property and all media in which or on which any of the information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data, (vi) all licenses, consents, permits, variances, certifications, authorizations and approvals, however characterized, now or hereafter acquired or held by such Pledgor, including building permits, certificates of occupancy, environmental certificates, industrial permits or licenses and certificates of operation and (vii) all rights to reserves, deferred payments, deposits, refunds, indemnification of claims and claims for tax or other refunds against any Governmental Authority.

"Goodwill" shall mean, collectively, with respect to each Pledgor, the goodwill connected with such Pledgor's business including all goodwill connected with (i) the use of and symbolized by any Intellectual Property Collateral in which such Pledgor has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill and (iii) all product lines of such Pledgor's business.

5

"Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Instruments" shall mean, collectively, with respect to each Pledgor, all "instruments," as such term is defined in Article 9, rather than Article 3, of the UCC, and shall include all promissory notes, drafts, bills of exchange or acceptances.

"Intellectual Property Collateral" shall mean, collectively, the Patents, Trademarks, Copyrights, Intellectual Property Licenses and Goodwill.

"Intellectual Property Licenses" shall mean, collectively, with respect to each Pledgor, all license and distribution agreements with, and covenants not to sue, any other party with respect to any Patent, Trademark or Copyright or any other patent, trademark or copyright, whether such Pledgor is a licensor or licensee, distributor or distributee under any such license or distribution agreement, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements or violations thereof, (iii) rights to sue for past, present and future infringements or violations thereof and (iv) other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights or any other patent, trademark or copyright.

"Intercompany Notes" shall mean, with respect to each Pledgor, all intercompany notes described in Schedule 10 to the Perfection Certificate and intercompany notes hereafter acquired by such Pledgor and all certificates, instruments or agreements evidencing such intercompany notes, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof to the extent permitted pursuant to the terms hereof.

"Investment Property" shall mean a security, whether certificated or uncertificated, Security Entitlement, Securities Account, Commodity Contract or Commodity Account, excluding, however, the Securities Collateral.

"Joinder Agreement" shall mean an agreement substantially in the form of Exhibit 3 hereto.

"Material Intellectual Property Collateral" shall mean any Intellectual Property Collateral that is material (i) to the use and operation of the Pledged Collateral or Mortgaged Property or (ii) to the business, results of operations, prospects or condition, financial or otherwise, of any Pledgor.

"Mortgaged Property" shall have the meaning assigned to such term in the Mortgages.

"Patents" shall mean, collectively, with respect to each Pledgor, all patents issued or assigned to, and all patent applications and registrations made by, such Pledgor (whether established or registered or recorded in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable

6

law with respect to such Pledgor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Perfection Certificate" shall mean that certain perfection certificate dated [_____], 2010, executed and delivered by each Pledgor in favor of the Collateral Agent for the benefit of the Secured Parties, and each other Perfection Certificate (which shall be in form and substance reasonably acceptable to the Collateral Agent) executed and delivered by the applicable Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties contemporaneously with the execution and delivery of each Joinder Agreement executed in accordance with Section 3.5 hereof, in each case, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the DIP Credit Agreement.

"Pledge Amendment" shall have the meaning assigned to such term in Section 5.1 hereof.

"Pledged Collateral" shall have the meaning assigned to such term in Section 2.1 hereof.

"Pledged Securities" shall mean, collectively, with respect to each Pledgor, (i) all issued and outstanding Equity Interests of each issuer set forth on Schedules 9(a]) and 9(b) to the Perfection Certificate as being owned by such Pledgor and all options, warrants, rights, agreements and additional Equity Interests of whatever class of any such issuer acquired by such Pledgor (including by issuance), together with all rights, privileges, authority and powers of such Pledgor relating to such Equity Interests in each such issuer or under any Organizational Document of each such issuer, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such Equity Interests, (ii) all Equity Interests of any issuer, which Equity Interests are hereafter acquired by such Pledgor (including by issuance) and all options, warrants, rights, agreements and additional Equity Interests of whatever class of any such issuer acquired by such Pledgor (including by issuance), together with all rights, privileges, authority and powers of such Pledgor relating to such Equity Interests or under any Organizational Document of any such issuer, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such Equity Interests, from time to time acquired by such Pledgor in any manner, and (iii) all Equity Interests issued in respect of the Equity Interests referred to in clause (i) or (ii) upon any consolidation or merger of any issuer of such Equity Interests; provided, however, that Pledged Securities shall not include any Equity Interests which are not required to be pledged pursuant to Section 5.11(b) of the DIP Credit Agreement.

"Pledgor" shall have the meaning assigned to such term in the Preamble hereof.

7

"Receivables" shall mean all (i) Accounts and (ii) Chattel Paper, Payment Intangibles, General Intangibles and Instruments, in each case to the extent they represent rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the UCC together with all of Pledgors' rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Records relating thereto.

"Securities Account Control Agreement" shall mean an agreement in a form that is reasonably satisfactory to the Collateral Agent establishing the Collateral Agent's Control with respect to any Securities Account.

"Securities Collateral" shall mean, collectively, the Pledged Securities, the Intercompany Notes and the Distributions.

"Trademarks" shall mean, collectively, with respect to each Pledgor, all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locations (URL's), domain names, corporate names and trade names, whether registered or unregistered, owned by or assigned to such Pledgor and all registrations and applications for the foregoing (whether statutory or common law and whether established or registered in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's and the Secured Parties' security interest in any item or portion of the Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

SECTION 1.2.    Interpretation.  The rules of interpretation specified in the DIP Credit Agreement (including Section 1.03 thereof) shall be applicable to this Agreement.

SECTION 1.3.    Resolution of Drafting Ambiguities.  Each Pledgor acknowledges and agrees that it was represented by counsel in connection with the execution and delivery hereof, that it and its counsel reviewed and participated in the preparation and negotiation hereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party (i.e., the Collateral Agent) shall not be employed in the interpretation hereof.

8

SECTION 1.4.    Perfection Certificate.  The Collateral Agent and each Secured
Party agree that the Perfection Certificate and all descriptions of Pledged Collateral, schedules,
amendments and supplements thereto are and shall at all times remain a part of this Agreement.


ARTICLE II

GRANT OF SECURITY AND SECURED OBLIGATIONS


SECTION 2.1.    Grant of Security Interest.  As collateral security for the
payment and performance in full of all the Secured Obligations, each Pledgor hereby pledges and
grants to the Collateral Agent for the benefit of the Secured Parties, a lien on and security interest
in all of the right, title and interest of such Pledgor in, to and under the following property,
wherever located, and whether now existing or hereafter arising or acquired from time to time
(collectively, the "Pledged Collateral"):

(i)     all Accounts;

(ii)    all Equipment, Goods, Inventory and Fixtures;

(iii)   all Documents, Instruments and Chattel Paper;

(iv)    all Letters of Credit and Letter-of-Credit Rights;

(v)     all Securities Collateral;

(vi)    all Investment Property;

(vii)   all Intellectual Property Collateral;

(viii)  the Commercial Tort Claims described on Schedule 12 to the Perfection
        Certificate;

(ix)    all General Intangibles;

(x)     all Money and all Deposit Accounts;

(xi)    all Supporting Obligations;

(xii)   all books and records relating to the Pledged Collateral;

(xiii)  all Avoidance Actions; and

(xiv)   to the extent not covered by clauses (i) through (xiii) of this sentence, all
        other personal property of such Pledgor, whether tangible or intangible,
        and all Proceeds and products of each of the foregoing and all accessions
        to, substitutions and replacements for, and rents, profits and products of,
        each of the foregoing, any and all Proceeds of any insurance, indemnity,

9

warranty or guaranty payable to such Pledgor from time to time with respect to any of the foregoing.

