# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

----------------------------------------------------------------x

| | |
|---|---|
| **In re** : | **Chapter 11** |
| : | |
| **ELECTRICAL COMPONENTS** : | **Case No. _____ (____)** |
| **INTERNATIONAL, INC.** *et al.*[1] : | |
| : | |
| **Debtors.** : | **Joint Administration Requested** |
| : | |

----------------------------------------------------------------x

## DECLARATION OF DAVID J. WEBSTER IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, David J. Webster, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am the Chief Executive Officer of FP-ECI Holdings Company, a Delaware corporation ("**Holdings**"), Electrical Components International, Inc., a Delaware corporation ("**ECI**"), and each of the other debtors and debtors in possession in the above-referenced chapter 11 cases (collectively, the "**Debtors**"), all of which are direct or indirect subsidiaries of Holdings. The Debtors and their non-debtor international subsidiaries are collectively referred to herein as the "**Companies**." I have been responsible for the management oversight of the Companies since 1997 and, in my current capacity, I am familiar with the day-to-day operations, business, and financial affairs of the Companies.

2. I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each debtor's federal tax identification number, are: Electrical Components International, Inc. (4361); FP-ECI Holdings Company (4246); ECM Holding Company (7759); Noma O.P. Inc. (5495). The address for each of the Debtors is 1 City Place Drive, Suite 450, St. Louis, Missouri, 63141.

chapter 11 cases (the "**Chapter 11 Cases**") and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Commencement Date**") and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court (the "**First Day Pleadings**"). Prior to the Commencement Date, the Debtors solicited votes on the Debtors' *Joint Prepackaged Plan of Reorganization of Electrical Components International, Inc. Et Al. Under Chapter 11 of the Bankruptcy Code* (the "**Prepackaged Plan**") through their *Disclosure Statement Dated March 4, 2010 Relating to the Joint Prepackaged Plan of Reorganization of Electrical Components International, Inc. Et Al. Under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code. The Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in sections 1126(c) and 1126(d) of the Bankruptcy Code.

3.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of the Companies' senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Companies' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4.     This Declaration is intended to provide a summary overview of the Companies' businesses and the Chapter 11 Cases. Sections I through IV provide a description of the Companies' businesses, corporate history and organizational structure, capital structure, and the circumstances giving rise to the commencement of the Chapter 11 Cases. Part V summarizes

the First Day Pleadings and the relief they seek, which the Debtors believe is crucial to their
successful reorganization.

## I. THE COMPANIES' BUSINESSES

5. The Companies are leading designers, manufacturers and marketers of
wire harnesses and providers of value-added assembly services to North American, European
and Asian "white goods" appliance manufacturers. The Companies are the largest supplier of
wire harnesses to the white goods appliance market in North America. Additionally, the
Companies produce specialty wire harnesses for an expanding customer base in diverse markets
including transportation; heating, ventilation and air conditioning ("**HVAC**"); construction and
agriculture; vending and industrial. Wire harnesses are configurations of wires, cables,
connectors, terminals and plugs that can be found in many electronic products, including home
appliances; transportation, automotive and HVAC; construction and agricultural equipment; and
vending and industrial machines.

6. The Companies are suppliers to over 90 original equipment manufacturers
in numerous end markets, including industry leaders Bosch, Chrysler, Case, Delphi, Electrolux,
EZ GO, General Electric, General Motors, Haier, Mabe, Nissan, Whirlpool and Xerox. The
Companies' success is derived from their long-term relationships with their customer base,
advanced design and engineering expertise, low-cost structure, global production platform and
commitment to quality, delivery and customer service.

7. The Companies have a low-cost global footprint with eleven facilities
strategically located in five countries around the world. Approximately 98% of their 8,750
employees are located in low-cost regions, with six facilities in Mexico, two facilities in China
and one facility in Poland. In addition, the Companies have one facility in Canada and one in

Germany, which serve the local customer base. The Companies have consistently maintained a leading market position by proactively working with customers to migrate production to their low-cost facilities in Mexico, China and Poland. To advance the Companies' customer migration strategy, they have successfully expanded their presence in China through the construction of a new plant that became fully operational in September 2006. In addition, they have consolidated most of their European operations into a newly constructed greenfield facility in Poland, which began operating in the third quarter of 2008. The Companies' manufacturing facilities are strategically located to take advantage of low-cost manufacturing environments and to better serve their customers.

8.     All business operations are carried out by ECI and its subsidiaries. ECI's principal executive offices are located at 1 City Place Drive, Suite 450, St. Louis, Missouri 63141.

9.     For the fiscal year ended December 31, 2009, the Companies, on a consolidated basis, generated approximately $460 million in net sales. As of January 31, 2010, the Companies and their non-debtor subsidiaries had total assets of approximately $363.6 million and total liabilities of approximately $435.7 million, including approximately $297.3 million of long-term debt. As of the Commencement Date, the Companies have approximately 122 employees in the United States.

## II.     CORPORATE HISTORY AND ORGANIZATIONAL STRUCTURE

10.     The business was founded in the late 1950s as Burcliff Industries and later consolidated into International Wire Group, Inc., which was sold to Viasystems, Inc. in 2000. On May 1, 2006, Francisco Partners acquired the business from Viasystems for a purchase price of $320 million and subsequently operated the business as an independent enterprise. Financing

for the acquisition was provided by (i) a $35 million senior secured revolving credit facility (the **"Initial Revolver"**), (ii) a $155 million senior secured term loan facility (the **"Initial Term Loan"** and, together with the Revolver, the **"Initial First Lien Credit Facility"**) and (iii) a $60 million second lien term loan facility (the **"Second Lien Facility"**). ECI entered into that certain Senior Secured Credit Agreement, dated as of May 1, 2006 (the **"Senior Secured Credit Agreement"**), with the lenders party thereto (the **"First Lien Lenders"**) and UBS AG, Stamford Branch, as administrative agent and collateral agent (the **"First Lien Administrative Agent"**) and that certain Second Lien Credit Agreement, dated as of May 1, 2006 (the **"Second Lien Credit Agreement"**), with the lenders party thereto (the **"Second Lien Lenders"** and together with the First Lien Lenders, the **"Prepetition Lenders"**) and UBS AG, Stamford Branch, as administrative agent and collateral agent (the **"Second Lien Administrative Agent"**)[2].

11.     In July 2006, Cabind S.p.A., a leading European provider of wire harnesses and value-added assembly services to the white goods industry, was acquired by ECI. The purchase price for Cabind was approximately $16 million, a portion of which was paid in Preferred Stock and Common Stock. Financing for the acquisition was provided by cash on hand.

12.     In February 2007, to consolidate the business' leading market position in the North American wire harness market for home appliances, ECI acquired Noma, a leading manufacturer and marketer of wire harnesses for the white goods, automotive, HVAC, imaging system markets and provider of value-added assembly services to the white goods industry, for a purchase price of $75 million. To finance the acquisition of Noma, ECI replaced the Senior Secured Facilities with (i) a $35 million senior secured revolving credit facility (the **"Second**

---

[2] UBS AG, Stamford Branch was subsequently replaced by NexBank, SSB, as Second Lien Administrative Agent.

Revolver") and (ii) a $245 million senior secured term loan facility (the "**Second Term Loan**" and, together with the Second Revolver, the "**Second First Lien Credit Facility**"). ECI entered into that certain First Lien Credit Agreement, dated as of February 16, 2007 (the "**First Lien Credit Agreement**"), with the First Lien Lenders and the First Lien Administrative Agent.

13.     Holdings is the parent corporation of ECI and is a holding company. ECM Holding is a wholly-owned subsidiary of ECI and is the holding company for a number of international operating subsidiaries. Cabind S.p.A. is a wholly-owned subsidiary of ECI and is the parent corporation of the European operating subsidiaries. Noma is a wholly-owned subsidiary of ECI that does not hold any operating assets, but is a contract party to certain royalty agreements and other intellectual property arrangements. None of the foreign subsidiaries is a debtor in these Chapter 11 Cases.

14.     As of the Commencement Date, Francisco Partners owned approximately 98.5% of each of the outstanding shares of preferred stock of Holdings (the "**Preferred Stock**") and the outstanding shares of common stock of Holdings (the "**Common Stock**"). The remaining shares are owned by a former executive with Cabind and myself.

### III.     SIGNIFICANT INDEBTEDNESS

15.     To finance the acquisition of ECI by Francisco Partners in 2006, ECI entered into the Initial First Lien Credit Agreement and the Second Lien Credit Agreement, which had an aggregate borrowing limit of $250 million. As noted above, ECI and the lenders party to the Initial First Lien Credit Agreement agreed to replace the Initial First Lien Credit Agreement with the Second First Lien Credit Agreement to finance the Noma acquisition in 2007, which increased the aggregate borrowing limits under the Credit Agreements to $340 million.

16. In 2008, ECI requested each of the Credit Agreements be amended after the occurrence of certain events of default thereunder. On September 23, 2008, ECI amended and restated each of the Credit Agreements. In connection with the amendment and restatement of the First Lien Credit Agreement, the term loan facility was decreased from $245 million to approximately $229.4 million, which decreased the aggregate borrowing limits under the Credit Agreements to approximately $324.4 million. Francisco Partners also subscribed for $25 million in Preferred Stock in September 2008.