Notwithstanding anything to the contrary contained in clauses (i) through (xiv) above, (a) Avoidance Actions shall be the last Pledged Collateral used to repay the Obligations and (b) the security interest created by this Agreement shall not extend to, and the term "Pledged Collateral" shall not include, any Excluded Property or any Equity Interests in Foreign Subsidiaries which would not be required to be pledged pursuant to the terms of <u>Section 5.11</u> of the DIP Credit Agreement (including Equity Interests owned by a Pledgor as of the Closing Date to the extent such Equity Interests would not be required to be pledged if acquired after the Closing Date) and (i) the Pledgors shall from time to time at the request of the Collateral Agent give written notice to the Collateral Agent identifying in reasonable detail any material Excluded Property and shall provide to the Collateral Agent such other information regarding the Excluded Property as the Collateral Agent may reasonably request and (ii) from and after the Closing Date, no Pledgor shall permit to become effective in any document creating, governing or providing for any permit, license or agreement a provision that would prohibit the creation of a Lien on such permit, license or agreement in favor of the Collateral Agent unless such Pledgor believes, in its reasonable judgment, that such prohibition is usual and customary in transactions of such type.

SECTION 2.2.    <u>Filings</u>.

(a)    Each Pledgor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Pledged Collateral, including (i) whether such Pledgor is an organization, the type of organization and any organizational identification number issued to such Pledgor, (ii) any financing or continuation statements or other documents without the signature of such Pledgor where permitted by law, including the filing of a financing statement describing the Pledged Collateral as "all assets now owned or hereafter acquired by the Pledgor or in which Pledgor otherwise has rights" and (iii) in the case of a financing statement filed as a fixture filing or covering Pledged Collateral constituting minerals or the like to be extracted or timber to be cut, a sufficient description of the real property to which such Pledged Collateral relates. Each Pledgor agrees to provide all information described in the immediately preceding sentence to the Collateral Agent promptly upon request by the Collateral Agent.

(b)    Each Pledgor hereby ratifies its authorization for the Collateral Agent to file in any relevant jurisdiction any financing statements relating to the Pledged Collateral if filed prior to the date hereof.

10

ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;

USE OF PLEDGED COLLATERAL

SECTION 3.1.    Delivery of Certificated Securities Collateral.  Each Pledgor represents and warrants that, to the extent not otherwise delivered to the Pre-Petition First Lien Agent in connection with the Pre-Petition First Lien Credit Agreement prior to the Closing Date, all certificates, agreements or instruments representing or evidencing the Securities Collateral pledged pursuant to Section 2.1 in existence on the date hereof have been delivered to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank and that the Collateral Agent has a perfected First Priority security interest therein.  Each Pledgor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral acquired by such Pledgor after the date hereof shall promptly (but in any event within ten Business Days after receipt thereof by such Pledgor) be delivered to and held by or on behalf of the Collateral Agent pursuant hereto. All such certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Collateral Agent.  The Collateral Agent shall have the right, at any time upon the occurrence and during the continuance of any Event of Default, to endorse, assign or otherwise transfer to or to register in the name of the Collateral Agent or any of its nominees or endorse for negotiation any or all of such Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder.  In addition, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right at any time to exchange certificates representing or evidencing such Securities Collateral for certificates of smaller or larger denominations.

SECTION 3.2.    Perfection of Uncertificated Securities Collateral.  Each Pledgor represents and warrants that, upon the entry of the Interim Order, the Collateral Agent has a perfected First Priority security interest in all uncertificated Pledged Securities pledged by it hereunder that are in existence on the date hereof.  Each Pledgor hereby agrees that if any of the Pledged Securities are at any time not evidenced by certificates of ownership, then each applicable Pledgor shall, to the extent permitted by applicable law, (i) cause the issuer to execute and deliver to the Collateral Agent an acknowledgment of the pledge of such Pledged Securities substantially in the form of Exhibit 1 hereto or such other form that is reasonably satisfactory to the Collateral Agent, (ii) execute any customary pledge forms or other documents necessary or appropriate to complete the pledge and give the Collateral Agent the right to transfer such Pledged Securities under the terms hereof and (iii) upon request by the Collateral Agent, provide to the Collateral Agent an opinion of counsel, in form and substance reasonably satisfactory to the Collateral Agent, confirming such pledge and perfection thereof.

SECTION 3.3.    Financing Statements and Other Filings; Maintenance of Perfected Security Interest.  Each Pledgor represents and warrants that all financing statements, agreements, instruments and other documents necessary to perfect, subject to the terms of the Loan Documents, the security interest granted by it to the Collateral Agent in respect of the

11

Pledged Collateral have been delivered to the Collateral Agent in completed and, to the extent necessary or appropriate, duly executed form for filing in each governmental, municipal or other office specified in Schedule 6 to the Perfection Certificate. Each Pledgor agrees that at the sole cost and expense of the Pledgors, such Pledgor will maintain the security interest created by this Agreement in the Pledged Collateral as a perfected First Priority security interest.

      SECTION 3.4.   Other Actions.  In order to further ensure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Collateral Agent's security interest in the Pledged Collateral, each Pledgor represents and warrants (as to itself) as follows and agrees, in each case at such Pledgor's own expense, to take the following actions with respect to the following Pledged Collateral:

      (a)   Instruments and Tangible Chattel Paper.  As of the date hereof, no amount individually or in the aggregate in excess of $500,000] payable under or in connection with any of the Pledged Collateral are evidenced by any Instrument or Tangible Chattel Paper other than such Instruments and Tangible Chattel Paper listed in Schedule 10 to the Perfection Certificate. Each Instrument and each item of Tangible Chattel Paper listed in Schedule 10 to the Perfection Certificate has been properly endorsed, assigned and delivered to the Collateral Agent, accompanied by instruments of transfer or assignment duly executed in blank. If any amount then payable under or in connection with any of the Pledged Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, and such amount, together with all amounts payable evidenced by any Instrument or Tangible Chattel Paper existing at such time and not previously delivered to the Collateral Agent exceeds $500,000 in the aggregate for all Pledgors, the Pledgor acquiring such Instrument or Tangible Chattel Paper shall promptly (but in any event within ten Business Days after receipt thereof) endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time specify.

      (b)   Deposit Accounts.  Each Pledgor hereby represents, warrants and covenants that (i) as of the date hereof, each Pledgor has neither opened nor maintains any Deposit Accounts other than the accounts listed in Schedule 13 to the Perfection Certificate, (ii) each Pledgor will, on the Closing Date, execute and deliver a Control Agreement in a form that is reasonably satisfactory to Collateral Agent with respect to the Deposit Accounts listed on Schedule 13 to the Perfection Certificate or close such accounts, except in each case to the extent the aggregate amount maintained in any such Deposit Account together with all amounts maintained in all other Deposit Accounts, Securities Accounts and Commodity Accounts not subject to a Control Agreement does not exceed at any time $500,000, and (iii) as of the date each such Control Agreement is executed, the Collateral Agent will have a perfected First Priority security interest in such Deposit Accounts by Control (except to the extent a Control Agreement is not required with respect to any Deposit Accounts pursuant to clause (ii) above). No Pledgor shall hereafter establish and maintain any Deposit Account unless (1) it shall have given the Collateral Agent 10 days' (or such shorter period as may be agreed to be in writing by the Collateral Agent in its sole discretion) prior written notice of its intention to establish such new Deposit Account with a Bank and (2) such Bank and such Pledgor shall have duly executed and delivered to the Collateral Agent a Deposit Account Control

Agreement (or an amendment to an existing Deposit Account Control Agreement) in a form as may be reasonably acceptable to the Collateral Agent. The Collateral Agent agrees with each Pledgor that the Collateral Agent shall not give any instructions directing the disposition of funds from time to time credited to any Deposit Account or withhold any withdrawal rights from such Pledgor with respect to funds from time to time credited to any Deposit Account unless an Event of Default has occurred and is continuing. The provisions of this Section 3.4(b) shall not apply to any Deposit Accounts for which the Collateral Agent is the Bank. No Pledgor shall grant Control of any Deposit Account to any person other than the Collateral Agent, the Pre-Petition First Lien Collateral Agent or the Pre-Petition Second Lien Agent.