17. Obligations arising under the Credit Agreements are the direct obligations of ECI, and are guaranteed by Holdings, ECM Holding and Noma. As of the Commencement Date, there was (a) approximately $261.4 million outstanding under the First Lien Credit Agreement, consisting of (i) $35 million in aggregate principal amount under the Revolver and (ii) $226.4 million in aggregate principal amount under the Term Loan and (b) approximately $60 million outstanding under the Second Lien Credit Agreement, excluding, in each case, accrued and unpaid interest thereon.

18. The First Lien Credit Agreement is secured by (i) a first priority lien on substantially all of the assets of the Companies, (ii) a first priority pledge of the capital stock of the U.S. subsidiaries and (iii) a first priority pledge of 66% of the capital stock of the Companies' equity interests in their first-tier foreign subsidiaries. The Second Lien Credit Agreement is secured by (i) a second priority lien on substantially all of the assets of the Companies, (ii) a second priority pledge of the capital stock of the U.S. subsidiaries and (iii) a second priority pledge of 66% of the capital stock of the Companies' equity interests in their first-tier foreign subsidiaries.

19.     In addition to periodic interest payments, the First Lien Credit Agreement sets form an amortization schedule which provides for annual amortization payment of 1% of the principal amount of the Term Loan Facility annually with the remainder due on May 1, 2013. The $35 million in aggregate principal amount under the Revolver is payable on May 1, 2012. The $60 million in aggregate principal amount under the Second Lien Credit Agreement is payable on May 1, 2014.

## IV.     CIRCUMSTANCES GIVING RISE TO THE DEBTORS' CHAPTER 11 FILINGS

### A.     Industry-Specific Events

20.     Commencing in late 2007, the Companies experienced and continue to experience financial difficulties primarily due to the unprecedented downturn in the U.S. housing industry and global economic recession. The market downturn and other adverse macroeconomic factors have led to a sharp decline in demand in the Companies' key revenue segments such as appliance, HVAC and automotive. As a consequence, the Companies' customer base started taking out production days and drawing down inventory levels to meet the lower demand. The economic downturn affecting the Companies' customer base has resulted in lower sales and weaker cash flows than expected.

### B.     Liquidity Constraints and Prepetition Negotiations

21.     As a result of the market downturn, in 2008 the Companies began evaluating their financial position compared to anticipated levels for 2009 and beyond and determined that plant shutdowns and consolidations as well as headcount reductions were required to reduce costs to more appropriate levels in-line with expected customer demand. Despite the operational improvements and cost reduction initiatives over the last two years, the downturn continued to reduce sales at unprecedented levels and consequently reduce earnings.

22.     The Companies suffered a net loss of approximately $169.2 million for 2008, which is principally attributable to impairment charges related to goodwill and restructuring charges.  The Companies' operating performance and liquidity was negatively affected by economic and industry conditions related to the global economic recession and downturn in the appliance industry.  As a result, the Companies' ability to service the $321.4 million in long term debt obligations became strained and ultimately led to defaults by ECI under the Credit Agreements.  The Companies also had a stockholders' deficit of $30.6 million as of December 31, 2008.

23.     Despite amending and restating the Credit Agreements in September 2008, ECI was not in compliance with the maximum leverage and minimum interest coverage ratios required by the Credit Agreements as of December 31, 2008.  Accordingly, ECI notified the First Lien Administrative Agent and the Second Lien Administrative Agent that, as of December 31, 2008, ECI was in breach of its financial covenants under the Credit Agreements.  ECI received a reservation of rights letter from the First Lien Administrative Agent, reserving its rights, inter alia, to accelerate all outstanding loan obligations under the First Lien Credit Agreement and take enforcement action against the collateral securing such obligations.

24.     ECI engaged Rothschild Inc. ("**Rothschild**") to provide financial advice and assistance in connection with a potential restructuring due to ECI's potential liquidity event.  Additionally, discussions were held with the First Lien Lenders and the Second Lien Lenders in an attempt to restructure the obligations under the Credit Agreements.  ECI also engaged Weil, Gotshal & Manges LLP to assist in analyzing restructuring scenarios and in negotiations with creditors and other groups affected by any potential restructuring.

*C.     Restructuring Negotiations*

25.     Throughout 2009, the Companies engaged the First Lien Lenders, the First Lien Administrative Agent, the Second Lien Lenders, the Second Lien Administrative Agent and Francisco Partners in discussions about a potential financial restructuring and held numerous meetings and conversations.  In connection therewith, ECI agreed to pay certain fees incurred by (i) Latham & Watkins LLP, as legal advisors, and Loughlin Meghji + Company, as financial advisors, to the First Lien Lenders and the First Lien Administrative Agent, (ii) Goodwin Procter LLP, as legal advisors to the Second Lien Lenders and the Second Lien Administrative Agent, (iii) Ropes & Gray LLP, as legal advisor to Sankaty Advisors and (iv) O'Melvany & Myers LLP, as legal advisors to Francisco Partners.[3]  The Companies have actively negotiated with the First Lien Lenders, the Second Lien Lenders and the current equity holders to create a consensus on the appropriate restructuring of the outstanding debt.  In addition, each group presented varying restructuring proposals, reflecting reduced debt and a revised capital structure.  On December 31, 2009, the Companies did not make any payments of principal or interest owing under either of the Credit Agreements.

26.     On February 12, 2010, (a) holders of more than two-thirds (2/3) in amount and half (1/2) in number of the (i) First Lien Lender Claims[4] (the "**Consenting First Lien Lenders**") and (ii) Second Lien Lender Claims (the "**Consenting Second Lien Lenders**"), (b) the First Lien Administrative Agent, (c) holders of more than two-thirds (2/3) in amount of the Holdings Preferred Equity Interests, (d) the Second Lien Administrative Agent and (e) BlackRock Kelso Capital Corporation, Sankaty Credit Opportunities II, L.P., Sankaty Credit Opportunities III, L.P., Sankaty Credit Opportunities IV, L.P. and Sankaty Credit Opportunities

---

[3] O'Melvany & Myers LLP was subsequently replaced by Shearman & Sterling LLP.

[4] All capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Prepackaged Plan.

(Offshore Master) IV, L.P. (collectively, the "**Equity Investors**"), entered into that certain Plan Support Agreement with the Companies, pursuant to which they agreed to support the restructuring transactions reflected in, and vote in favor of, the Prepackaged Plan (the "**Plan Support Agreement**" and the signatories thereto, the "**Consenting Parties**"). On March 6, 2010, the Companies launched their solicitation of votes on the Prepackaged Plan. As noted above, the Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in sections 1126(c) and 1126(d) of the Bankruptcy Code.

### D.  The Financial Restructuring

#### 1.  Plan Support Agreement

27.  Pursuant to the Plan Support Agreement, (i) the Companies agreed to use their commercially reasonable efforts to implement the restructuring of the Companies' capital structure (the "**Restructuring**") by commencing the Solicitation of votes for the Prepackaged Plan and the filing of Chapter 11 Cases substantially in accordance with the terms of the Prepackaged Plan, (ii) certain of the First Lien Lenders committed to fund the DIP Facility and the Exit Facility Tranche A Term Loans, and (iii) the Equity Investors agreed to make the New Money Equity Contribution and the Secondary Equity Contribution, all on the terms and conditions set forth therein.

28.  The Prepackaged Plan sets forth the Companies' capital structure after the effective date of the Prepackaged Plan (the "**Effective Date**") and the distribution each class of the Debtors' creditors and equity holders is to receive under the Prepackaged Plan. Specifically, upon the Effective Date, among other things:

(a)  Each holder of First Lien Lender Claims will receive its its *pro rata* share of: (i) 50,000,000 shares of New Common Stock unless such holder makes a Cash Election (as described below) and (ii) the Exit Facility Tranche B Term Loans. In connection with the solicitation of votes, the holders of First Lien Lender Loans made their Cash Election and have

elected to receive $10,359,764 in cash for a portion of their shares of New Common Stock. As a result, the holders of the First Lien Lender Loans will receive an aggregate of 39,640,236 shares, or 54.68%, of New Common Stock. The Equity Investors will purchase the remaining shares pursuant to the Secondary Equity Contribution;

(b)     Each holder of Second Lien Lender Claims will receive its *pro rata* share of $10,000,000 in cash;

(c)     The Equity Investors will purchase (i) 22,500,000 shares of New Common Stock at a price of $1.00 per share pursuant to the New Money Equity Contribution and (ii) 10,359,764 shares of New Common Stock at a price of $1.00 per share pursuant to the Secondary Equity Contribution. The Equity Investors will receive an aggregate of 32,859,764 shares, or 45.32%, of New Common Stock (exclusive of shares of New Common Stock they will receive on account of their First Lien Lender Claims, if any);

(d)     Each holder of General Unsecured Claims will be unimpaired;

(e)     Each holder of Holdings Preferred Stock will receive its *pro rata* share of the Rights (as defined in the Prepackaged Plan); and

(f)     All existing shares of Holdings Preferred Stock and Holdings Common Stock will be cancelled.