(c) Securities Accounts and Commodity Accounts. (i) Each Pledgor hereby represents, warrants and covenants that (i) as of the date hereof, each Pledgor has neither opened nor maintains any Securities Accounts or Commodity Accounts other than the accounts listed in Schedule 13 to the Perfection Certificate, (ii) each Pledgor will, on the Closing Date, execute and deliver a Control Agreement in a form that is reasonably satisfactory to Collateral Agent with respect to the Securities Accounts and Commodity Accounts listed on Schedule 13 to the Perfection Certificate or close such accounts, except in each case to the extent the aggregate amount maintained in any such Securities Account or Commodity Account together with all amounts maintained in all other Deposit Accounts, Securities Accounts and Commodity Accounts not subject to a Control Agreement does not exceed at any time $500,000, and (iii) as of the date each such Control Agreement is executed and upon entry of the Interim Order, the Collateral Agent will have a perfected First Priority security interest in such Securities Accounts and Commodity Accounts by Control (except to the extent a Control Agreement is not required with respect to any Deposit Accounts pursuant to clause (ii) above). No Pledgor shall hereafter establish and maintain any Securities Account or Commodity Account with any Securities Intermediary or Commodity Intermediary unless (1) it shall have given the Collateral Agent 10 days' (or such shorter period as may be agreed to in writing by Collateral Agent in its sole discretion) prior written notice of its intention to establish such new Securities Account or Commodity Account with such Securities Intermediary or Commodity Intermediary and (2) such Securities Intermediary or Commodity Intermediary, as the case may be, and such Pledgor shall have duly executed and delivered a Control Agreement with respect to such Securities Account or Commodity Account, as the case may be. The Collateral Agent shall not give any Entitlement Orders or instructions or directions to any issuer of uncertificated securities, Securities Intermediary or Commodity Intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by such Pledgor, unless an Event of Default has occurred and is continuing or, after giving effect to any such investment and withdrawal rights, would occur. The provisions of this Section 3.4(c) shall not apply to any Financial Assets credited to a Securities Account for which the Collateral Agent is the Securities Intermediary. No Pledgor shall grant Control over any Investment Property to any person other than the Collateral Agent, the Pre-Petition First Lien Collateral Agent or the Pre-Petition Second Lien Collateral Agent.

(ii) As between the Collateral Agent and the Pledgors, the Pledgors shall bear the investment risk with respect to the Investment Property and Pledged Securities, and

the risk of loss of, damage to, or the destruction of the Investment Property and Pledged Securities, whether in the possession of, or maintained as a Security Entitlement or deposit by, or subject to the Control of, the Collateral Agent, any Pre-Petition Agent, a Securities Intermediary, a Commodity Intermediary, any Pledgor or any other person; provided, however, that nothing contained in this Section 3.4(c) shall release or relieve any Securities Intermediary or Commodity Intermediary of its duties and obligations to the Pledgors or any other Person under any Control Agreement or under applicable law.

(d)     Electronic Chattel Paper and Transferable Records. As of the date hereof, no amount individually or in the aggregate in excess of $500,000 under or in connection with any of the Pledged Collateral is evidenced by any Electronic Chattel Paper or any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction). If any amount payable under or in connection with any of the Pledged Collateral shall be evidenced by any Electronic Chattel Paper or any transferable record, the Pledgor acquiring such Electronic Chattel Paper or transferable record shall promptly notify the Collateral Agent thereof and shall take such action as the Collateral Agent may reasonably request to vest in the Collateral Agent control of such Electronic Chattel Paper under Section 9-105 of the UCC or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The requirement in the preceding sentence shall not apply to the extent that such amount, together with all amounts payable evidenced by Electronic Chattel Paper or any transferable record in which the Collateral Agent has not been vested control within the meaning of the statutes described in the immediately preceding sentence, does not exceed $500,000 in the aggregate for all Pledgors. The Collateral Agent agrees with such Pledgor that the Collateral Agent will arrange, pursuant to procedures satisfactory to the Collateral Agent and so long as such procedures will not result in the Collateral Agent's loss of control, for the Pledgor to make alterations to the Electronic Chattel Paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to allow without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by such Pledgor with respect to such Electronic Chattel Paper or transferable record.

(e)     Letter-of-Credit Rights. If any Pledgor is at any time a beneficiary under a Letter of Credit now or hereafter issued, such Pledgor shall promptly notify the Collateral Agent thereof and such Pledgor shall, at the request of the Collateral Agent, pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, either (i) arrange for the issuer and any confirmer of such Letter of Credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under the Letter of Credit or (ii) arrange for the Collateral Agent to become the transferee beneficiary of such Letter of Credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under the Letter of Credit are to be applied as provided in the DIP Credit Agreement. The actions in the preceding sentence shall not be required to the extent that

14

the amount of any such Letter of Credit, together with the aggregate amount of all other Letters of Credit for which the actions described above in clause (i) and (ii) have not been taken, does not exceed $500,000 in the aggregate for all Pledgors.

(f)     Commercial Tort Claims.  As of the date hereof, each Pledgor hereby represents and warrants that it holds no Commercial Tort Claims other than those listed in Schedule 12 to the Perfection Certificate.  If any Pledgor shall at any time hold or acquire a Commercial Tort Claim, such Pledgor shall immediately notify the Collateral Agent in a writing signed by such Pledgor of the brief details thereof and grant to the Collateral Agent in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Collateral Agent.  The requirement in the preceding sentence shall not apply to the extent that the amount of such Commercial Tort Claim, together with the amount of all other Commercial Tort Claims held by any Pledgor in which the Collateral Agent does not have a security interest, does not exceed $500,000 in the aggregate for all Pledgors.

(g)     Account Verification.  Whether or not a Default or Event of Default exists, Collateral Agent shall have the right at any time, in the name of the Collateral Agent, any designee of Collateral Agent or any Pledgor, to engage in any reasonable procedure to verify the validity, amount or any other matter relating to any Accounts of any Pledgor by mail, telephone or otherwise.  Pledgors shall cooperate fully with the Collateral Agent in an effort to facilitate and promptly conclude any such verification process.

SECTION 3.5.     Joinder of Additional Guarantors.  The Pledgors shall cause each Subsidiary of the Borrower which, from time to time, after the date hereof shall be required to pledge any assets to the Collateral Agent for the benefit of the Secured Parties pursuant to the provisions of the DIP Credit Agreement, (a) to execute and deliver to the Collateral Agent (i) a Joinder Agreement substantially in the form of Exhibit 3 hereto within ten (10) days of the date on which it was acquired or created and (ii) a Perfection Certificate, in each case, within ten (10) days of the date on which it was acquired or created (or such later date as may be agreed by the Collateral Agent) and upon such execution and delivery, such Subsidiary shall constitute a "Guarantor" and a "Pledgor" for all purposes hereunder with the same force and effect as if originally named as a Guarantor and Pledgor herein.  The execution and delivery of such Joinder Agreement shall not require the consent of any Pledgor hereunder.  The rights and obligations of each Pledgor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor and Pledgor as a party to this Agreement.

SECTION 3.6.     Supplements; Further Assurances.  Each Pledgor shall take such further actions, and execute and/or deliver to the Collateral Agent such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as the Collateral Agent may in its reasonable judgment deem necessary or appropriate in order to create, perfect, preserve and protect the security interest in the Pledged Collateral as provided herein and the rights and interests granted to the Collateral Agent hereunder, to carry into effect the purposes hereof or better to assure and confirm the validity, enforceability and priority of the Collateral Agent's security interest in the Pledged Collateral or permit the Collateral Agent to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged

15

Collateral, including the filing of financing statements, continuation statements and other documents (including this Agreement) under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interest created hereby and the execution and delivery of Control Agreements, all in form reasonably satisfactory to the Collateral Agent and in such offices (including the United States Patent and Trademark Office and the United States Copyright Office) wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest in the Pledged Collateral as provided herein and to preserve the other rights and interests granted to the Collateral Agent hereunder, as against third parties, with respect to the Pledged Collateral. Without limiting the generality of the foregoing, each Pledgor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Collateral Agent from time to time upon reasonable request by the Collateral Agent such lists, schedules, descriptions and designations of the Pledged Collateral, copies of warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as the Collateral Agent shall reasonably request. If an Event of Default has occurred and is continuing, the Collateral Agent may institute and maintain, in its own name or in the name of any Pledgor, such suits and proceedings as the Collateral Agent may be advised by counsel shall be necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Pledged Collateral. All of the foregoing shall be at the sole cost and expense of the Pledgors (subject to Section 10.03 of the DIP Credit Agreement). The Pledgors and the Collateral Agent acknowledge that this Agreement is intended to grant to the Collateral Agent for the benefit of the Secured Parties a security interest in and First Priority Lien upon the Pledged Collateral and shall not constitute or create a present assignment of any of the Pledged Collateral.