### 2.     *Forbearance Agreements*

29.     Concurrently with the execution of the Plan Support Agreement, (i) the Debtors, the Consenting First Lien Lenders and the First Lien Administrative Agent entered into the Forbearance Agreement, dated as of February 12, 2010, with respect to certain specified defaults and events of default under the First Lien Credit Agreement (the "**First Lien Forbearance Agreement**") and (ii) the Debtors, the Consenting Second Lien Lenders and the Second Lien Agent entered into the Forbearance Agreement, dated as of February 12, 2010, with respect to certain specified defaults and events of default under the Second Lien Credit Agreement (the "**Second Lien Forbearance Agreement**").

### 3.     *Debtor-in-Possession Financing*

30.     On or immediately after the Commencement Date, the Companies are expected to enter into a credit agreement to fund the Debtors' working capital needs during the

pendency of the Chapter 11 Cases (the "**DIP Facility**"), by and among the Companies, certain of the First Lien Lenders and UBS AG, Stamford Branch as administrative agent and collateral agent. The DIP Facility will consist of a delayed-draw term loan facility with an initial commitment of $17 million and a subsequent commitment of $8 million. Proceeds from the DIP Facility will be used to provide liquidity to the Debtors during the Chapter 11 Cases and for other purposes as set forth in the Postpetition Credit Agreement (as defined below).

       *4.     New Debt Financing*

       31.     The Companies are expected to enter into a credit agreement, to be dated as of the Effective Date (the "**Exit Facility**"), by and among Reorganized ECI, the other Reorganized Debtors (as guarantors), BlackRock Kelso and certain other First Lien Lenders and General Electric Capital Corporation, as administrative agent and collateral agent.

       32.     The Exit Facility will consist of senior secured term loan facilities in an aggregate principal amount of $177.5 million, comprised of (i) a new money first-out term loan facility in an aggregate principal amount of $32.5 million, which is comprised of (x) an initial sub-tranche in the aggregate principal amount of $12.5 million, and (y) an additional sub-tranche in the aggregate principal amount of $20.0 million (collectively, the "**Tranche A Term Loans**") and (ii) a second-out term loan facility in an aggregate principal amount of $145.0 million (the "**Tranche B Term Loans**"). Proceeds from the Exit Facility will be used to fund distributions under the Prepackaged Plan and to provide post-Effective Date liquidity to the Reorganized Debtors.

       *5.     New Equity Investors*

       33.     The Equity Investors will purchase (i) 22,500,000 shares of the equity of the Reorganized Debtors (the "**New Common Stock**") at $1.00 per share and (ii) 10,359,764

shares of New Common Stock at $1.00 per share for which the holders of First Lien Lender Loans exercised the Cash Election (as described above). On the Effective Date, the Equity Investors will own 45.32% of the New Common Stock (exclusive of shares of New Common Stock they will receive on account of their First Lien Lender Claims, if any) and the holders of First Lien Lenders Loans will own 54.68% of the New Common Stock.

### 6.    *Purpose*

34.    The primary purpose of the Prepackaged Plan is to effectuate the restructuring of the Companies' capital structure in order to bring it into alignment with the Companies' present and future operating prospects and to provide the Companies with greater liquidity. The Restructuring pursuant to the proposed Prepackaged Plan would enable the Companies to reduce the amount of debt owed by approximately $165 million (or approximately 50%) and will provide additional liquidity to the Companies through the subscription proceeds from the Equity Investors and available funds under the Exit Facility. The Companies believe that the Restructuring will enable them to invest in their businesses and position them to pursue future growth opportunities.

## V.    SUMMARY OF FIRST DAY PLEADINGS

35.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed, for the Court's approval, a number of First Day Pleadings, which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. The Debtors respectfully request that each of the First Day Pleadings be granted, as they are a critical element in stabilizing and facilitating the Debtors' operations during the pendency of these Chapter 11 Cases. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

## A. Motion for an Order Directing Joint Administration of Chapter 11 Cases

36.     By this motion (the "**Joint Administration Motion**"), the Debtors request, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the joint administration of the Debtors' Chapter 11 Cases. As discussed above, ECI is the direct subsidiary of Holdings, and the parent of ECM Holding and Noma. I am informed by counsel that, as a result, the Debtors are "affiliates" as defined under section 101(2) of the Bankruptcy Code and, accordingly, this Court is authorized to consolidate these cases for procedural purposes.

37.     Because joint administration of these cases will remove the need to prepare, replicate, file and serve duplicative notices, applications and orders, joint administration will save substantial time and expense for the Debtors and their estates. Further, joint administration will relieve this Court of entering duplicative orders and maintaining duplicative files and dockets and, similarly, simplify supervision of the administrative aspects of these Chapter 11 Cases by the United States Trustee for the District of Delaware.

38.     Consequently, I believe joint administration of the Debtors' Chapter 11 Cases is in the best interests of the Debtors, their estates, and all parties in interest, and the relief requested in the Joint Administration Motion should be granted.

## B. Debtors' Motion for an Interim and Final Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Adequate Assurance; and (III) Approving Procedures for Resolving Requests for Additional Adequate Assurance

39.     By this motion (the "**Utilities Motion**"), the Debtors request entry of (a) an interim order (i) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending

entry of the Final Order (as defined in the Utilities Motion), (ii) approving the Debtors' Proposed Adequate Assurance (as defined in the Utilities Motion), (iii) approving the Debtors' proposed procedures for resolving any Additional Assurance Requests (as defined in the Utilities Motion), and (iv) scheduling a hearing on the Motion to consider granting the relief requested herein on a final basis; and (b) a final order granting the relief requested in the Utilities Motion on a final basis.

40.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water, telephone services, and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies or their brokers (collectively, the "**Utility Companies**"). Annexed to the Utilities Motion as Exhibit C is a non-exclusive list of Utility Companies that provide Utility Services to the Debtors (the "**Utility Services List**"). The relief requested in the Utilities Motion applies to all Utility Companies providing Utility Services to the Debtors and is not limited to those listed on the Utility Service List.

41.     Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' Chapter 11 Cases. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts. It is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

42.     Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Utilities Motion should be granted.

**C.** **Debtors' Motion for Authority to Pay Prepetition Use Taxes, Property Taxes, and Certain Other Governmental Assessments**

43.     By this motion (the "**Tax Motion**"), the Debtors request authorization to pay all prepetition use taxes, property taxes, and other certain governmental assessments of franchise fees and business license fees to various Taxing Authorities, including those obligations subsequently determined upon audit to be owed for periods prior to the Commencement Date. A list of the Taxing Authorities is annexed as <u>Exhibit B</u> to the Tax Motion.[5] Although the Debtors believe the list of Taxing Authorities set forth therein is substantially complete, the relief requested in the Tax Motion is to be applicable with respect to all Taxing Authorities and is not limited to those Taxing Authorities set forth therein.

44.     Payment of the prepetition Use Taxes, Property Taxes, and Other Governmental Assessments (each as defined in the Tax Motion) is critical to the Debtors' continued, uninterrupted operations. Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, or seeking to lift the automatic stay, any of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

45.     Moreover, many federal and state statutes hold officers and directors of collecting entities personally liable or criminally responsible for certain taxes owed by those entities. To the extent that any Use Taxes remain unpaid by the Debtors, the Debtors' officers and directors may be subject to lawsuits or criminal prosecution during the pendency of these

---

[5] The Debtors remit taxes to taxing authorities in respect of federal, state, and local income taxes, social security, and Medicare that the Debtors withhold from employees' wages. Remittance of these taxes to the applicable taxing authorities is addressed in the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing Payment of Wages, Compensation, and Employee Benefits.*

Chapter 11 Cases. The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtors and their personnel from important tasks, to the detriment of all parties in interest. The dedicated and active participation of the Debtors' directors, officers, and other employees is not only integral to the Debtors' continued, uninterrupted operations, but also essential to the orderly administration of these Chapter 11 Cases.

46.     Consequently, I believe the relief requested in the Tax Motion is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted.

**D.     Debtors' Motion for (I) Authority to (A) Continue Existing Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and (II) an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code**

47.     To manage their businesses efficiently and seamlessly, the Debtors use a cash management system (the "**Cash Management System**") to collect and transfer the funds generated by their operations and to disburse funds to satisfy their financial obligations. The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their bank accounts (the "**Bank Accounts**") located at various banks (the "**Banks**") listed on Exhibit 1 of the proposed order annexed to the motion (the "**Cash Management Motion**"). By the Cash Management Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363(c) and 345(b) of the Bankruptcy Code, granting them (i) authorization to (a) continue their existing Cash Management System and (b) maintain existing Bank Accounts and business forms, and (ii) an extension of time to comply with section 345(b) of the Bankruptcy Code. Without the requested relief, it is my belief that the Debtors would be unable to maintain their financial operations effectively and efficiently, which would cause significant harm to the Debtors and to their estates.

48. In the ordinary course of business, the Debtors use the Cash Management System, which is similar to those used by other large companies that operate in numerous locations, to collect, transfer, and disburse funds generated by the Debtors' business operations efficiently. The Debtors record such collections, transfers, and disbursements as they are made. The Cash Management System is organized around the Debtors' corporate functions and its manufacturing segments. For demonstrative purposes, a series of diagrams generally illustrating the Cash Management System is annexed as Exhibit B to the Cash Management Motion.