## ARTICLE IV

## REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Pledgor represents, warrants and covenants as follows:

SECTION 4.1.    Title.    At all times after the Petition Date and upon entry of the Interim Order, the Secured Obligations shall be allowed super-priority administrative expense claim in each of the Chapter 11 Cases having priority over all administrative expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), (upon entry of the Final Order) 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out, and except for the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and Permitted Liens, such Pledgor owns and has rights and, as to Pledged Collateral acquired by it from time to time after the date hereof, will own and have rights in each item of Pledged Collateral pledged by it hereunder, free and clear of

any and all Liens or claims of others. In addition, no Liens or claims exist on the Securities Collateral, other than as permitted by Section 6.02 of the DIP Credit Agreement.

SECTION 4.2. Validity of Security Interest. The security interest in and Lien on the Pledged Collateral granted to the Collateral Agent for the benefit of the Secured Parties hereunder constitutes (a) a legal and valid security interest in all the Pledged Collateral securing the payment and performance of the Secured Obligations, and (b) subject to the Orders and the filings and other actions described in Schedule 6 to the Perfection Certificate (to the extent required to be listed on the schedules to the Perfection Certificate as of the date this representation is made or deemed made), a perfected First Priority security interest in all the Pledged Collateral to the extent required by the Loan Documents and subject to the deliveries contemplated pursuant to Section 3.1 and Section 3.4 and the filings contemplated pursuant to Section 3.3. The security interest and Lien granted to the Collateral Agent for the benefit of the Secured Parties under the Interim Order (and, when entered, the Final Order) and pursuant to this Agreement in and on the Pledged Collateral will at all times constitute a perfected First Priority, continuing security interest therein, prior to all other Liens on the Pledged Collateral. Notwithstanding anything to the contrary in any of the Loan Documents, no Loan Party shall be deemed to make any representation hereunder or under the DIP Credit Agreement with respect to any foreign Requirements of Law that may affect the validity or perfection of any security interest purported to be granted under any Security Document.

SECTION 4.3. Defense of Claims; Transferability of Pledged Collateral. Subject to Section 5.05 of the DIP Credit Agreement, each Pledgor shall, at its own cost and expense, defend title to the Pledged Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Collateral Agent and the priority thereof (as provided in Section 2.20 of the DIP Credit Agreement) against all claims and demands of all persons, at its own cost and expense (subject to Section 10.03 of the DIP Credit Agreement), at any time claiming any interest therein adverse to the Collateral Agent or any other Secured Party other than Permitted Liens. Except as may arise in connection with the Chapter 11 Cases, there is no agreement, order, judgment or decree, and no Pledgor shall enter into any agreement or take any other action, that would materially impair or conflict with such Pledgor's obligations or the rights of the Collateral Agent hereunder except as otherwise expressly permitted in the Loan Documents.

SECTION 4.4. Other Financing Statements. It has not filed, nor authorized any third party to file (nor will there be), any valid or effective financing statement (or similar statement, instrument of registration or public notice under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Pledged Collateral, except such as have been filed in favor of the Collateral Agent pursuant to this Agreement, the Pre-Petition First Lien Credit Agreement, the Pre-Petition Second Lien Credit Agreement or in favor of any holder of a Lien that constitutes a Permitted Lien with respect to such Lien that constitutes a Permitted Lien or financing statements or public notices relating to the termination statements listed on Schedule 8 to the Perfection Certificate. No Pledgor shall execute, authorize or permit to be filed in any public office any financing statement (or similar statement, instrument of registration or public notice under the law of any jurisdiction) relating to any Pledged Collateral, except financing statements and other statements and instruments filed or to be filed in respect of and covering the security interests granted by such Pledgor to the holder of a Lien constituting a Permitted Liens.

17

SECTION 4.5.   Location of Inventory and Equipment.  All Equipment and Inventory of such Pledgor located in the United States is located at the chief executive office or such other location listed in the Schedules of the Perfection Certificate as of the date hereof, except to the extent the aggregate value of all such Equipment and Inventory at all such locations in the United States not so listed at any one time does not exceed $500,000.  It shall not move any Equipment or Inventory to any location in the United States, other than any location that is listed in the relevant Schedules to the Perfection Certificate, unless it promptly notifies the Collateral Agent in writing of its intention so to do, clearly describing such new location and providing such other information in connection therewith as the Collateral Agent may request; provided that (i) in no event shall any Equipment be moved from a location in the United States to any location outside of the continental United States, other than any Equipment that is moved in the ordinary course of business and (ii) in no event any Inventory that constitutes finished goods shall be moved from a location in the United States to any location outside of the continental United States, other than any such Inventory that is moved (A) pursuant to sales contracts in the ordinary course of business or (B) in connection with any reworking or retooling.

SECTION 4.6.   Due Authorization and Issuance.  All of the Pledged Securities existing on the date hereof have been, and to the extent any Pledged Securities are hereafter issued, such Pledged Securities will be, upon such issuance, duly authorized, validly issued and fully paid and non-assessable to the extent applicable.  There is no amount or other obligation owing by any Pledgor to any issuer of the Pledged Securities in exchange for or in connection with the issuance of the Pledged Securities or any Pledgor's status as a partner or a member of any issuer of the Pledged Securities.

SECTION 4.7.   Consents, etc..  In the event that the Collateral Agent desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other person therefor, then, upon the reasonable request of the Collateral Agent, such Pledgor agrees to use its best efforts to assist and aid the Collateral Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

SECTION 4.8.   Pledged Collateral.  All information set forth herein, including the schedules hereto, and all information contained in any documents, schedules and lists heretofore delivered to any Secured Party, including the Perfection Certificate and the schedules thereto, in connection with this Agreement, in each case, relating to the Pledged Collateral, is accurate and complete in all material respects as of the date hereof.  The Pledged Collateral described on the schedules to the Perfection Certificate constitutes all of the property of such type of Pledged Collateral owned or held by the Pledgors as of the date hereof.

SECTION 4.9.   Insurance.  In the event that the proceeds of any insurance claim are paid to any Pledgor after the Collateral Agent has exercised its right to foreclose after an Event of Default, such Net Cash Proceeds shall be held in trust for the benefit of the Collateral Agent and immediately after receipt thereof shall be paid to the Collateral Agent for application in accordance with the terms of the DIP Credit Agreement.

18

SECTION 4.10.   Secured, Super-Priority Obligations.   The provisions of this Agreement and the Orders are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests (having the priority provided for in Section 2.20 of the DIP Credit Agreement and in the Orders) in all right, title and interest in the Pledged Collateral, enforceable against each Pledgor.   Pursuant to Section 364(c)(1) of the Bankruptcy Code and the Orders, all Obligations of Pledgors under this Agreement and the DIP Credit Agreement and each other Loan Document at all times shall constitute allowed super-priority administrative expense claims in each of the Chapter 11 Cases having priority over all administrative expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in any of the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out.