49. The Cash Management System has three (3) main components: (i) cash collection, including the collection of payments made to the Debtors by customers, (ii) cash concentration; and (iii) cash disbursements to fund the Debtors' operations, primarily consisting of payroll and payments to the vendors and service providers that supply the goods and services which the Debtors use to manufacture their products and serve their customers. In addition, the Cash Management System is comprised of certain stand-alone accounts that are used for the purposes specified in the Cash Management Motion. The Cash Management System is managed by the VP-Corporate Controller at ECI. ECI has deposit account control agreements with Wells Fargo Bank, N.A., and certain of the other Banks where the Bank Accounts are located, which gives the First Lien Administrative Agent or Second Lien Administrative Agent, as applicable, upon the occurrence of certain events enumerated in the agreement, certain rights to take control for enforcement purposes over the Debtors' cash and deposit accounts and funds maintained therein that are subject to the control agreement.

50. The Cash Management System constitutes an ordinary course and essential business practice that provides significant benefits to the Debtors, including, among other things, the ability to (i) control corporate funds; (ii) ensure the maximum availability of

funds when and where necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Based upon the foregoing, maintenance of the existing Cash Management System is in the best interest of the Debtors and their estates.

51.     I am informed by counsel that the Office of the United States Trustee's *Operating Guidelines For Chapter 11 Cases* (the "**U.S. Trustee Guidelines**") mandate the closure of the Debtors' prepetition bank accounts, the opening of new accounts, including special accounts for the payment of taxes and segregation of cash collateral, and the immediate printing of new checks with "Debtor in Possession" and other information printed on them. If the Debtors were required to comply with these guidelines, it is my belief that their operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from the closure of their existing Bank Accounts, the opening of new accounts and the immediate printing of new checks.

52.     The Debtors believe, therefore, that their transition to chapter 11 will be smoother and more orderly, with minimum disruption and harm to their operations, if the Bank Accounts are continued following the Commencement Date with the same account numbers; provided, however, that checks issued or dated prior to the Commencement Date will not be honored, absent a prior order of this Court. By preserving business continuity and avoiding the disruption and delay to the Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best served. Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner

consistent with prepetition practices, and to pay any ordinary course Bank fees that may be incurred in connection with the Bank Accounts prior to or following the Commencement Date.

53. Furthermore, the Debtors request that the Banks be authorized to accept and honor all representations from the Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Commencement Date. The Debtors further request that the Banks shall not be liable to any party on account of following the Debtors' instructions or representations regarding which checks should be honored. The Banks also shall be permitted to accept and process chargebacks against the Bank Accounts arising out of returned deposits into such accounts without regard to the date such return item was deposited.

54. In addition to mandating the closure of all bank accounts, I am informed by counsel that the U.S. Trustee Guidelines require the immediate printing of new checks with the label "Debtor in Possession," and other information related to the Debtors' cases. Similarly, Local Rule 2015-2(a) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") mandate that the Debtors, upon exhausting their existing check stock, order new checks with the "Debtor in Possession" label. The Debtors issue a large number of checks, and use a large volume of purchase orders, letterhead, envelopes, promotional materials, and other business forms (collectively, the "**Business Forms**"), in the ordinary course of business. In light of the expedited nature of these prepackaged cases and to minimize expenses, the Debtors request that they be authorized to continue using their existing business forms, including electronically generated forms, substantially in the form existing immediately before the Commencement Date,

without reference to their status as debtors in possession, and without adding the other related information required by the U.S. Trustee Guidelines.

55. The Debtors further request (i) a ninety (90) day extension of the time to comply with Local Rule 2015-2(a)'s requirement that any newly ordered check stock bear the debtor in possession legend and the bankruptcy case number and (ii) a waiver of this requirement upon confirmation of the Prepackaged Plan. The Debtors intend to remain in chapter 11 only as long as it takes to confirm and effectuate their prepackaged reorganization plan. Obtaining new Business Forms (including new check stock) and implementing new electronic check forms across all of their businesses would create significant expense and logistical difficulties. Once such a transition is accomplished, the Debtors would almost immediately have to start the process all over again to return to using their regular Business Forms upon their emergence. Furthermore, the Debtors have conducted prepetition solicitation, will send a notice of commencement to all known creditors and will also serve notice via publication. Given such wide publication of the Debtors' status as debtors in possession, publication on checks and other business forms will add little additional notice. Accordingly, the Debtors request a waiver of the requirement to mark new check stock with the debtor in possession status unless the Debtors remain in bankruptcy for longer than expected.

56. By the Cash Management Motion, the Debtors also seek a sixty (60) day extension of the time to comply with section 345(b) of the Bankruptcy Code. During the extension period, the Debtors propose to engage the Office of the United States Trustee in discussions to determine what modification to their investment guidelines, if any, would be appropriate under the circumstances. The Debtors believe that the benefits of the requested extensions far outweigh any harm to the estates.

57.     With the exception of the investment accounts described in the Cash Management Motion, the Debtors' transactional bank accounts are insured by the United States government through the Federal Deposit Insurance Corporation's ("**FDIC**") Transaction Account Guarantee ("**TAG**") program.  Under this program, non-interest bearing transactional accounts are fully insured by the FDIC.  The TAG program was initially set to expire on December 31, 2009, but the FDIC has extended it through June 30, 2010.  The Debtors submit that because of the TAG program, their transactional Bank Accounts comply with section 345(b) regardless of the amounts deposited into these accounts.  The Debtors expect to emerge from chapter 11 before any of their banks could cease participating in the program on June 30, 2010.

58.     In addition, the Debtors believe that funds held in their Bank Accounts, even those in investment accounts and in excess of the usual limits insured by the FDIC, are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, is unnecessary and detrimental to the Debtors' estates and creditors.  The Debtors submit that "cause" exists pursuant to section 345(b) of the Bankruptcy Code to extend the time to comply with this section's requirements because, among other considerations, (i) the Debtors' Banks are federally or state chartered banks subject to supervision by federal banking regulators, (ii) the Debtors retain the right to remove funds held at the Banks and establish new bank accounts as needed, (iii) the cost associated with satisfying the requirements of section 345 is burdensome, and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtors' businesses.  Moreover, strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in these Chapter 11 Cases.  A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond is available at all.

59. Based on the foregoing, the relief requested in the Cash Management Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Cash Management Motion should be granted.

**E.    Debtors' Motion (I) Authorizing The Debtors to Pay Wages, Salaries, Compensation, And Employee Benefits, And (II) Authorizing and Directing the Debtors' Financial Institutions to Honor and Process Checks and Electronic Funds Transfers Related to Such Obligations**

60. By this motion (the "**Employee Motion**"), the Debtors request, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code, entry of an order (I) authorizing, but not requiring, the Debtors to (a) pay, in their sole discretion, wage, salary and commission obligations, payroll taxes, garnishments, expense reimbursements, employee benefits, bonuses, certain severance obligations, and retirement plan and benefit obligations, and costs incident to the foregoing (each as defined in the Employee Motion, and collectively, the "**Employee Obligations**"), and (b) maintain and continue to honor their practices, programs, and policies for their employees (the "**Employee Benefits**") as they were in effect on the Commencement Date, and as they may be modified, amended, or supplemented from time to time in the ordinary course of business, and (II) authorizing the Debtors' banks and financial institutions to receive, honor, process, and pay any and all checks or electronic funds transfers drawn on the Debtors' accounts in satisfaction of Employee Obligations and Employee Benefits.

### The Debtors' Prepetition Employee Obligations

61. In the ordinary course of their businesses, the Debtors incur payroll and various other obligations and provide other benefits to their employees for the performance of services.[6] As of the Commencement Date, the Debtors employ approximately 122 full-time[7]

---

[6] ECI is the only Debtor with employees.

employees, of which (i) approximately 98 are salaried employees (the "**Salaried Employees**"), and (ii) approximately 24 are non-union employees paid on an hourly basis (the "**Hourly Employees**," and together with the Salaried Employees, the "**Full-time Employees**"). The Debtors also employ one part-time employee who is paid on an hourly basis[8] (the "**Part-time Employee**" and, together with the Full-time Employees, the "**Employees**"). The Debtors also employ 18 temporary employees (the "Temporary Employees") that work upwards of 40 hours per week, but are actually employees of one of four temporary agencies the Debtors hire from. The Temporary Employees are not eligible for benefits. The Temporary Employees are paid on a weekly basis at varying hourly billing rates.

62.     The Debtors have incurred obligations to their Employees in the period prior to the Commencement Date. Certain of these costs and obligations are outstanding, due and payable, while others will become due and payable in the ordinary course of the Debtors' businesses after the Commencement Date. Pursuant to the Employee Motion, the Debtors request authority to pay such obligations for the reasons discussed below.

## Wages, Salaries, Commissions, and Incentive Programs

(i)     **Wage and Salary Obligations**

63.     Prior to the Commencement Date and in the ordinary course of their businesses, the Debtors paid obligations relating to wages, salary, and compensation (collectively, the "**Wage Obligations**") to their Employees on a bi-weekly or semi-monthly basis. Due to the nature of the Debtors' operations, the schedule by which the Debtors pay Wage Obligations varies. All Wage Obligations, however, are paid through direct deposit or by check.

---

[7] Full-time Employees are those that work at least thirty (30) hours per week at ECI.

[8] Part-time Employees are all Employees other than Full-time Employees.

Based on the previous twelve-month period, the Debtors' average monthly gross wages and salaries aggregate approximately $740,000. In addition, the Debtors had Wage Obligations with regards to the Temporary Employees that average $11,275 per week.