ARTICLE V

CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.   Pledge of Additional Securities Collateral.   Subject to Section 5.11 of the DIP Credit Agreement, each Pledgor shall, upon obtaining any Pledged Securities or Intercompany Notes of any person, accept the same in trust for the benefit of the Collateral Agent and promptly (but in any event within ten Business Days after receipt thereof) deliver to the Collateral Agent a pledge amendment, duly executed by such Pledgor, in substantially the form of Exhibit 2 hereto (each, a "Pledge Amendment"), and the certificates and other documents required under Section 3.1 and Section 3.2 hereof in respect of the additional Pledged Securities or Intercompany Notes which are to be pledged pursuant to this Agreement, and confirming the attachment of the Lien hereby created on and in respect of such additional Pledged Securities or Intercompany Notes.   Each Pledgor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Agreement and agrees that all Pledged Securities or Intercompany Notes listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder be considered Pledged Collateral.

SECTION 5.2.   Voting Rights; Distributions, etc.

(a)   So long as no Event of Default shall have occurred and be continuing:

(i)   Each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, the DIP Credit Agreement or any other document evidencing the Secured Obligations.

(ii)   Each Pledgor shall be entitled to receive and retain, and to utilize free and clear of the Lien hereof, any and all Distributions, but only if and to the extent made in accordance with the provisions of the DIP Credit Agreement; provided, however, that any

19

and all such Distributions consisting of rights or interests in the form of securities shall be forthwith delivered to the Collateral Agent to hold as Pledged Collateral and shall, if received by any Pledgor, be received in trust for the benefit of the Collateral Agent, be segregated from the other property or funds of such Pledgor and be promptly (but in any event within ten Business Days after receipt thereof) delivered to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

(b)     So long as no Event of Default shall have occurred and be continuing, the Collateral Agent shall be deemed without further action or formality to have granted to each Pledgor all necessary consents relating to voting rights and shall, if necessary, upon written request of any Pledgor and at the sole cost and expense of the Pledgors, from time to time execute and deliver (or cause to be executed and delivered) to such Pledgor all such instruments as such Pledgor may reasonably request in order to permit such Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to Section 5.2(a)(i) hereof and to receive the Distributions which it is authorized to receive and retain pursuant to Section 5.2(a)(ii) hereof.

(c)     Upon the occurrence and during the continuance of any Event of Default:

(i)     All rights it would otherwise be entitled to exercise pursuant to Section 5.2(a)(i) hereof shall immediately cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to exercise such voting and other consensual rights until the applicable Event of Default is no longer continuing, in which case the Collateral Agent's rights under this Section 5.2(c) shall cease to be effective, subject to revesting in the event of a subsequent Event of Default that is continuing.

(ii)     All rights of each Pledgor to receive Distributions which it would otherwise be authorized to receive and retain pursuant to Section 5.2(a)(ii) hereof shall immediately cease and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to receive and hold as Pledged Collateral such Distributions until the applicable Event of Default is no longer continuing, in which case the Collateral Agent's rights under this Section 5.2(c) shall cease to be effective, subject to revesting in the event of a subsequent Event of Default that is continuing.

(d)     Each Pledgor shall, at its sole cost and expense, from time to time execute and deliver to the Collateral Agent appropriate instruments as the Collateral Agent may request in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise pursuant to Section 5.2(c)(i) hereof and to receive all Distributions which it may be entitled to receive under Section 5.2(c)(ii) hereof.

(e)     All Distributions which are received by any Pledgor contrary to the provisions of Section 5.2(c)(ii) hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of such Pledgor and shall immediately be paid over to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

NY\1619323.7

SECTION 5.3.    Defaults, etc.  As of the date hereof, no Pledgor is in default in the payment of any portion of any mandatory capital contribution, if any, required to be made under any agreement to which such Pledgor is a party relating to the Pledged Securities pledged by it.  As of the date hereof, to the knowledge of such Pledgor no Securities Collateral pledged by such Pledgor is subject to any defense, offset or counterclaim, nor have any of the foregoing been asserted or alleged against such Pledgor by any person with respect thereto, and as of the date hereof, there are no certificates, instruments, documents or other writings (other than the Organizational Documents and certificates representing such Pledged Securities that, if any, delivered to the Collateral Agent) which evidence any Pledged Securities of such Pledgor.

SECTION 5.4.    Certain Agreements of Pledgors as Issuers and Holders of Equity Interests.

(a)     In the case of each Pledgor which is an issuer of Securities Collateral, such Pledgor agrees to be bound by the terms of this Agreement relating to the Securities Collateral issued by it and will comply with such terms insofar as such terms are applicable to it.

(b)     In the case of any Pledgor which is a partner, shareholder or member, as the case may be, in a partnership, limited liability company or other entity, such Pledgor hereby consents to the extent required by the applicable Organizational Document to the pledge by each other Pledgor, pursuant to the terms hereof, of the Pledged Securities in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default, to the transfer of such Pledged Securities to the Collateral Agent or its nominee and to the substitution of the Collateral Agent or its nominee as a substituted partner, shareholder or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner, limited partner, shareholder or member, as the case may be.

ARTICLE VI

CERTAIN PROVISIONS CONCERNING INTELLECTUAL

PROPERTY COLLATERAL

SECTION 6.1.    Grant of Intellectual Property License.  For the purpose of enabling the Collateral Agent, during the continuance of an Event of Default, to exercise rights and remedies under Article IX hereof at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Pledgor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, non-exclusive license to use, assign, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by such Pledgor, wherever the same may be located.  Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

21

SECTION 6.2.    Protection of Collateral Agent's Security.  On a continuing basis, each Pledgor shall, at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Collateral Agent of any materially adverse determination in any proceeding or the institution of any proceeding in any federal, state or local court or administrative body or in the United States Patent and Trademark Office or the United States Copyright Office regarding any Material Intellectual Property Collateral, such Pledgor's right to register such Material Intellectual Property Collateral or its right to keep and maintain such registration in full force and effect, (ii) maintain all Material Intellectual Property Collateral as presently used and operated, (iii) not permit to lapse or become abandoned any Material intellectual Property Collateral, and not settle or compromise any pending or future litigation or administrative proceeding with respect to any such Material Intellectual Property Collateral, in either case except as shall be consistent with commercially reasonable business judgment, (iv) upon such Pledgor obtaining knowledge thereof, promptly notify the Collateral Agent in writing of any event which may be reasonably expected to materially and adversely affect the value or utility of any Material Intellectual Property Collateral or the rights and remedies of the Collateral Agent in relation thereto including a levy or threat of levy or any legal process against any Material Intellectual Property Collateral, (v) except in its reasonable business judgment, not license any Intellectual Property Collateral other than licenses entered into by such Pledgor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of any Intellectual Property Collateral or the Lien on and security interest in the Intellectual Property Collateral created therein hereby intended to be granted to the Collateral Agent for the benefit of the Secured Parties, (vi) until the Collateral Agent completes the exercise of its remedies with respect to Collateral hereunder, keep reasonably adequate records respecting all Intellectual Property Collateral and (vii) furnish to the Collateral Agent from time to time upon the Collateral Agent's request therefor reasonably detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to any Intellectual Property Collateral as the Collateral Agent may from time to time request.  Notwithstanding the foregoing nothing herein shall prevent any Pledgor from selling, disposing of or otherwise using any Intellectual Property Collateral as permitted under the DIP Credit Agreement.

SECTION 6.3.    After-Acquired Property.  If any Pledgor shall (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, the provisions hereof shall automatically apply thereto and any such item enumerated in the preceding clause (i) or (ii) shall automatically constitute Intellectual Property Collateral as if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.  Each Pledgor shall not later than five Business Days after the end of the then current fiscal quarter provide to the Collateral Agent written notice of any of the foregoing.  Further, each Pledgor authorizes the Collateral Agent to modify this Agreement by amending Schedules 12(a) and 12(b) to the Perfection Certificate to include any Intellectual Property Collateral of such Pledgor acquired or arising after the date hereof.