64.    Under the Debtors' varied payroll systems, a portion of Employees are compensated in arrears for work already performed. Consequently, when most Employees receive their direct deposit or payroll checks, they have already earned – and are owed – additional pay. As of the Commencement Date, the Debtors estimate they owe approximately $38,985 outstanding in accrued prepetition Wage Obligations. The Debtors also estimate they have approximately $4,510 outstanding in accrued prepetition Wage Obligations owed to the Temporary Employees.

(ii)    **Payroll Taxes**

65.    The Debtors are required by law to withhold from the Employees' salaries and wages amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit the same to the appropriate taxing authorities (collectively, the "**Taxing Authorities**"). In addition, the Debtors are required to make payments from their own funds on account of Social Security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Taxes**").

66.    The Debtors' average monthly liability for Payroll Taxes as of the Commencement Date is approximately $122,409, of which approximately $89,372 is withheld from Employees' paychecks and approximately $33,038 is paid by the Debtors. Therefore, as of

the Commencement Date, the Debtors estimate they owe the Taxing Authorities approximately $9,400 on account of Payroll Taxes relating to the prepetition period, of which approximately $4,400 is withheld from Employee's paychecks and approximately $5,000 is paid by the Debtors.

     (iii)   **Deductions**

67.    In the ordinary course of their businesses, the Debtors deduct, at the request of their Employees, certain amounts from each Employee's gross pay for various expenses, such as the flex spending account (the "**Deductions**"). These amounts are held in trust by the Debtors and then remitted to applicable third parties. On average, the Debtors withhold approximately $4,230 per month in Deductions. As of the Commencement Date, the Debtors estimate that they have approximately no unremitted Deductions relating to the prepetition period.

     (iv)   **Garnishments**

68.    In the ordinary course of processing payroll checks for their Employees, the Debtors may be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the "**Garnishments**"). The Debtors then remit the Garnishments to the appropriate state agencies. On average, the Debtors withhold approximately $1,079.80 per month in Garnishments. As of the Commencement Date, the Debtors estimate that they have approximately $375 in unremitted Garnishments relating to the prepetition period.

     (v)   **Obligations in Respect of Payroll Processing Service**

69.    The Debtors retain certain payroll service providers to facilitate payment of their Employee Obligations. The Debtors are invoiced by each payroll service provider. As

of the Commencement Date, the Debtors estimate they do not owe their payroll service providers any outstanding prepetition amounts on account of services rendered.

(vi) **Reimbursement of Expenses**

70.     Certain of the Debtors' Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses. Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' businesses, the Debtors reimburse the Employees for such expenses (the "**Expense Reimbursement**").

71.     Employees must submit an expense report detailing their claims and seek reimbursement from the Debtors. There may be a lag of approximately one week between submission and reimbursement of such claims. Because of the lag between submission and reimbursement of an expense report, and because Employees do not always submit their expense reports with regularity, it is difficult for the Debtors to determine the amount of Expense Reimbursements outstanding at any particular time. Based upon historical figures and additional expenses related to the filing of these chapter 11 cases, however, the Debtors estimate that there may be approximately $100,000 of Expense Reimbursements outstanding as of the Commencement Date. Accordingly, the Debtors request authority to pay postpetition up to the estimated $100,000 of Expense Reimbursements incurred prepetition.

(vii) **The Incentive Compensation Program**

72.     ECI has implemented the Electrical Components International, Inc. Annual Incentive Compensation Program (the "**Incentive Program**") to provide certain qualified Employees additional compensation based on ECI meeting certain corporate objectives (the "**Incentives**"). The Incentive Program has been in place since ECI's inception and the threshold corporate performance required for the payment (the "**Requisite Performance**") of the

Incentives is determined annually. The Requisite Performance was met for the 2009 fiscal year to invoke the payments of Incentives under the Incentive Program.

73.     Under the current Incentive Program, the Incentives are being paid in three phases. To date, two payments of Incentives have been made, totaling $411,500 in 2010 based on ECI's performance in 2009. One phase of Bonus payments, in the amount of $673,000, remains to be paid based on 2009 performance (the "**Unpaid 2010 Bonuses**"), but the Debtors do not expect to pay any of the Unpaid 2010 Bonuses during the pendency of the Chapter 11 Cases. However, the Debtors reserve the right to seek leave of this Court to make payments of Unpaid 2010 Bonuses.

### (viii)    The Severance Program

As part of their employment contracts, certain ECI employees and former employees are eligible for ordinary course severance payments (the "**Severance Program**"). Currently the Debtors are making semi-monthly payments under the terms of the Severance Programs to one former employee (the "**Severance Obligation**"). Under the Severance Program, the Debtors are obligated to continue payments to cover the Severance Obligation through May 2010. The current Severance Obligation is $9,791.66 semi-monthly and $39,167 remains owing.

35.     As part of the Severance Program, Employees are eligible to continue to receive certain health benefits for themselves and their family members, and certain other benefits provided under the BeniComp program (the "**Continuing Benefits**"). Under the Severance Program, the Debtors are obligated to continue to offer the Continuing Benefits to employees covered by the Severance Program, and bear costs associated with the Continuing Benefits in the same manner they would if the severed Employee were still employed with the company.

## Employee Benefits Programs

74.     In the ordinary course of business, the Debtors maintain certain employee benefits programs, including: (a) insurance coverage, such as health, dental, vision, short- and long-term disability, and life insurance; (b) the Severance Program; (c) retirement plans, such as 401(k) plans; (d) healthcare flexible spending accounts; (e) statutorily-mandated benefits, such as military, jury and family or medical-related leave; and (f) other programs, such as employee assistance programs (under which confidential counseling is offered to Employees and their dependents with respect to family issues, mental problems, stress, substance abuse, and eating disorders), car allowance, vacation and tuition reimbursement (collectively, the "**Employee Benefits**"). The types of Employee Benefits and the terms of the Employee Benefits offered vary by Debtor.

75.     As of the Commencement Date, certain contributions or benefits on account of the Employee Benefits have accrued prepetition but are not yet payable. These amounts, however, will become payable in the ordinary course of the Debtors' businesses. Accordingly, the Debtors seek authority to pay these amounts as they come due. The Employee Benefits that the Debtors seek authority to pay include those accrued under the following categories:

(a)     **Third-Party Insured Plans**: The Debtors maintain certain insured benefit plans under which the Debtors, the Employees or both contribute to the payment of premiums for insurance or other coverage provided by third parties (collectively, the "**Insured Plans**"). The Insured Plans include general health, dental, vision and short- and long-term disability, and life insurance. Generally, the Debtors pay all health and dental insurance obligations with respect to the Insured Plans in advance on the 1st of each month. Accordingly, the Debtors estimate that there will be no accrued but unpaid premium contributions on account of the Insured Plans as of the Commencement Date.

(b)     **Company-Sponsored Employee Benefits**: The Debtors also maintain certain other Employee Benefits under which the Debtors, the Employees

or both contribute to the benefits provided thereunder (collectively, the **"Sponsored Programs"**). The Sponsored Programs include, among others, (i) flexible spending accounts, the funds of which are used to pay health care and dependent care costs on a pre-tax basis; (ii) tuition reimbursement programs; (iii) employee assistance programs; (iv) car allowance; and (v) severance programs. Based on the historical levels of participation in the Sponsored Programs, the Debtors estimate that there are no accrued but unpaid obligations as of the Commencement Date.

76.     The Debtors believe that many of the Employee Obligations and Employee Benefits relating to the period prior to the Commencement Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code in that they do not exceed $10,950 per Employee. Accordingly, the relief requested will affect only the timing of the payment of these priority obligations, and should not prejudice the rights of general unsecured creditors or other parties in interest.

77.     Further, payments made in connection with the Employee Obligations and Employee Benefits are justified by the facts and circumstances of the case. In this case, any delay or failure to pay wages, salaries, expense reimbursements, benefits, severance, and other similar items could irreparably impair the Employees' morale, dedication, confidence, and cooperation, and could adversely impact the Debtors' relationship with the Employees at a time when the Employees' support is critical to the success of the Debtors' Chapter 11 Cases. The Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend any decline in their Employees' morale. Moreover, because these prepackaged cases are advancing under a compressed schedule and because general unsecured claims are unimpaired under the Prepackaged Plan, paying the Employees in the ordinary course of business will enable the Debtors to operate smoothly during these cases. Such relief allows the Debtors to focus on consummating the Prepackaged Plan for the benefit of the Debtors, their estates, and their creditors. Under these circumstances, approval of the requested relief is appropriate.

78. Absent an order granting the relief requested in the Employee Motion, the Employees could suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question may be needed to enable certain of the Employees to meet their own personal financial obligations. Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives. In addition, it would be inequitable to require the Employees to bear personally the cost of any business expenses they incurred prepetition on behalf of the Debtors with the understanding that they would be reimbursed.

79. With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtors, as I have been informed that the relevant Taxing Authorities generally would hold priority claims under the Bankruptcy Code with respect to such obligations. Moreover, the portion of the Payroll Taxes withheld from an employee's wages on behalf of an applicable Taxing Authority are held in trust by the Debtors. As such, I have been informed that these Payroll Taxes are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

80. In addition, the Debtors believe it is necessary to continue payment of administrative fees to the administrators of the Debtors' Employee Obligations and to the administrators of programs related to Employee Benefits. Without the continued service of these administrators, the Debtors will be unable to continue to honor their obligations under these programs in an efficient and cost-effective manner.