SECTION 6.4.    Litigation.  Unless there shall occur and be continuing any Event of Default, each Pledgor shall have the right to commence and prosecute in its own name, as the party in interest, for its own benefit and at the sole cost and expense of the Pledgors, such applications for protection of the Intellectual Property Collateral and suits, proceedings or other actions to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value or other damage as are necessary to protect the Intellectual Property Collateral. Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall have the right but shall in no way be obligated to file applications for protection of the Intellectual Property Collateral and/or bring suit in the name of any Pledgor, the Collateral Agent or the Secured Parties to enforce the Intellectual Property Collateral and any license thereunder. In the event of such suit, each Pledgor shall, at the reasonable request of the Collateral Agent, do any and all lawful acts and execute any and all documents requested by the Collateral Agent in aid of such enforcement and the Pledgors shall promptly reimburse and indemnify the Collateral Agent for all costs and expenses incurred by the Collateral Agent in the exercise of its rights under this Section 6.4 in accordance with Section 10.03 of the DIP Credit Agreement. In the event that the Collateral Agent shall elect not to bring suit to enforce the Intellectual Property Collateral, each Pledgor agrees, at the reasonable request of the Collateral Agent, to take all commercially reasonable actions necessary, whether by suit, proceeding or other action, to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value of or other damage to any of the Intellectual Property Collateral which is material to its business by others and for that purpose agrees to diligently maintain any suit, proceeding or other action against any Person so infringing necessary to prevent such infringement.

ARTICLE VII

CERTAIN PROVISIONS CONCERNING RECEIVABLES

SECTION 7.1.    Maintenance of Records.  Each Pledgor shall keep and maintain at its own cost and expense complete records of each Receivable, in a manner consistent with prudent business practice, including records of all payments received, all credits granted thereon, all merchandise returned and all other documentation relating thereto. Each Pledgor shall, at such Pledgor's sole cost and expense, upon the Collateral Agent's demand made at any time after the occurrence and during the continuance of any Event of Default, deliver all tangible evidence of Receivables, including all documents evidencing Receivables and any books and records relating thereto to the Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Pledgor). Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent may transfer a full and complete copy of any Pledgor's books, records, credit information, reports, memoranda and all other writings relating to the Receivables to and for the use by any person that has acquired or is contemplating acquisition of an interest in the Receivables or the Collateral Agent's security interest therein without the consent of any Pledgor.

SECTION 7.2.    Legend.  Each Pledgor shall legend, at the request of the Collateral Agent made at any time after the occurrence of any Event of Default and in form and manner satisfactory to the Collateral Agent, the Receivables and the other books, records and

23

documents of such Pledgor evidencing or pertaining to the Receivables with an appropriate reference to the fact that the Receivables have been assigned to the Collateral Agent for the benefit of the Secured Parties and that the Collateral Agent has a security interest therein.

SECTION 7.3.    Modification of Terms, etc.. No Pledgor shall rescind or cancel any obligations evidenced by any Receivable or modify any term thereof or make any adjustment with respect thereto except in the ordinary course of business, or extend or renew any such obligations except in the ordinary course of business or compromise or settle any dispute, claim, suit or legal proceeding relating thereto or sell any Receivable or interest therein except in the ordinary course of business without the prior written consent of the Collateral Agent. Each Pledgor shall timely fulfill all material obligations on its part to be fulfilled under or in connection with the Receivables.

SECTION 7.4.    Collection. Each Pledgor shall cause to be collected from the Account Debtor of each of the Receivables, as and when due in the ordinary course of business, any and all amounts owing under or on account of such Receivable, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Receivable, except that any Pledgor may, with respect to a Receivable, allow in the ordinary course of business (i) a refund or credit due as a result of returned or damaged or defective merchandise and (ii) such extensions of time to pay amounts due in respect of Receivables and such other modifications of payment terms or settlements in respect of Receivables as shall be commercially reasonable in the circumstances, all in accordance with such Pledgor's ordinary course of business. The costs and expenses (including attorneys' fees) of collection, in any case, whether incurred by any Pledgor, the Collateral Agent or any Secured Party, shall be paid by the Pledgors (subject to Section 10.03 of the DIP Credit Agreement).

ARTICLE VIII

TRANSFERS

SECTION 8.1.    Transfers of Pledged Collateral. No Pledgor shall sell, convey, assign or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral pledged by it hereunder except to the extent not prohibited by the DIP Credit Agreement.

ARTICLE IX

REMEDIES

SECTION 9.1.    Remedies. Upon the occurrence and during the continuance of any Event of Default, subject to the Orders and without further order from the Bankruptcy Court, the Collateral Agent may from time to time exercise in respect of the Pledged Collateral, in addition to the other rights and remedies provided for herein or otherwise available to it, the following remedies:

24

(i)     Personally, or by agents or attorneys, immediately take possession of the Pledged Collateral or any part thereof, from any Pledgor or any other person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon any Pledgor's premises where any of the Pledged Collateral is located, remove such Pledged Collateral, remain present at such premises to receive copies of all communications and remittances relating to the Pledged Collateral and use in connection with such removal and possession any and all services, supplies, aids and other facilities of any Pledgor;

(ii)     Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Pledged Collateral including instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Pledged Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Collateral Agent, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to any Pledgor, prior to receipt by any such obligor of such instruction, such Pledgor shall segregate all amounts received pursuant thereto in trust for the benefit of the Collateral Agent and shall promptly (but in no event later than three (3) Business Days after receipt thereof (or such date as may be agreed to in writing by Collateral Agent in its sole discretion) pay such amounts to the Collateral Agent;

(iii)     Sell, assign, grant a license to use or otherwise liquidate, or direct any Pledgor to sell, assign, grant a license to use or otherwise liquidate, any and all investments made in whole or in part with the Pledged Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, license or liquidation;

(iv)     Take possession of the Pledged Collateral or any part thereof, by directing any Pledgor in writing to deliver the same to the Collateral Agent at any place or places so designated by the Collateral Agent, in which event such Pledgor shall at its own expense: (A) forthwith cause the same to be moved to the place or places designated by the Collateral Agent and therewith delivered to the Collateral Agent, (B) store and keep any Pledged Collateral so delivered to the Collateral Agent at such place or places pending further action by the Collateral Agent and (C) while the Pledged Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition. Each Pledgor's obligation to deliver the Pledged Collateral as contemplated in this Section 9.1(iv) is of the essence hereof. Upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by any Pledgor of such obligation;

(v)     Withdraw all moneys, instruments, securities and other property in any bank, financial securities, deposit or other account of any Pledgor constituting Pledged Collateral for application to the Secured Obligations as provided in Article X hereof;

(vi)     Retain and apply the Distributions to the Secured Obligations as provided in Article X hereof;

(vii)     Exercise any and all rights as beneficial and legal owner of the Pledged Collateral, including perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Pledged Collateral; and

(viii)     Exercise all the rights and remedies of a secured party on default under the UCC, and the Collateral Agent may also in its sole discretion, without notice except as specified in Section 9.2 hereof, sell, assign or grant a license to use the Pledged Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable. The Collateral Agent or any other Secured Party or any of their respective Affiliates may be the purchaser, licensee, assignee or recipient of the Pledged Collateral or any part thereof at any such sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Pledged Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations owed to such person as a credit on account of the purchase price of the Pledged Collateral or any part thereof payable by such person at such sale. Each purchaser, assignee, licensee or recipient at any such sale shall acquire the property sold, assigned or licensed absolutely free from any claim or right on the part of any Pledgor, and each Pledgor hereby waives, to the fullest extent permitted by law, all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent shall not be obligated to make any sale of the Pledged Collateral or any part thereof regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Pledgor hereby waives, to the fullest extent permitted by law, any claims against the Collateral Agent arising by reason of the fact that the price at which the Pledged Collateral or any part thereof may have been sold, assigned or licensed at such a private sale was less than the price which might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Pledged Collateral to more than one offeree.

(ix)     In addition to the foregoing, the Collateral Agent may also exercise the remedies set forth in Paragraphs 15 and 21 of the Interim Order (with respect to the period prior to the entry of the Final Order) and the analogous section of the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, with respect to any Cash Collateral on deposit in any Deposit Account, Securities Account and/or Commodities Account subject to a Pre-Petition Control Agreement.