81. The Debtors do not seek to alter any of the Employee Benefits at this time. The Employee Motion is intended only to permit the Debtors, in their discretion, to (i) make payments consistent with existing policies to the extent that, without the benefit of an order

approving the Employee Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) continue to honor practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Commencement Date. Payment of all Employee Obligations and Employee Benefits in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest, and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption. The Debtors' Employees are central to their businesses and are vital to these Chapter 11 Cases, and failure to pay the Employee Obligations and Employee Benefits would have a detrimental impact on the Debtors, their value, and their reorganization efforts. The total amount sought to be paid herein is relatively modest compared with the size of the Debtors' overall businesses and the importance of the Employees to the Debtors' Chapter 11 Cases.

82. The Debtors submit that as set forth above, payments made in connection with the Employee Obligations and Employee Benefits are justified by the facts and circumstances of the case.

83. Based on the foregoing, the relief requested in the Employee Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Employee Motion should be granted.

F.  **Debtors' Motion for Authority to (A) Continue Their Workers' Compensation Programs and Their Liability, Property, and Other Insurance Programs and (B) Pay All Obligations in Respect Thereof**

84. By this motion (the "**Insurance Motion**"), the Debtors seek an order authorizing them to continue their workers' compensation and employer's liability policies and programs (the "**Workers' Compensation Programs**") and their various liability, property, directors and officers' liability, and other insurance policies and programs, including any and all

liability self-insurance programs (the "**General Insurance Programs**," and, together with the Workers' Compensation Programs, the "**Insurance Programs**") uninterrupted and to honor their undisputed prepetition obligations thereunder (the "**Insurance Obligations**").[9] As of the Commencement Date, the Debtors estimate that there are no unpaid and outstanding prepetition Insurance Obligations.

85.     To the extent any of the Debtors' employees hold valid claims under the Workers' Compensation Programs, the Debtors also seek authorization to modify section 362 of the Bankruptcy Code to permit these employees to proceed with their claims under the Workers' Compensation Programs. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Programs. Any claims relating to any of the General Insurance Programs or otherwise will remain subject to the automatic stay.

86.     The majority of the Debtors' current workers' compensation obligations arise under one workers' compensation policy (the "**Cornerstone Workers' Compensation Program**") with The Cornerstone Insurance Group, LLC ("**Cornerstone**"), covering claims made between May 1, 2009 and May 1, 2010. During the pendency of the Chapter 11 Cases, the Cornerstone Workers' Compensation Program will need to be renewed for the 2010-2011 year. At this time, Cornerstone is conducting an audit of the Debtors' businesses to determine the Cornerstone Workers' Compensation Premiums for the 2010-2011 year. By this motion, the Debtors' seek authority to renew, in the ordinary course of their business, the Cornerstone Workers' Compensation Policy for the 2010-2011 year.

---

[9] In addition to the Insurance Programs discussed herein, the Debtors maintain numerous insurance programs with respect to, among other things, employee health, dental, disability, and life insurance benefits. These policies are addressed in a separate motion pertaining to the Debtors' employee wage policies and benefits programs and summarized above.

87.     In connection with the operation of their businesses, the Debtors maintain the Insurance Programs through several different insurance carriers (the "**Insurance Carriers**") including, but not limited to, the Insurance Programs and Insurance Carriers identified in Exhibit B to the Insurance Motion. The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis. The Debtors are required to pay premiums under the General Insurance Programs (the "**Insurance Premiums**") based upon a fixed rate established and billed by each Insurance Carrier and paid through Aon Risk Services of Missouri, Inc. ("**Aon**") as Insurance Broker (as defined in the Insurance Motion).

88.     The Debtors' General Insurance Programs, with the exception of the D&O Policy (as defined in the Insurance Motion), are in effect from May 1, 2009 through May 1, 2010. The Debtors' D&O Policy (as defined in the Insurance Motion) has been extended through June 1, 2010. During the pendency of the Chapter 11 Cases, the General Insurance Programs, with the exception of the D&O Policy, will need to be renewed for the 2010-2011 year. At this time, Aon is conducting an audit of the Debtors' businesses to determine the Insurance Premiums for the 2010-2011 year. Pursuant to the Insurance Motion, the Debtors' seek authority to renew, in the ordinary course of their business, the General Insurance Programs, including the D&O Policy (as defined in the Insurance Motion), for the 2010-2011 year.

89.     I believe that the nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing policies, declining to renew their insurance policies, or refusing to enter into new insurance agreements with the Debtors in the future. If the Insurance Programs

are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely detrimental impact on the Debtors' ability to successfully reorganize. Furthermore, the Debtors would then be required to obtain replacement policies on an expedited basis at what they expect to be a significantly higher cost to their estates. Accordingly, the Debtors must make all payments with respect to the Insurance Programs and be permitted to renew the Cornerstone Workers' Compensation Program and the General Insurance Programs, including the D&O Policy (as defined in the Insurance Motion), for the 2010-2011 year.

90.     Moreover, the Insurance Programs are vital to the Debtors' continued operations. Applicable state law mandates that the Debtors maintain workers' compensation coverage for their employees. Failure by the Debtors to pay the premiums associated with their Workers' Compensation Programs would jeopardize their coverage and expose the Debtors to substantial liability in fines by various state workers' compensation authorities.

91.     In addition, the risk that eligible workers' compensation claimants will not receive timely payments for prepetition employment-related injuries could have a devastating effect on the financial well-being and morale of the Debtors' current employees – perhaps resulting in employee departures. Employee departures at this critical time may result in a severe disruption of the Debtors' businesses with a substantially adverse impact on the Debtors, the value of their assets and businesses, and their ability to reorganize. The retention of the Debtors' qualified and dedicated senior management is also linked to the continuation of the directors' and officers' liability insurance policies. Finally, pursuant to the terms of many of their real property leases, as well as the U.S. Trustee Guidelines, as I am informed by counsel, the Debtors are obligated to remain current with respect to certain of their primary Insurance Programs.

Therefore, the continuation of the Insurance Programs, on an uninterrupted basis, and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Programs are essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.

92.    Based on the foregoing, the relief requested in the Insurance Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Insurance Motion should be granted.

## G.    Debtors' Motion for Authorization to Pay Prepetition Claims of Certain Creditors in the Ordinary Course of Business

93.    By this motion (the "**Payable Claims Motion**"), the Debtors seek entry of an order that authorizes, but does not direct, the Debtors to pay the Debtors' allowed, fixed, liquidated, noncontingent, and undisputed prepetition claims (the "**Payable Claims**") of holders of General Unsecured Claims and Other Secured Claims[10] (each as defined in the Prepackaged Plan) (collectively the "**Prepetition Creditors**"), including claims of their prepetition suppliers of goods and services according to their ordinary business terms and in the ordinary course of business.

94.    These Chapter 11 Cases are the culmination of a lengthy and detailed process designed to restore the Debtors' financial condition while at the same time providing an appropriate treatment for the Debtors' creditors. The Debtors believe that a seamless transition into and through bankruptcy will preserve the value upon which the Prepackaged Plan is based. A fundamental aspect of the Debtors' efforts to minimize disruption during their cases is the Debtors' ability to maintain and develop their relationships with important vendors with whom

---

[10] Certain of the Debtors' prepetition trade creditors, such as shippers and mechanics, may be secured creditors because of their capacity to assert liens on the Debtors' property.

the Debtors conduct business. The perception and understanding of these Chapter 11 Cases by such parties is vital to the success of the Debtors' reorganization.

95.     Indeed, the relief requested in the Payable Claims Motion is designed to create certainty in the Debtors' relationships with such parties. These relationships will contribute to the continued operation of the business of the Debtors during and after these Chapter 11 Cases. The Debtors are not seeking to pay these amounts immediately, but only such portions thereof as become due in the ordinary course of the Debtors' businesses and consistent with prepetition business practices.

96.     Further, the Debtors anticipate emerging from chapter 11 within a very short time period and concurrently herewith the Debtors have filed the Prepackaged Plan and Disclosure Statement. The Debtors are seeking approval of the Disclosure Statement and confirmation of the Prepackaged Plan as soon as possible. The Prepackaged Plan provides, inter alia, that the Payable Claims will be paid in full and thus be unimpaired. As a result, assuming confirmation of the Prepackaged Plan within 40-60 days, granting the relief requested in the Payable Claims Motion may accelerate in certain circumstances, and then only slightly, the timing of payments to the Debtors' vendors and other holders of unimpaired General Unsecured Claims or Other Secured Claims and will not affect or impair the rights of other creditors in these Chapter 11 Cases.

97.     Absent continuity of payment of the Payable Claims in the ordinary course of business, the Debtors' businesses will be disrupted. The adverse consequences of not being able to maintain existing terms with vendors could damage, perhaps irreparably, the Debtors' operations and potentially imperil their restructuring efforts if such Prepetition Creditors cease providing goods and services even for a short period of time. The Debtors rely on the Prepetition

Creditors to operate their businesses, and many of the Prepetition Creditors are the only qualified source for the specific supplies the Debtors require. Refusal by the Prepetition Creditors to continue to supply the Debtors would be devastating to their businesses.