SECTION 9.2.     Notice of Sale. Each Pledgor acknowledges and agrees that, to the extent notice of sale or other disposition of the Pledged Collateral or any part thereof shall be required by law, ten (10) days' prior notice to such Pledgor of the time and place of any public sale or of the time after which any private sale or other intended disposition is to take place shall be commercially reasonable notification of such matters. No notification need be given to any

Pledgor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying any right to notification of sale or other intended disposition.

SECTION 9.3. <u>Waiver of Notice and Claims</u>. Each Pledgor hereby waives, to the fullest extent permitted by applicable law, notice or judicial hearing in connection with the Collateral Agent's taking possession or the Collateral Agent's disposition of the Pledged Collateral or any part thereof, including any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which such Pledgor would otherwise have under law, and each Pledgor hereby further waives, to the fullest extent permitted by applicable law with respect to any action of the Collateral Agent when an Event of Default has occurred and is continuing: (i) all damages occasioned by such taking of possession, (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Collateral Agent's rights hereunder and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable law. The Collateral Agent shall not be liable for any incorrect or improper payment made pursuant to this <u>Article IX</u> in the absence of gross negligence or willful misconduct on the part of the Collateral Agent. Any sale of, or the grant of options to purchase, or any other realization upon, any Pledged Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the applicable Pledgor therein and thereto, and shall be a perpetual bar both at law and in equity against such Pledgor and against any and all persons claiming or attempting to claim the Pledged Collateral so sold, optioned or realized upon, or any part thereof from, through or under such Pledgor.

SECTION 9.4. <u>Certain Sales of Pledged Collateral</u>.

(a) Each Pledgor recognizes that, by reason of certain prohibitions contained in law, rules, regulations or orders of any Governmental Authority, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Pledged Collateral, to limit purchasers to those who meet the requirements of such Governmental Authority. Each Pledgor acknowledges that any such sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that, except as may be required by applicable law, the Collateral Agent shall have no obligation to engage in public sales.

(b) Each Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act, and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Securities Collateral and Investment Property, to limit purchasers to persons who will agree, among other things, to acquire such Securities Collateral or Investment Property for their own account, for investment and not with a view to the distribution or resale thereof. Each Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act), and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Securities Collateral or Investment Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring

registration under the Securities Act or under applicable state securities laws, even if such issuer would agree to do so.

(c)     If the Collateral Agent determines to exercise its right to sell any or all of the Securities Collateral or Investment Property, upon written request, the applicable Pledgor shall from time to time furnish to the Collateral Agent all such information as the Collateral Agent may request in order to determine the number of securities included in the Securities Collateral or Investment Property which may be sold by the Collateral Agent as exempt transactions under the Securities Act and the rules of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(d)     Each Pledgor further agrees that a breach of any of the covenants contained in this <u>Section 9.4</u> will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this <u>Section 9.4</u> shall be specifically enforceable against such Pledgor, and such Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and is continuing.

SECTION 9.5.     <u>No Waiver; Cumulative Remedies</u>.

(a)     No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law or otherwise available.

(b)     In the event that the Collateral Agent shall have instituted any proceeding to enforce any right, power, privilege or remedy under this Agreement or any other Loan Document by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Collateral Agent, then and in every such case, the Pledgors, the Collateral Agent and each other Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Pledged Collateral, and all rights, remedies, privileges and powers of the Collateral Agent and the other Secured Parties shall continue as if no such proceeding had been instituted.

SECTION 9.6.     <u>Certain Additional Actions Regarding Intellectual Property</u>. If any Event of Default shall have occurred and be continuing, upon the written demand of the Collateral Agent, each Pledgor shall execute and deliver to the Collateral Agent an assignment or assignments of the registered Intellectual Property Collateral or such other documents as are necessary or appropriate to carry out the intent and purposes hereof; *provided, however*, that if the Event of Default is no longer continuing, the Collateral Agent shall promptly execute and deliver to each Pledgor such reassignments or other documents necessary to place such Pledgors in control and ownership of such Intellectual Property Collateral.

NY\1619323.7

ARTICLE X

APPLICATION OF PROCEEDS

SECTION 10.1. <u>Application of Proceeds</u>. The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Pledged Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, in accordance with the DIP Credit Agreement and the Orders.

ARTICLE XI

MISCELLANEOUS

SECTION 11.1. <u>Concerning Collateral Agent</u>.

(a)     The Collateral Agent has been appointed as collateral agent pursuant to the DIP Credit Agreement. The actions of the Collateral Agent hereunder are subject to the provisions of the DIP Credit Agreement. The Collateral Agent shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including the release or substitution of the Pledged Collateral), in accordance with this Agreement and the DIP Credit Agreement. Each Secured Party, by its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon any of the Pledged Collateral hereunder. The Collateral Agent may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith. The Collateral Agent may resign and a successor Collateral Agent may be appointed in the manner provided in the DIP Credit Agreement. Upon the acceptance of any appointment as the Collateral Agent by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent under this Agreement, and the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under this Agreement. After any retiring Collateral Agent's resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement while it was the Collateral Agent.

(b)     The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if such Pledged Collateral is accorded treatment substantially equivalent to that which the Collateral Agent, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Collateral Agent nor any of the Secured Parties shall have responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Securities Collateral, whether or not the Collateral Agent or any other Secured Party has or is deemed to have knowledge of such matters

29

or (ii) taking any necessary steps to preserve rights against any person with respect to any Pledged Collateral.

(c)     The Collateral Agent shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper person, and, with respect to all matters pertaining to this Agreement and its duties hereunder, upon advice of counsel selected by it.

(d)     If any item of Pledged Collateral also constitutes collateral granted to the Collateral Agent under any other deed of trust, mortgage, security agreement, pledge or instrument of any type, in the event of any conflict between the provisions hereof and the provisions of such other deed of trust, mortgage, security agreement, pledge or instrument of any type in respect of such collateral, the Collateral Agent, in its sole discretion, shall select which provision or provisions shall control.

(e)     The Collateral Agent may rely on advice of counsel as to whether any or all UCC financing statements of the Pledgors need to be amended as a result of any of the changes described in <u>Section 5.13</u> of the DIP Credit Agreement. If any Pledgor fails to provide information to the Collateral Agent about such changes on a timely basis, the Collateral Agent shall not be liable or responsible to any party for any failure to maintain a perfected security interest in such Pledgor's property constituting Pledged Collateral, for which the Collateral Agent needed to have information relating to such changes. The Collateral Agent shall have no duty to inquire about such changes if any Pledgor does not inform the Collateral Agent of such changes, the parties acknowledging and agreeing that it would not be feasible or practical for the Collateral Agent to search for information on such changes if such information is not provided by any Pledgor.

SECTION 11.2.     <u>Collateral Agent May Perform; Collateral Agent Appointed Attorney-in-Fact</u>. Except as otherwise expressly provided in the Orders, if any Pledgor shall fail to perform any covenants contained in this Agreement (including such Pledgor's covenants to (i) pay the premiums in respect of all required insurance policies hereunder, (ii) pay and discharge any taxes, assessments and special assessments, levies, fees and governmental charges imposed upon or assessed against, and landlords', carriers', mechanics', workmen's, repairmen's, laborers', materialmen's, suppliers' and warehousemen's Liens and other claims arising by operation of law against, all or any portion of the Pledged Collateral, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any obligations of such Pledgor under any Pledged Collateral, but in any case subject to the terms of the DIP Credit Agreement) or if any warranty on the part of any Pledgor contained herein shall be breached, the Collateral Agent may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; <u>provided</u>, <u>however</u>, that the Collateral Agent shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which such Pledgor fails to pay or perform as and when required hereby and which such Pledgor does not contest in accordance with the provisions of the DIP Credit Agreement. Any and all amounts so expended by the Collateral Agent shall be paid by the Pledgors in accordance with the provisions of <u>Section 10.03</u> of the DIP Credit Agreement. Neither the provisions of this <u>Section 11.2</u> nor any action taken by the Collateral Agent pursuant to the provisions of this <u>Section 11.2</u> shall