98. The Debtors estimate that, as of the Commencement Date, they owe a total of approximately $38,000,000 on account of undisputed Payable Claims.[11] Of those claims, the Debtors estimate that approximately $15,000,000 would also be entitled to administrative priority status pursuant to section 503(b)(9) of the Bankruptcy Code because they relate to goods delivered to the Debtors in the ordinary course of business within twenty (20) days of the Commencement Date. Furthermore, $500,000 of the Payable Claims may be secured. None of the Payable Claims arise from capital projects with vendors that may be able to assert mechanics' liens on the Debtors' property and less than $500,000 arise from transporters who may be able to assert possessory liens on the Debtors' property. The Debtors estimate that approximately $15,000,000 of Payable Claims will become due and payable within the first twenty (20) days of these Chapter 11 Cases. These amounts of Payable Claims are typical for the Debtors in the ordinary course of their business. Further, the Debtors are current with virtually all of their payments to Prepetition Creditors as of the Commencement Date. Many of Payable Claims are on rolling, 30, 60, or 90-day terms, and Debtors do not intend to pay the Payable Claims until they would come due in the ordinary course of their business.

99. In light of the prepackaged nature of these cases, the short duration of time which the Debtors expect to be in bankruptcy, and the fact that the Prepackaged Plan provides that General Unsecured Creditors and Other Secured Creditors will be unimpaired and that

---

[11] This figure does not include the value of goods in transit and not received by the Debtors as of the Commencement Date because amounts due for such goods will be paid in the ordinary course as administrative expense priority claims.

administrative and priority claims will be paid in full, I believe the relief requested in the Payable

Claims Motion is in the best interests of the Debtors, their creditors, and all parties in interest

and, therefore, the Payable Claims Motion should be granted.

**H.** **Motion of Debtors (A) for Authorization to Obtain Postpetition Financing on a Superpriority and Priming Basis pursuant to Sections 105, 361, 362 and 364 of the Bankruptcy Code, (B) for Granting Priming Liens and Superpriority Claims to Postpetition Lenders pursuant to Section 364(c) and (d) of the Bankruptcy Code, (C) for Authorization to use Cash Collateral pursuant to Section 363 of the Bankruptcy Code, (D) for Granting Adequate Protection to Prepetition Secured Lenders pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (D) for Modifying the Automatic Stay and (E) to Schedule a Final Hearing pursuant to Bankruptcy Rule 4001**

100.    By this motion (the "**DIP Motion**"), the Debtors request entry of interim

and final orders authorizing the Debtors to, among other things: (i) obtain postpetition financing

pursuant to sections 105, 361, 362 and 364 of the Bankruptcy Code on an interim basis in an

amount up to $17 million and on a final basis in the aggregate committed amount of up to $25

million (the "**DIP Loans**"); (ii) grant priming liens and superpriority administrative claims

pursuant to sections 364(c) and 364(d) of the Bankruptcy Code to and on behalf of the

Postpetition Agent (as defined below) and the Postpetition Lenders (as defined below) to secure

the obligations under the Postpetition Credit Agreement (as defined below), (iii) use cash

collateral pursuant to section 363 of the Bankruptcy Code and DIP Loans, (iv) grant adequate

protection pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code to the holders of

secured obligations under the Debtors' First Lien Credit Agreement and Second Lien Credit

Agreement (the "**Prepetition Secured Parties**"), whose liens and security interests are being

primed by the DIP Loans, and (v) modify and vacate the automatic stay imposed by section 362

of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and

provisions of the Postpetition Credit Agreement and related documents.  Pending a final hearing

on this request, the financing will be implemented on an interim basis pursuant to that certain

Senior Secured Superpriority Debtor-In-Possession Credit Agreement (the "**Postpetition Credit Agreement**") to be entered into by and among ECI as borrower, Holdings and certain other direct and indirect affiliates of ECI (including all of the Debtors) as guarantors, the lenders from time to time party thereto (the "**Postpetition Lenders**") and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities and together with its successors, the "**Postpetition Agent**").

101.    The Debtors may lack sufficient unencumbered funds with which to operate their businesses during the pendency of the Chapter 11 Cases. The Debtors' ability to maintain business relationships with their customers, pay their employees, and satisfy other critical operating expenses is essential to the Debtors' ability to successfully reorganize, and the cash collateral requested in the DIP Motion is not sufficient to operate the Debtors' businesses throughout the pendency of the Chapter 11 Cases.

102.    To provide the Debtors with the funding necessary to fulfill their administrative and operational obligations throughout the duration of their prepackaged Chapter 11 Cases, the Debtors require a postpetition lending facility. Thus, prior to the Commencement Date, ECI and Rothschild surveyed various sources of postpetition financing, including financing from the Prepetition Lenders and unrelated third parties. ECI and Rothschild approached six (6) parties including the Prepetition Lenders having the capability of providing a facility of the size required. Rothschild received no interest from any of the contacted parties.

103.    The Postpetition Lenders, who also comprise certain of the Prepetition Lenders, were willing to extend postpetition financing on the terms and conditions described in the DIP Motion. ECI concluded that the Postpetition Credit Agreement proposed by the Postpetition Lenders is desirable because, among other things, the Postpetition Credit Agreement

permits the Debtors to secure the postpetition financing required for their reorganization under the Prepackaged Plan. Consequently, ECI determined that the Postpetition Lenders' proposed DIP Loans is the best financing option available under the circumstances.

104. ECI and the Postpetition Agent engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the Postpetition Credit Agreement. Importantly, the Postpetition Credit Agreement provides that ECI may draw funds immediately (on an interim basis) to meet their administrative and operational obligations, in accordance with and subject to the Budget (as defined in the DIP Motion), in the period leading up to confirmation of the Debtors' Chapter 11 Cases.

105. Pursuant to the Postpetition Credit Agreement, ECI may use the proceeds of the DIP Loans to pay the transaction costs related to the closing of the DIP Loans and thereafter, to finance the Chapter 11 Cases and for other general corporate purposes, in accordance with and subject to the Budget (as defined in the DIP Motion).

106. Each of the proposed uses of the DIP Loans confers a direct benefit upon the Debtors. Among other things, the DIP Loans allows ECI to finance the ordinary costs of operations, maintain business relationships with vendors, suppliers and customers, make payroll, make capital expenditures, and satisfy other working capital and operational needs.

107. Accordingly, I believe that the authority to enter into the proposed Postpetition Credit Agreement is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate and reorganize their businesses in chapter 11 without disruption.

## I. Motion of Debtors Pursuant to Bankruptcy Rule 1007(c) and Local Rule 1007-1(b) for an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts

**and Unexpired Leases, and Statements of Final Affairs and (II) Waiving the
Requirements to File Same Upon Confirmation of the Plan**

108.     The Debtors request, pursuant to section 521 of the Bankruptcy Code and

Rule 1007(c) of the Bankruptcy Rules and Local Rule 1007-1(b), (I) an extension of time to file

their (a) schedules of assets and liabilities; (b) schedules of current income and expenditures;

(c) schedules of executory contracts and unexpired leases; and (d) statements of financial affairs

(collectively, the "**Schedules and SOFAs**") and (II) a waiver of the requirements to file the

Schedules and SOFAs upon confirmation of the Prepackaged Plan.

109.     Due to the demands on the limited resources available to the Debtors at

this time, the Debtors anticipate that they will be unable to complete their Schedules in the mere

thirty (30) days provided by the Bankruptcy Rules. To prepare the Schedules, the Debtors must

compile information from their books, records, and other sources relating to their assets,

contracts, and creditors. Assembling the necessary information will be a significant task for the

Debtors. Therefore, the Debtors are requesting a thirty (30) day extension of the applicable time

period to a total of sixty (60) days after the Commencement Date.

110.     Since the Prepackaged Plan provides for the payment in full of all

Allowed General Unsecured Claims, Allowed Other Secured Claims, Allowed Priority Non-Tax

Claims, Allowed Priority Tax Claims, Allowed Intercompany Claims, and Allowed

Administrative Expense Claims (each as defined in the Prepackaged Plan), the numerous

creditors with these types of claims – *i.e.* the vest majority of the Debtors' creditors - do not need

the Schedules to determine how their claim is being treated, and will not be prejudiced by any

extension in the deadline to file the Schedules and SOFAs. Similarly, the Debtors submit that

upon confirmation of the Prepackaged Plan, the Schedules and SOFAs will provide no benefit to

creditors that could justify incurring the costs of creating them and, accordingly, the requirement of filing the Schedules and SOFAs should be waived at that time.

111.    Accordingly, I respectfully submit that in light of (i) the large amount of information that must be assembled and compiled, (ii) the significant amount of employee time that must be devoted to the task of completing the Schedules and SOFAs, (iii) the many pressing items that must be addressed at the inception of these cases, and (iv) the payment in full of the vast majority of the Debtors' creditors under the Prepackaged Plan, ample cause exists for the Court to grant the requested extension for filing their Schedules and SOFAs and the waiver of the requirements to file the Schedules and SOFAs upon confirmation of the Prepackaged Plan.

**J.      Motion for an Order Authorizing the Debtors to Employ Professionals Used in the Ordinary Course of Business**

112.    By this Motion (the "**OCP Motion**"), the Debtors seek entry of an order authorizing the Debtors to employ professionals used in the ordinary course of business (each, an "**Ordinary Course Professional**," and collectively, the "**Ordinary Course Professionals**"), effective as of the Commencement Date, without the (i) submission of separate employment applications or (ii) issuance of separate retention orders for each individual professional. A list of the Debtors' current Ordinary Course Professionals is annexed to the OCP Motion as Exhibit B.

113.    The Debtors seek the continued employment of the Ordinary Course Professionals to render a wide variety of professional services to their estates in the same manner and for the same purposes as the Ordinary Course Professionals were retained before the Commencement Date. In the past, these professionals have provided professional services relating to various litigation, regulatory, general corporate counseling, intellectual property, and tax issues as well as other services relating to issues that have a direct and significant impact on

the Debtors' day-to-day operations. To avoid disruption of the Debtors' normal business operations, it is essential that the Debtors be permitted to continue to employ these Ordinary Course Professionals, many of whom already are familiar with the Debtors' businesses and financial affairs.

114. The proposed employment of the Ordinary Course Professionals and the payment of monthly compensation on the terms set forth in the OCP Motion are in the best interests of the Debtors' and their respective estates and creditors. The relief requested will save the estates the substantial expenses associated with applying separately for the employment of each Ordinary Course Professional. Further, the relief requested will avoid the incurrence of additional fees relating to the preparation and prosecution of fee applications for each Ordinary Course Professional. Likewise, the procedures outlined herein will relieve the Court, the Office of the United States Trustee and any committees appointed in these cases of the burden of reviewing numerous fee applications involving relatively small amounts of fees and expenses.

115. Based on the foregoing, coupled with the prepackaged nature of the Chapter 11 Cases and the short duration of time which the Debtors expect to be in bankruptcy, I believe that the relief requested in the OCP Motion is in the best interests of the Debtors, their creditors, and all parties in interest and, therefore, the OCP Motion should be granted.

**K. Motion for an Order (I) Scheduling a Combined Hearing to Consider (A) Approval of the Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of the Prepackaged Plan; (II) Establishing an Objection Deadline to Object to the Disclosure Statement and the Prepackaged Plan; (III) Approving the Form and Manner of Notice Thereof; and (IV) Granting Related Relief**

116. By this motion (the "**Scheduling Motion**"), the Debtors seek entry of a scheduling order (I) scheduling a combined hearing (the "**Combined Hearing**") to consider (a) approval of the Disclosure Statement; (b) approval of the Solicitation Procedures (as defined

below) employed to solicit votes to accept or reject the Prepackaged Plan pursuant to Bankruptcy Rule 3017(a) and the forms of Ballots (as defined below); and (c) the confirmation of the Prepackaged Plan pursuant to section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules; (II) establishing an objection deadline to object to the adequacy of the Disclosure Statement or confirmation of the Prepackaged Plan; (III) authorizing and approving the form and manner of notice of the Combined Hearing; and (IV) granting related relief.

117.    Below is a table highlighting the dates relevant to the solicitation of the Prepackaged Plan and setting forth the Debtors' proposed dates for the mailing of the Summary and Notice (as defined below), the Combined Hearing, and the Objection Deadline:

| Proposed Timetable | |
| --- | --- |
| Commencement of Solicitation | March 6, 2010 |
| Voting Deadline | March 29, 2010 |
| Commencement Date | March 30, 2010 |
| Mailing of Summary and Notice | April 5, 2010 |
| Objection Deadline | May 3, 2010 |
| Reply Date (if any) | May 7, 2010 |
| Combined Hearing | May 11, 2010 |

118.    The most sensitive and complex task required to effectuate a successful reorganization – the negotiation of consensual agreements with critical creditor constituencies – has already been accomplished in advance of the Commencement Date. As set forth above, the Debtors solicited votes on the Prepackaged Plan from all classes of holders of claims entitled to vote to accept or reject the Prepackaged Plan. The votes tabulated and received from these classes are sufficient to confirm the Prepackaged Plan. Thus, the Debtors respectfully submit that there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan. Moreover, it is in the best interests of the Debtors' estates and creditors to proceed with the confirmation process as expeditiously as possible.

119.    Accordingly, the Debtors respectfully request that the Court schedule the Combined Hearing to be held as soon as practicable but on not less than twenty-five (25) days' notice. Specifically, the Debtors respectfully request the Court schedule the Combined Hearing for May 11, 2010. The proposed schedule is in the interests of all parties in interest in the Debtors' Reorganization Cases. The requested relief is necessary to the efficient prosecution of these Chapter 11 Cases and will assist in the expeditious confirmation of the Prepackaged Plan while providing adequate notice to, and protecting the rights of, creditors. In addition to the reasons set forth above, it is appropriate that a scheduling order be entered at this time so that creditors may be informed as promptly as possible of the anticipated scheduling of events preceding confirmation of the Prepackaged Plan that they have voted to accept. The proposed schedule affords creditors and all other parties in interest ample notice of the proceedings. Insofar as the solicitation period was completed prior to the Commencement Date, and the proposed schedule affords an additional twenty-eight (28) days in which parties may evaluate the Prepackaged Plan prior to the proposed Combined Hearing thereon, no party in interest will be prejudiced by the relief requested in the Scheduling Motion. Such relief allows for more than ample time for parties to evaluate the Disclosure Statement and Prepackaged Plan prior to the Combined Hearing.

120.    The Debtors request that at the Combined Hearing the Court consider approval of the solicitation, balloting, tabulation and related activities undertaken in connection with the Prepackaged Plan, all of which were undertaken and substantially completed prior to the Commencement Date (collectively, the "**Solicitation Procedures**").

121.    The Debtors respectfully request that the Court set a date that is at least twenty-eight (28) calendar days after the mailing of the Summary and Notice (as defined below)

as the last date to file objections to approval of the Disclosure Statement or confirmation of the Prepackaged Plan (the "**Objection Deadline**"). This date will provide creditors and holders of equity interests twenty-eight (28) days' notice of the deadline for filing objections to the Disclosure Statement and the Prepackaged Plan, while still affording the Debtors and other parties in interest time to file a responsive brief and, if possible, resolve any objections received. The Debtors also request that the Court set any reply deadline at least four (4) business days after the Objection Deadline.

122. The Debtors further request that the Court direct that any objections to the Disclosure Statement or Prepackaged Plan be in writing, filed with the Clerk of the Court together with proof of service thereof, set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estate or property of the Debtors, and state the legal and factual basis for such objection and be served upon the parties specified in the Scheduling Motion so as to be received no later than 4:00 p.m. Eastern time on May 3, 2010.

123. The Debtors propose to serve a notice and summary of the Prepackaged Plan (the "**Summary and Notice**"), substantially in the form annexed as <u>Exhibit 1</u> to the proposed scheduling order, by first-class mail or deposit with a reputable overnight delivery service on or before April 5, 2010 upon all parties in interest. The Summary and Notice contains, *inter alia*: (i) the date, time, and place of the Combined Hearing; (ii) instructions for obtaining copies of the Disclosure Statement and Prepackaged Plan; (iii) the Objection Deadline and the procedures for filing objections to the Disclosure Statement and the confirmation of the Prepackaged Plan; and (iv) notice of commencement of these Chapter 11 Cases.

124. In addition, I am informed that Bankruptcy Rule 2002(l) permits a court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice." The Debtors request that this Court authorize them, in their discretion, to give supplemental publication notice of the Combined Hearing in on a date no less than 28 days prior to the Combined Hearing. I believe the proposed notice schedule and publication affords parties in interest ample notice of these proceedings.

125. The Debtors request that the Court also determine that they are not required to distribute copies of the Prepackaged Plan or the Disclosure Statement to any holder of a claim against or equity interest in the Debtors within a class under the Prepackaged Plan that is deemed to accept or is deemed to reject the Prepackaged Plan, unless such party makes a specific request in writing for the same. In lieu of furnishing each such holder of a claim against or equity interest in the Debtors that is either deemed to accept or is deemed to reject the Prepackaged Plan with a copy of the Prepackaged Plan and the Disclosure Statement, the Debtors propose to send to such parties the Summary and Notice, which sets forth the manner in which a copy of the Prepackaged Plan and the Disclosure Statement may be obtained. Accordingly, the Debtors submit that such notice satisfies the requirements of Bankruptcy Rule 3017(d).

126. As set forth above, all the classes consisting of holders of claims materially affected by the Prepackaged Plan have already accepted the Prepackaged Plan in excess of the statutory thresholds specified in sections 1126(c) and 1126(d) of the Bankruptcy Code. The Prepackaged Plan contemplates an expeditious emergence from chapter 11 and the Debtors intend to proceed accordingly. The Debtors submit that cause exists for this Court to direct the United States Trustee not to convene a meeting of creditors or equity security holders

unless the Prepackaged Plan is not confirmed within ninety (90) days after the Commencement Date.

127.     In light of the prepackaged nature of these cases and the short duration of time which the Debtors expect to be in bankruptcy, I believe the relief requested in the Scheduling Motion is in the best interests of the Debtors, their creditors, and all parties in interest and, therefore, the Scheduling Motion should be granted.

I respectfully request that the Court grant all relief requested in the First Day Pleadings and such

and other further relief as may be just.

Dated: March 30, 2010

By: _____

Name: David J. Webster
Title: Chief Executive Officer
of FP-ECI Holdings Company