30

prevent any such failure to observe any covenant contained in this Agreement nor any breach of representation or warranty from constituting an Event of Default. Each Pledgor hereby appoints the Collateral Agent its attorney-in-fact, with full power and authority in the place and stead of such Pledgor and in the name of such Pledgor, or otherwise, from time to time following an Event of Default which is continuing in the Collateral Agent's discretion to take any action and to execute any instrument consistent with the terms of the DIP Credit Agreement, this Agreement and the other Security Documents which the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof (but the Collateral Agent shall not be obligated to and shall have no liability to such Pledgor or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. Each Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

SECTION 11.3.   Continuing Security Interest; Assignment.  This Agreement shall create a continuing security interest in the Pledged Collateral and shall (i) be binding upon the Pledgors, their respective successors and assigns and (ii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and the other Secured Parties and each of their respective permitted successors, transferees and assigns.  No other persons (including any other creditor of any Pledgor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), any Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party, herein or otherwise, subject however, to the provisions of the DIP Credit Agreement and in the case of a Secured Party that is a party to a Hedging Agreement, such Hedging Agreement. Each of the Pledgors agrees that its obligations hereunder and the security interest created hereunder shall continue to be effective or be reinstated, as applicable, if at any time payment, or any part thereof, of all or any part of the Secured Obligations is rescinded or must otherwise be restored by the Secured Party upon the bankruptcy or reorganization of any Pledgor or otherwise.

SECTION 11.4.   Termination; Release.

(a)      When all the Secured Obligations have been paid in full and the Commitments of the Lenders to make any Loan under the DIP Credit Agreement shall have expired or been sooner terminated in accordance with the provisions of the DIP Credit Agreement, this Agreement shall terminate.  Upon termination of this Agreement the Pledged Collateral shall be released from the Lien of this Agreement.  Upon such release or any release of Pledged Collateral or any part thereof in accordance with the provisions of the DIP Credit Agreement, the Collateral Agent shall, upon the request and at the sole cost and expense of the Pledgors, assign, transfer and deliver to Pledgor, against receipt and without recourse to or warranty by the Collateral Agent except as to the fact that the Collateral Agent has not encumbered the released assets, such of the Pledged Collateral or any part thereof to be released (in the case of a release) as may be in possession of the Collateral Agent and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Pledged Collateral, proper documents and instruments (including UCC-3 termination financing statements or releases) acknowledging the termination hereof or the release of such Pledged Collateral, as the case may be.

SECTION 11.5.   Modification in Writing.  No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by any Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the DIP Credit Agreement and unless in writing and signed by the Collateral Agent. Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by any Pledgor from the terms of any provision hereof in each case shall be effective only in the specific instance and for the specific purpose for which made or given.  Except where notice is specifically required by this Agreement or any other document evidencing the Secured Obligations, no notice to or demand on any Pledgor in any case shall entitle any Pledgor to any other or further notice or demand in similar or other circumstances.

SECTION 11.6.   Notices.  Unless otherwise provided herein or in the DIP Credit Agreement, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the DIP Credit Agreement, as to any Pledgor, addressed to it at the address of the Borrower set forth in the DIP Credit Agreement and as to the Collateral Agent, addressed to it at the address set forth in the DIP Credit Agreement, or in each case at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 11.6.

SECTION 11.7.   Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial.  Sections 10.09 and 10.10 of the DIP Credit Agreement are incorporated herein, *mutatis mutandis*, as if a part hereof.

SECTION 11.8.   Severability of Provisions.  Any provision hereof which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

SECTION 11.9.   Execution in Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.10.  Business Days.  In the event any time period or any date provided in this Agreement ends or falls on a day other than a Business Day, then such time period shall be deemed to end and such date shall be deemed to fall on the next succeeding Business Day, and performance herein may be made an such Business Day, with the same force and effect as if made on such other day.

SECTION 11.11.  No Credit for Payment of Taxes or Imposition.  Such Pledgor shall not be entitled to any credit against the principal, premium, if any, or interest payable under the DIP Credit Agreement, and such Pledgor shall not be entitled to any credit against any other

32

sums which may become payable under the terms thereof or hereof; by reason of the payment of any Tax on the Pledged Collateral or any part thereof.

SECTION 11.12. <u>No Claims Against Collateral Agent</u>. Nothing contained in this Agreement shall constitute any consent or request by the Collateral Agent, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Pledged Collateral or any part thereof, nor as giving any Pledgor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against the Collateral Agent in respect thereof or any claim that any Lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the Lien hereof.

SECTION 11.13. <u>No Release</u>. Nothing set forth in this Agreement nor the exercise by the Collateral Agent of any of the rights or remedies hereunder, shall relieve any Pledgor from the performance of any term, covenant, condition or agreement on such Pledgor's part to be performed or observed under or in respect of any of the Pledged Collateral or from any liability to any person under or in respect of any of the Pledged Collateral or shall impose any obligation on the Collateral Agent or any other Secured Party to perform or observe any such term, covenant, condition or agreement on such Pledgor's part to be so performed or observed or shall impose any liability on the Collateral Agent or any other Secured Party for any act or omission on the part of such Pledgor relating thereto or for any breach of any representation or warranty on the part of such Pledgor contained in this Agreement, the DIP Credit Agreement or the other Loan Documents, or under or in respect of the Pledged Collateral or made in connection herewith or therewith. Anything herein to the contrary notwithstanding, neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any contracts, agreements and other documents included in the Pledged Collateral by reason of this Agreement, nor shall the Collateral Agent or any other Secured Party be obligated to perform any of the obligations or duties of any Pledgor thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Pledged Collateral hereunder. The obligations of each Pledgor contained in this <u>Section 11.13</u> shall survive the termination hereof and the discharge of such Pledgor's other obligations under this Agreement, the DIP Credit Agreement and the other Loan Documents.

SECTION 11.14. <u>Obligations Absolute</u>. All obligations of each Pledgor hereunder shall be absolute and unconditional irrespective of:

(i)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Pledgor;

(ii)     any lack of validity or enforceability of the DIP Credit Agreement, any Hedging Agreement or any other Loan Document, or any other agreement or instrument relating thereto;

(iii)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the DIP Credit Agreement or any other Loan

33

Document, any Hedging Agreement or any other agreement or instrument relating thereto;

(iv)     any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(v)     any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, the DIP Credit Agreement, any Hedging Agreement or any other Loan Document except as specifically set forth in a waiver granted pursuant to the provisions of Section 11.5 hereof; or

(vi)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Pledgor.

SECTION 11.15.  Agreement Subject to Orders.  In the event of any conflict or inconsistency between this Agreement (or any portion thereof) and the Interim Order (or, when entered, the Final Order), the terms of the applicable Order shall govern.  Nothing contained in this Agreement shall allow the Administrative Agent (or any other Secured Party) or require any Pledgor to take any action that would violate the Interim Order (or, when entered, the Final Order).  In addition, none of the granting, control or perfection (whether by filing, possession, control or otherwise) measures or actions set forth in this Agreement are intended to limit or impair, in any manner whatsoever, any grant, perfection or priority of any lien on any Pledged Collateral or other assets pursuant to the Interim Order (or, when entered, the Final Order) and it is hereby understood and agreed that any such measures or other actions set forth herein are merely intended to supplement (rather than replace) any such grant, control, perfection or priority pursuant to the Interim Order (or, when entered, the Final Order).

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

NY\1619323.7

IN WITNESS WHEREOF, each Pledgor and the Collateral Agent have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

ELECTRICAL COMPONENTS
INTERNATIONAL, INC.,

as Pledgor

By: _____
Name:
Title:


FP-ECI HOLDINGS COMPANY,

as Pledgor

By: _____
Name:
Title:


ECM HOLDING COMPANY

as Pledgor

By: _____
     Name:
     Title:


NOMA O.P., INC.

as Pledgor

By: _____
     Name:
     Title:

UBS AG, STAMFORD BRANCH,
as Collateral Agent

By: _____
Name:
Title:


By: _____
Name:
Title: