# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **ELECTRICAL COMPONENTS** | : |  |
| **INTERNATIONAL, INC. et al.** | : |  |
|  | : |  |
| **Debtors.** | : | **Joint Administration** |
|  | : | **Requested** |

-------------------------------------------------------------------x

## DISCLOSURE STATEMENT RELATING TO THE
## JOINT PREPACKAGED PLAN OF REORGANIZATION OF
## ELECTRICAL COMPONENTS INTERNATIONAL, INC., *ET AL.*
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors
   in Possession
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700

RICHARDS, LAYTON & FINGER, P.A.
Attorneys for Debtors and Debtors
   in Possession
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

Dated: March 4, 2010

C:\NRPORTBL\US_ACTIVE\TREADWAY\43210445_13.DOC

**ELECTRICAL COMPONENTS INTERNATIONAL, INC.**
1 City Place Drive, Suite 450
St. Louis, Missouri 63141

March 4, 2010

To:     The holders of First Lien Lender Claims;
        The holders of Second Lien Lender Claims; and
        The holders of Holdings Preferred Equity Interests

We deliver to you herewith the attached disclosure statement (the "*Disclosure Statement*") distributed pursuant to sections 1125 and 1126(b) of title 11 of the United States Code and ballots ("*Ballots*") so that you may vote to accept or reject the proposed joint prepackaged chapter 11 plan of reorganization (the "*Prepackaged Plan*") of FP-ECI Holdings Company ("*Holdings*"), Electrical Components International, Inc. ("*ECI*"), ECM Holding Company, and Noma O.P., Inc. (collectively, the "*Debtors*" or the "*Companies*"), according to the Ballot applicable to your claims. The Debtors intend to use those votes that are returned to their voting agent, Epiq Bankruptcy Solutions, LLC (the "*Solicitation Agent*"), by 5:00 p.m., Eastern Time, on March 29, 2010 to seek approval of the Prepackaged Plan in chapter 11 cases (the "*Chapter 11 Cases*") to be filed after the appropriate solicitation period has expired.

The Prepackaged Plan incorporates a comprehensive financial restructuring that will significantly reduce the Debtors' outstanding debt. The Prepackaged Plan is the product of extended negotiations among the Debtors and certain of their creditors, including the holders of a majority in number and at least two-thirds (2/3) of the outstanding principal amount of the indebtedness under (i) that certain Amended and Restated First Lien Credit Agreement, dated as of September 23, 2008, by and among ECI, Holdings, the subsidiary guarantors party thereto, the lenders party thereto, and UBS AG, Stamford Branch, as administrative agent and (ii) that certain Amended and Restated Second Lien Credit Agreement, dated as of September 23, 2008, by and among ECI, Holdings, the subsidiary guarantors party thereto, the lenders party thereto, and NexBank, SSB, as administrative agent who have agreed to vote to accept the Prepackaged Plan.

Absent confirmation of the Prepackaged Plan, the Debtors do not have the resources to service all of their existing debt obligations. A restructuring pursuant to the proposed Prepackaged Plan would enable the Debtors to reduce the amount of debt owed by approximately $165 million (or approximately 50%). If confirmed, the proposed financial restructuring will also free up additional cash that can be reinvested in the Debtors' businesses and position them to pursue future growth opportunities.

The Debtors are seeking your vote on the Prepackaged Plan prior to the commencement of the Chapter 11 Cases. By using this "joint prepackaged chapter 11 plan of reorganization" method, the Debtors anticipate that their day-to-day business operations will not be impacted by the bankruptcy filing, the Chapter 11 Cases will be significantly shortened, and the administration of their cases will be simplified and less costly. Please review the attached Disclosure Statement carefully for details about voting, recoveries, the proposed financial restructuring, the Debtors and their financial performance, and other relevant matters. The Debtors have established the following date for determining who is entitled to vote on the Prepackaged Plan (the "*Voting Record Date*") and the following deadline for their Solicitation Agent to receive votes (the "*Voting Deadline*"):

VOTING RECORD DATE:          February 12, 2010

VOTING DEADLINE:             March 29, 2010, 5:00 p.m., Eastern Time

Sincerely,

Electrical Components International, Inc., *et al.*


/s/ David J. Webster
Name:  David J. Webster
Title:    Chief Executive Officer

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT CHAPTER 11 REORGANIZATION PLAN PRIOR TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE. BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, THE COMPANIES EXPECT TO SEEK PROMPTLY AN ORDER OF THE BANKRUPTCY COURT (i) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION AND THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE, AND (ii) CONFIRMING THE PREPACKAGED PLAN DESCRIBED HEREIN.



**Electrical Components International**

# DISCLOSURE STATEMENT

### DATED MARCH 4, 2010

PREPETITION SOLICITATION OF VOTES
WITH RESPECT TO THE JOINT PREPACKAGED REORGANIZATION PLAN
OF

## FP-ECI HOLDINGS COMPANY

AND

ITS WHOLLY-OWNED DIRECT AND INDIRECT SUBSIDIARIES,

## ELECTRICAL COMPONENTS INTERNATIONAL, INC.,

## ECM HOLDING COMPANY

## AND

## NOMA O.P., INC.

FROM THE HOLDERS OF

### FIRST LIEN LENDER CLAIMS,

### SECOND LIEN LENDER CLAIMS

AND

### HOLDINGS PREFERRED EQUITY INTERESTS

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS 5:00 P.M. PREVAILING EASTERN TIME, ON MARCH 29, 2010, UNLESS EXTENDED BY THE COMPANIES. IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE.

**RECOMMENDATION BY THE DEBTORS**
The Board of Directors of each of Holdings, ECI, ECM Holding and Noma have unanimously approved the Solicitation, the Prepackaged Plan, and the transactions contemplated thereby, and recommend that all creditors and equity holders whose votes are being solicited submit ballots to accept the Prepackaged Plan.

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE PREPACKAGED PLAN.

THE COMPANIES ARE FURNISHING SOLICITATION MATERIALS TO EACH RECORD HOLDER OF CLAIMS AND EQUITY INTERESTS AS OF THE VOTING RECORD DATE IN CONNECTION WITH THE COMPANIES' SOLICITATION OF ACCEPTANCES OF THE PREPACKAGED PLAN DESCRIBED HEREIN PURSUANT TO SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH HOLDER OF CLAIMS AND EQUITY INTERESTS SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PREPACKAGED PLAN; USE OF THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. THIS DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANIES.

**THE COMPANIES HAVE NOT COMMENCED REORGANIZATION CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF THE DATE OF THIS DISCLOSURE STATEMENT. IF, HOWEVER, THE COMPANIES RECEIVE PROPERLY COMPLETED BALLOTS (THAT ARE NOT SUBSEQUENTLY REVOKED) INDICATING ACCEPTANCE OF THE PREPACKAGED PLAN IN SUFFICIENT NUMBER AND AMOUNT TO MEET THE VOTING REQUIREMENTS PRESCRIBED BY SECTION 1126 OF THE BANKRUPTCY CODE, THE COMPANIES INTEND TO FILE (BUT HEREBY EXPRESSLY RESERVE THE RIGHT NOT TO FILE) WITH THE BANKRUPTCY COURT VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND TO SEEK, AS PROMPTLY THEREAFTER AS PRACTICABLE, CONFIRMATION OF THE PREPACKAGED PLAN. THE EFFECTIVE DATE OF THE PREPACKAGED PLAN IS EXPECTED TO OCCUR SHORTLY AFTER THE BANKRUPTCY COURT'S ENTRY OF THE CONFIRMATION ORDER.**

**IN THE EVENT THAT THE REQUISITE ACCEPTANCES ARE NOT RECEIVED OR, IF RECEIVED, ARE SUBSEQUENTLY REVOKED PRIOR TO TERMINATION OF THE SOLICITATION, THE COMPANIES HEREBY RESERVE THE ABSOLUTE RIGHT TO USE ANY AND ALL BALLOTS ACCEPTING THE PREPACKAGED PLAN THAT WERE RECEIVED PURSUANT TO THE SOLICITATION AND NOT SUBSEQUENTLY REVOKED TO SEEK CONFIRMATION OF THE PREPACKAGED PLAN (OR OF ANY MODIFICATION THEREOF THAT DOES NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF THE CLASSES OF CLAIMS AND EQUITY INTERESTS WITH RESPECT TO WHICH SUCH BALLOTS WERE CAST) PURSUANT TO SECTION 1129(B) OF THE BANKRUPTCY CODE. SEE SECTION VIII.C – "CONFIRMATION OF THE PREPACKAGED PLAN – REQUIREMENTS FOR CONFIRMATION OF THE PREPACKAGED PLAN – NON-CONSENSUAL CONFIRMATION."**

\* \* \* \* \*

BECAUSE ACCEPTANCE OF THE PREPACKAGED PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS AND EQUITY INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

C:\NRPORTBL\US_ACTIVE\TREADWAY\43210445_13.DOC

THE CONFIRMATION AND EFFECTIVENESS OF THE PREPACKAGED PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT. SEE SECTION III.H – "THE PREPACKAGED PLAN – CONDITIONS PRECEDENT TO EFFECTIVE DATE." THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE COMPANIES PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PREPACKAGED PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PREPACKAGED PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PREPACKAGED PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PREPACKAGED PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN SECTION III.E. – "THE PREPACKAGED PLAN – PROVISIONS GOVERNING DISTRIBUTIONS."

THE TERMS OF THE PREPACKAGED PLAN HAVE BEEN DEVELOPED IN THE COURSE OF DISCUSSIONS AND GOOD FAITH NEGOTIATIONS WITH THE FIRST LIEN LENDERS PARTY TO THE PLAN SUPPORT AGREEMENT, THE SECOND LIEN LENDERS PARTY TO THE PLAN SUPPORT AGREEMENT, BKC, SANKATY AND FP. HOLDERS OF (I) A MAJORITY IN NUMBER AND MORE THAN TWO-THIRDS (2/3) IN OUTSTANDING PRINCIPAL AMOUNT OF EACH OF THE FIRST LIEN LENDER LOANS AND THE SECOND LIEN LENDER LOANS AND (II) TWO-THIRDS (2/3) OF THE ISSUED AND OUTSTANDING SHARES OF PREFERRED STOCK OF HOLDINGS ENTITLED TO VOTE ON THE PREPACKAGED PLAN HAVE ALREADY AGREED TO VOTE TO ACCEPT THE PREPACKAGED PLAN.

\* \* \* \* \*

IF THE REQUISITE ACCEPTANCES ARE NOT RECEIVED, THE COMPANIES BELIEVE THAT THEY MAY HAVE TO FILE TRADITIONAL, NON-PREPACKAGED PETITIONS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THERE CAN BE NO ASSURANCE, HOWEVER, THAT THE COMPANIES WILL BE ABLE TO EMERGE FROM CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE IN SUCH CIRCUMSTANCES, AND THE COMPANIES MIGHT BE FORCED INTO LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. THE COMPANIES BELIEVE THAT IF THEY ARE LIQUIDATED UNDER CHAPTER 7, THE VALUES OF THE ASSETS AVAILABLE FOR PAYMENT TO CREDITORS WOULD BE SIGNIFICANTLY LOWER THAN THE VALUES OF THE DISTRIBUTIONS CONTEMPLATED BY AND UNDER THE PREPACKAGED PLAN. SEE THE DEBTORS' LIQUIDATION ANALYSIS ATTACHED AS EXHIBIT E HERETO.

\* \* \* \* \*

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PREPACKAGED PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PREPACKAGED PLAN, ANTICIPATED EVENTS IN THE COMPANIES' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE COMPANIES BELIEVE THAT THE PREPACKAGED PLAN AND RELATED DOCUMENTS AND STATUTORY PROVISION SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE COMPANIES ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL

PROJECTIONS AND OTHER FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PREPACKAGED PLAN, HOLDERS OF CLAIMS AND EQUITY INTERESTS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANIES AND THE TERMS OF THE PREPACKAGED PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PREPACKAGED PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY. SEE SECTION VI – "CERTAIN FACTORS TO BE CONSIDERED" FOR A DISCUSSION OF VARIOUS FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PREPACKAGED PLAN.

* * * * *

NEITHER THIS DISCLOSURE STATEMENT NOR THE PREPACKAGED PLAN DESCRIBED HEREIN HAS BEEN FILED WITH OR REVIEWED BY, AND THE NEW COMMON STOCK AND THE RIGHTS WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PREPACKAGED PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

HOLDINGS IS RELYING ON THE EXEMPTION FROM THE SECURITIES ACT AND EQUIVALENT STATE LAW REGISTRATION REQUIREMENTS PROVIDED BY SECTION 1145(a) OF THE BANKRUPTCY CODE, AND TO THE EXTENT APPLICABLE SECTION 4(2) OF THE SECURITIES ACT AND SIMILAR STATE LAW PROVISIONS, TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT THE OFFER AND SALE OF THE NEW COMMON STOCK AND THE RIGHTS IN CONNECTION WITH THE SOLICITATION AND THE PREPACKAGED PLAN. SEE SECTION III.D.5 – "THE PREPACKAGED PLAN - MEANS FOR IMPLEMENTATION OF THE PREPACKAGED PLAN – ISSUANCE OF NEW COMMON STOCK" FOR A DESCRIPTION OF THE NEW COMMON STOCK AND SECTION III.D.6 – "THE PREPACKAGED PLAN – MEANS FOR IMPLEMENTATION OF THE PREPACKAGED PLAN – ISSUANCE OF RIGHTS" FOR A DESCRIPTION OF THE RIGHTS.

THE PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND, TO THE EXTENT APPLICABLE, SECTION 1125(e) OF THE BANKRUPTCY CODE, AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND

COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. SEE SECTION VI – "CERTAIN FACTORS TO BE CONSIDERED."

WHEN USED IN THIS DISCLOSURE STATEMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "MAY," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS GENERALLY IDENTIFY FORWARD-LOOKING STATEMENTS. ALTHOUGH THE COMPANIES BELIEVE THAT THEIR PLANS, INTENTIONS AND EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING STATEMENTS ARE REASONABLE, THEY CANNOT BE SURE THAT THEY WILL BE ACHIEVED. THESE FACTORS ARE NOT INTENDED TO REPRESENT A COMPLETE LIST OF THE GENERAL OR SPECIFIC FACTORS THAT MAY AFFECT THE REORGANIZED DEBTORS. IT SHOULD BE RECOGNIZED THAT OTHER FACTORS, INCLUDING GENERAL ECONOMIC FACTORS AND BUSINESS STRATEGIES, MAY BE SIGNIFICANT, PRESENTLY OR IN THE FUTURE, AND THE FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT MAY AFFECT THE COMPANIES TO A GREATER EXTENT THAN INDICATED. ALL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE COMPANIES OR PERSONS ACTING ON THEIR BEHALF ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS SET FORTH IN THIS DISCLOSURE STATEMENT. EXCEPT AS REQUIRED BY LAW, THE COMPANIES UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT AS SET FORTH IN SECTION X.H – "THE SOLICITATION; VOTING PROCEDURES – FURTHER INFORMATION; ADDITIONAL COPIES," NO PERSON HAS BEEN AUTHORIZED BY THE COMPANIES IN CONNECTION WITH THE PREPACKAGED PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANIES. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THOSE TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE EXPRESSLY SET FORTH HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PREPACKAGED PLAN WILL CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT.

THE SUMMARIES OF THE PREPACKAGED PLAN AND OTHER DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PREPACKAGED PLAN ITSELF, THE EXHIBITS ATTACHED THERETO AND ALL DOCUMENTS DESCRIBED THEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARIES PROVIDED HEREIN AND THE TERMS OF THE PREPACKAGED PLAN OR SUCH RELATED DOCUMENTS, THE TERMS OF THE PREPACKAGED PLAN SHALL GOVERN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, THE INFORMATION REGARDING THE HISTORY, BUSINESSES, AND OPERATIONS OF THE COMPANIES, THE HISTORICAL AND PROJECTED FINANCIAL

INFORMATION OF THE COMPANIES AND THE LIQUIDATION ANALYSIS RELATING TO THE COMPANIES ARE INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PREPACKAGED PLAN. AS TO ANY JUDICIAL PROCEEDINGS IN ANY COURT, INCLUDING ANY ADVERSARY PROCEEDINGS OR CONTESTED MATTERS THAT MAY BE FILED IN THE BANKRUPTCY COURT, SUCH INFORMATION IS NOT TO BE CONSTRUED AS AN ADMISSION OR STIPULATION BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE COMPANIES.

EACH HOLDER OF CLAIMS AND EQUITY INTERESTS IS ENCOURAGED TO CONSULT WITH ITS OWN LEGAL, REGULATORY, TAX, BUSINESS, FINANCIAL AND ACCOUNTING ADVISERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE PREPACKAGED PLAN TO THE EXTENT IT DEEMS NECESSARY TO MAKE AN INFORMED DECISION IN CONNECTION WITH ITS VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN. HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY NOT RELY UPON ANY RECOMMENDATION, PROMISE, REPRESENTATION OR WARRANTY OF OR VIEW EXPRESSED BY OR ON BEHALF OF ANY PARTY, OTHER THAN THOSE EXPRESSED IN THE PREPACKAGED PLAN OR THE DEFINITIVE DOCUMENTS (AS DEFINED IN THE PLAN SUPPORT AGREEMENT).

HOLDERS OF PREPETITION TRADE CLAIMS, CUSTOMERS AND EMPLOYEES WILL NOT BE IMPAIRED BY THE PREPACKAGED PLAN, AND AS A RESULT THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PREPACKAGED PLAN. DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL TRADE CREDITORS, CUSTOMERS AND EMPLOYEES OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE COMPANIES OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

* * * * *

C:\NRPORTBL\US_ACTIVE\TREADWAY\43210445_13.DOC

## SUMMARY OF THE PREPACKAGED PLAN

The following is a summary of the Companies' proposed Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code and the distributions contemplated thereunder.

The Companies are leading designers, manufacturers and marketers of wire harnesses and providers of value-added assembly services to North American, European and Asian "white goods" appliance manufacturers. Commencing in late 2007, the Companies experienced and continue to experience financial difficulties primarily due to the unprecedented downturn in the U.S. housing industry and global economic recession. The market downturn and other adverse macroeconomic factors have led to a sharp decline in demand in the Companies' key revenue segments and affected the Companies' customer base, which has resulted in lower sales and weaker cash flows than expected.

As a result, in 2008 the Companies began evaluating their financial position compared to anticipated levels for 2009 and beyond and determined that plant shutdowns and consolidations as well as headcount reductions were required to reduce costs to more appropriate levels in-line with expected customer demand. Despite the operational improvements and cost reduction initiatives over the last two years, the downturn continued to reduce sales at unprecedented levels and consequently reduce earnings. The Companies' ability to service its approximately $320 million in long term debt obligations became strained and ultimately led to defaults by ECI under its Credit Agreements (as defined below).

ECI engaged Rothschild to provide financial advice and assistance in connection with a potential restructuring due to ECI's potential liquidity event. Additionally, discussions were held with certain of the First Lien Lenders and the Second Lien Lenders in an attempt to restructure the obligations under the Credit Agreements. The Prepackaged Plan is the result of these discussions.

The primary purpose of the Prepackaged Plan is to effectuate the restructuring of the Companies' capital structure (the "*Restructuring*") in order to bring it into alignment with the Companies' present and future operating prospects and to provide the Companies with greater liquidity. If the Restructuring is not consummated, the Companies do not believe that the funds from operations will be sufficient to meet the Companies' debt service requirements and satisfy their debt obligations. The Companies believe that the Restructuring will substantially reduce their outstanding debt and put them in a stronger financial position for future growth and stability.

Under the Prepackaged Plan, as described in further detail in Section III, (i) each holder of an Allowed First Lien Lender Claim will be entitled to receive, in full satisfaction of such Claim, (a) such holder's *pro rata* share of 50,000,000 shares of the New Common Stock less the number of shares for which a holder exercises the Cash Election (which may be subject to reduction as described in Section III), (b) Cash pursuant to the Cash Election, if such holder exercises its Cash Election, and (c) such holder's *pro rata* share of the Exit Facility Tranche B Term Loans, and (ii) each holder of an Allowed Second Lien Lender Claim will be entitled to receive, in full satisfaction of such Claim, such holder's *pro rata* share of $10.0 million in Cash. In addition, each holder of an Allowed Holdings Preferred Equity Interest will be entitled to receive its *pro rata* share of the Rights. All of the Debtors' general unsecured creditors, including trade creditors, will be paid in full.

In addition, the New Money Investors have agreed to purchase (i) 22,500,000 shares of the New Common Stock in connection with the Primary Equity Contribution and (ii) between 10,000,000 and 15,000,000 shares of the New Common Stock in connection with the Secondary Equity Contribution. BlackRock and certain other First Lien Lenders have agreed to provide the Exit Facility Tranche A Term Loans in an aggregate amount of $32,500,000 on the Effective Date.

Under the Prepackaged Plan, the Companies will be consolidated solely for voting, treatment and distribution purposes.

The Companies believe that the Prepackaged Plan affords holders of impaired Claims and impaired Equity Interests the potential for the greatest realization on the Companies' assets and, therefore, is in the best interests of such holders.

**THE COMPANIES BELIEVE THAT THE PREPACKAGED PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PREPACKAGED PLAN IS IN THE BEST INTERESTS OF THE COMPANIES AND THEIR CREDITORS AND EQUITY HOLDERS. THE COMPANIES URGE CREDITORS AND EQUITY HOLDERS TO VOTE TO ACCEPT THE PREPACKAGED PLAN.**

# TABLE OF CONTENTS

Page

I.     GENERAL INFORMATION ............................................................................................ 1
      A.     The Companies ............................................................................................. 1
      B.     Current Officers ............................................................................................ 4
      C.     Prepetition Indebtedness and Capital Structure ........................................... 5
      D.     Key Events Leading to the Chapter 11 Cases ............................................. 6
      E.     The Restructuring ......................................................................................... 7

II.    ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES ........................................ 11
      A.     Administration of the Prepackaged Plan ..................................................... 11
      B.     Commencement of the Chapter 11 Cases ..................................................... 11
      C.     Debtor In Possession Financing ................................................................... 14
      D.     Anticipated Timetable for the Chapter 11 Cases ........................................ 14

III.   THE PREPACKAGED PLAN ................................................................................... 14
      A.     Introduction ................................................................................................. 14
      B.     Classification and Treatment of Claims and Equity Interests Under the Prepackaged Plan ......... 15
      C.     Treatment of Unclassified Claims ............................................................... 17
      D.     Means for Implementation of the Prepackaged Plan .................................... 23
      E.     Provisions Governing Distributions ............................................................ 27
      F.     Procedures for Treating Disputed Claims under the Prepackaged Plan ....... 29
      G.     Treatment of Executory Contracts and Unexpired Leases ........................... 30
      H.     Conditions Precedent to Effective Date ....................................................... 31
      I.      Effect of Confirmation ................................................................................ 33
      J.      Miscellaneous Provisions ............................................................................ 37

IV.   Exemption from Securities Laws ................................................................................. 40

V.    FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS ................. 43
      A.     Historical Financial Information .................................................................. 43
      B.     Consolidated Condensed Projected Financial Statements ............................ 43
      C.     Valuation Analysis ...................................................................................... 49

VI.   CERTAIN FACTORS TO BE CONSIDERED ............................................................... 52
      A.     Risks Related to the Prepackaged Plan ........................................................ 52
      B.     Risk Factors Regarding Financial Projections ............................................. 56
      C.     Risks Related to the Debtors' Business ........................................................ 56

VII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PREPACKAGED PLAN ....... 59
      A.     Consequences to the Debtors ...................................................................... 60
      B.     Consequences to Holders of Certain Claims ............................................... 63
      C.     Consequences to Holders of Allowed Holdings Preferred Equity Interests ... 69

# TABLE OF CONTENTS

## (continued)

|   |   |   |   |
|---|---|---|---|
| | D. | Information Reporting and Backup Withholding | 70 |
| VIII. | | CONFIRMATION OF THE PREPACKAGED PLAN | 71 |
| | A. | Confirmation Hearing | 71 |
| | B. | Requirements for Confirmation of the Prepackaged Plan – Consensual Confirmation | 71 |
| | C. | Requirements for Confirmation of the Prepackaged Plan – Non-Consensual Confirmation | 74 |
| IX. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PREPACKAGED PLAN | 75 |
| | A. | Commencement of "Traditional" Chapter 11 Cases | 75 |
| | B. | Alternative Plans | 75 |
| | C. | Liquidation under Chapter 7 or Chapter 11 | 75 |
| X. | | THE SOLICITATION; VOTING PROCEDURES | 76 |
| | A. | Voting Deadline | 77 |
| | B. | Voting Procedures | 77 |
| | C. | Fiduciaries and other Representatives | 78 |
| | D. | Parties Entitled to Vote | 78 |
| | E. | Agreements upon Furnishing Ballots | 78 |
| | F. | Waivers of Defects, Irregularities, Etc | 79 |
| | G. | Withdrawal of Ballots; Revocation | 79 |
| | H. | Further Information; Additional Copies | 80 |
| XI. | | RECOMMENDATION AND CONCLUSION | 80 |

## TABLE OF EXHIBITS

Exhibit A      Prepackaged Plan

Exhibit B      Organizational Chart of the Companies

Exhibit C      Plan Support Agreement

Exhibit D-1      Audited Historical Financial Information

Exhibit D-2      Unaudited Historical Financial Information

Exhibit E      Liquidation Analysis

# INTRODUCTION

## IMPORTANT – PLEASE READ

The Debtors submit this Disclosure Statement in connection with (i) the solicitation from accredited investors of acceptances (the "*Solicitation*") of the Prepackaged Plan substantially in the form set forth in Exhibit A to be filed with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") and (ii) the hearing to consider confirmation of the Prepackaged Plan (the "*Confirmation Hearing*"), which will be scheduled by the Bankruptcy Court after the commencement of chapter 11 cases regarding the Debtors (the "*Chapter 11 Cases*").

The Prepackaged Plan is comprised of a joint prepackaged chapter 11 plan for FP-ECI Holdings Company ("*Holdings*"), Electrical Components International, Inc. ("*ECI*"), ECM Holding Company ("*ECM Holding*") and Noma O.P., Inc. ("*Noma*" and together with Holdings, ECI and ECM Holding, the "*Debtors*" or the "*Companies*").

The Solicitation is being conducted at this time to obtain sufficient votes to enable the Prepackaged Plan to be confirmed by the Bankruptcy Court. Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to them in the Prepackaged Plan. Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Prepackaged Plan, the Prepackaged Plan shall govern.

The Debtors are commencing this Solicitation after extensive discussions between the Debtors and their major creditor and shareholder constituencies. The discussions have resulted in majorities of the two major creditor groups and the equity interests agreeing to support the Restructuring (as defined below) and vote to accept the Prepackaged Plan subject to, and in accordance with the terms of, the Plan Support Agreement (as defined below).

The Prepackaged Plan is premised upon the consolidation of the Companies for purposes of the Prepackaged Plan only. Accordingly, for purposes of the Prepackaged Plan, the assets and liabilities of the Companies are deemed to be assets and liabilities of a single consolidated entity and distributions to creditors are based upon that pool of assets and liabilities as if the Companies conducted business as a single economic entity. Such consolidation shall not (other than for voting, treatment, and distribution purposes under the Prepackaged Plan) affect (x) the legal and corporate structures of the Companies (including the corporate ownership of the Subsidiary Debtors), or (y) any Intercompany Claims.

**WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only holders of claims or interests in "*impaired*" classes are entitled to vote on the Prepackaged Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Prepackaged Plan pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be impaired under the Prepackaged Plan unless (i) the Prepackaged Plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Prepackaged Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes the treatment and estimated recovery for creditors and shareholders under the Prepackaged Plan who hold Allowed Claims and Equity Interests. For a further explanation, please refer to the discussion in Section III below, entitled "The Prepackaged Plan" and the Prepackaged Plan itself.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired.  Except to the extent that a holder agrees to less favorable treatment, each holder of an Allowed Priority Non-Tax Claim will receive Cash equal to the Allowed amount of such Priority Non-Tax Claim. | No (deemed to accept) | 100% |
| Class 2 | First Lien Lender Claims<br><br>*Estimated Principal Amount: $261.4 million* | Impaired.  On the Effective Date, except to the extent that the holder of an Allowed First Lien Lender Claim agrees to less favorable treatment, each holder of an Allowed First Lien Lender Claim will receive (i)(x) its *pro rata* share (based upon the principal amount of First Lien Lender Loans held by each holder divided by the aggregate outstanding principal amount of First Lien Lender Loans) of 50,000,000 shares of New Common Stock less (y) the number of shares on account of which such holder elected to receive a Cash distribution pursuant to the Cash Election, if any, (ii) the amount of Cash such holder elected to receive pursuant to the Cash Election, if any, and (iii) its *pro rata* share (based upon the principal amount of First Lien Lender Loans held by each holder divided by the aggregate outstanding principal amount of First Lien Lender Loans) of $145.0 million of Exit Facility Tranche B Term Loans.<br><br>In the event that holders of Allowed First Lien Lender Claims elected to receive an aggregate amount of Cash in excess of $15.0 million, then the number of shares of New Common Stock on account of which each holder that elected to receive Cash will be reduced on a *pro rata* basis (based upon the number of shares of New Common Stock on account of which such holder elected to receive Cash divided by the aggregate number of shares of New Common Stock on account of which all holders of Allowed First Lien Lender Claims elected to received Cash). | Yes | 75.9%<br><br>(assuming the amount of Cash distributed pursuant to the Cash Election is $10,359,764) |
| Class 3 | Second Lien Lender Claims | Impaired.  On the Effective Date, except to the extent that the holder of an Allowed Second Lien Lender Claim agrees to less favorable treatment, each holder of an | Yes | 16.7% |

| | | | | |
|---|---|---|---|---|
| | *Estimated Principal Amount: $60.0 million* | Allowed Second Lien Lender Claim will receive such holder's *pro rata* share (based upon the principal amount of Second Lien Lender Loans held by each holder divided by the aggregate outstanding principal amount of Second Lien Lender Loans) of $10.0 million in Cash. | | |
| Class 4 | Secured Tax Claims<br><br>*Estimated Amount: $31,000* | Unimpaired. Except to the extent that a holder agrees to less favorable treatment, each holder of an Allowed Secured Tax Claim will receive Cash equal to the Allowed amount of such Secured Tax Claim. | No (deemed to accept) | 100% |
| Class 5 | Other Secured Claims<br><br>*Estimated Amount: $2.4 million* | Unimpaired. On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder of an Other Secured Claim will either (i) be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default, (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code or (iii) receive the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code. | No (deemed to accept) | 100% |
| Class 6 | General Unsecured Claims<br><br>*Estimated Amount: $49.5 million* | Unimpaired. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim will receive (i) Cash (A) to the extent such Allowed General Unsecured Claim is due and owing on the Effective Date, paid on the later of the Effective Date and the date such claim becomes an Allowed General | No (deemed to accept) | 100% |

| | | Unsecured Claim, or as soon as reasonably practicable thereafter or otherwise in accordance with the terms of any agreement between the Debtors and such holder, (B) to the extent such Allowed General Unsecured Claim is not by its terms due and owing on the Effective Date, paid when and as such Allowed General Unsecured Claim becomes due and owing in the ordinary course of business, or (ii) treatment that leaves unaltered the legal, equitable and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim. | | |
|---|---|---|---|---|
| Class 7 | Intercompany Claims | Unimpaired. The legal, equitable and contractual rights of the holders of Allowed Intercompany Claims will be unaltered by the Prepackaged Plan, or such Intercompany Claims will otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. Any such transaction may be effected on or subsequent to the Effective Date without any further authorization from the Bankruptcy Court or other action by the holders of New Common Stock. | No (deemed to accept) | 100% |
| Class 8 | Holdings Preferred Equity Interests | Impaired. On the Effective Date or as soon thereafter as is reasonably practicable, all shares of Holdings Preferred Stock will be cancelled and each holder of an Allowed Holdings Preferred Equity Interest will receive its *pro rata* share (based upon the number of shares of Holdings Preferred Stock held by each holder divided by the aggregate outstanding number of shares of Holdings Preferred Stock) of the Rights. FP will waive the Waived FP Claim pursuant to Section 11.12 of the Prepackaged Plan. | Yes | > 0% |
| Class 9 | Equity Interests in Subsidiary Debtors | Unimpaired. On the Effective Date, all of the Equity Interests of the Subsidiary Debtors will be owned by Reorganized Holdings or Reorganized ECI, as applicable. | No (deemed to accept) | 100% |
| Class 10 | Holdings Common Equity Interests | Impaired. On the Effective Date or as soon thereafter as is reasonably practicable, all shares of Holdings Common Stock will be cancelled and each holder of an Allowed Holdings Common Equity Interest will not be entitled to, and will not receive or retain, any | No (deemed to reject) | 0% |

| | | property or interest in property on account of such Allowed Holdings Common Equity Interests. | | |

The primary purpose of the Prepackaged Plan is to effectuate the restructuring of the Companies' capital structure in order to bring it into alignment with the Companies' present and future operating prospects and to provide the Companies with greater liquidity. If the Restructuring is not consummated, the Companies do not believe that the funds from their current and future operations will be sufficient to meet the Companies' debt service requirements and satisfy their debt repayment obligations. The Companies believe that the Restructuring will substantially reduce their outstanding debt and put them in a stronger financial position for future growth and stability.

Under the Prepackaged Plan, as described in further detail in Section III:

- Each holder of an Allowed First Lien Lender Claim will be entitled to receive such holder's *pro rata* share (based upon the principal amount of Allowed First Lien Lender Claims held by each holder divided by the aggregate outstanding principal amount of Allowed First Lien Lender Claims) of (A) subject to the Cash Election described in the next sentence, up to 50,000,000 shares of New Common Stock, which represents up to 69.0% of the New Common Stock issuable on the Effective Date and (B) $145.0 million of the Exit Facility Tranche B Term Loans. In lieu of a distribution of its *pro rata* share of 50,000,000 shares of the New Common Stock pursuant to the previous sentence, each holder of an Allowed First Lien Lender Claim may elect to receive Cash on account of all or a portion of its distribution of New Common Stock in an amount equal to $1.00 per share of New Common Stock; provided, that the aggregate amount of shares of New Common Stock on account of which the Electing Lenders may receive Cash distributions pursuant to the Cash Election shall not exceed 15,000,000;

- Each holder of an Allowed Second Lien Lender Claim will be entitled to receive such holder's *pro rata* share (based upon the principal amount of Allowed Second Lien Lender Claims held by each holder divided by the aggregate outstanding principal amount of Allowed Second Lien Lender Claims) of $10.0 million in Cash;

- Each holder of an Allowed Holdings Preferred Equity Interest will be entitled to receive such holder's *pro rata* share (based upon the amount of Allowed Holdings Preferred Equity Interests held by each holder divided by the aggregate outstanding amount of Allowed Holdings Preferred Equity Interests) of the Rights; and

- Each holder of a General Unsecured Claim will be paid in full, including the Debtors' trade creditors.

Payments under the Prepackaged Plan will be funded by (i) the purchase of 22,500,000 shares of New Common Stock at a price of $1.00 per share by the New Money Investors (the "***Primary Equity Contribution***"), (ii) the purchase of between 10,000,000 and 15,000,000 additional shares of New Common Stock at a price of $1.00 per shares by the New Money Investors in the event that the holders of Allowed First Lien Lenders choose to receive Cash in lieu of all or a portion of their distribution of New Common Stock pursuant to the Cash Election described above (the "***Secondary Equity Contribution***") and (iii) the $32,500,000 Tranche A Term Loan Facility to be entered into among the Debtors and certain of the First Lien Lenders.

Pursuant to the Plan Support Agreement, certain holders of Allowed First Lien Lender Claims have agreed to elect to receive an aggregate amount of $10,359,764 in Cash in exchange for 10,359,764 shares of New Common Stock.

The Debtors will seek Bankruptcy Court authority to continue paying trade creditors and holders of other unsecured Claims in the ordinary course of their businesses during the Chapter 11 Cases.

**WHERE TO FIND ADDITIONAL INFORMATION**: For detailed historical and projected financial information and financial estimates, see Section V below, entitled "FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS." The Financial Projections included therein project the financial performance of the Reorganized Debtors through December 31, 2014. The Financial Projections are based on (i) the current business plan for the Reorganized Debtors, (ii) information available as of November 30, 2009 and (iii) numerous assumptions that are an integral part of the Financial Projections, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. See Section VI – "CERTAIN FACTORS TO BE CONSIDERED."

The Debtors' legal advisors are Weil, Gotshal & Manges LLP and Richards, Layton & Finger, P.A. and their financial advisor is Rothschild Inc. ("*Rothschild*"). They can be contacted at:

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
Attn: Stephen A. Youngman, Esq.
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

ROTHSCHILD INC.
1251 Avenue of the Americas, 51st Floor
New York, NY 10020
Attn: Homer D. Parkhill
Telephone: (212) 403-3677
Facsimile: (212) 403-5454

- and-

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

## A.     Summary of Voting Procedures

The Bankruptcy Code defines "acceptance" of a plan (i) by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan and (ii) by a class of equity interests as acceptance by holders of equity interests in that class that hold at least two-thirds in dollar amount of the equity interests that cast ballots for acceptance or rejection of the plan.

To be counted, your vote must be received, pursuant to the following instructions, by the Debtors' Solicitation Agent at the following address, before the Voting Deadline of 5 p.m. (Prevailing Eastern Time) on March 29, 2010 (the "*Voting Deadline*"):

**Epiq Bankruptcy Solutions, LLC**

*By Mail/Overnight Courier/Hand:*
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Electrical Components International, Inc.
Telephone: (646) 282-1800

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 2 (FIRST LIEN LENDER CLAIMS), CLASS 3 (SECOND LIEN LENDERS CLAIMS) AND CLASS 8 (HOLDINGS PREFERRED EQUITY INTERESTS) EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN.

IF THEY WISH TO DO SO, THE HOLDERS OF CLAIMS IN CLASS 2 (FIRST LIEN LENDER CLAIMS) MAY ELECT WHETHER OR NOT TO RECEIVE CASH IN LIEU OF A PORTION OF THEIR DISTRIBUTION OF NEW COMMON STOCK UNDER THE PREPACKAGED PLAN. IF A HOLDER OF CLAIMS IN CLASS 2 DOES NOT COMPLETE A BALLOT OR DOES NOT ELECT WHETHER OR NOT TO RECEIVE CASH PURSUANT TO THE CASH ELECTION, THEN SUCH HOLDER WILL RECEIVE ITS PRO RATA SHARE OF NEW COMMON STOCK AND WILL NOT RECEIVE ANY CASH IN EXCHANGE FOR ITS ALLOWED CLAIMS.

PURSUANT TO THE PLAN SUPPORT AGREEMENT, ALL OF THE CONSENTING HOLDERS (AS DEFINED THEREIN) ARE CONTRACTUALLY REQUIRED TO VOTE IN FAVOR OF THE PREPACKAGED PLAN IN ACCORDANCE WITH THE TERMS OF THE PLAN SUPPORT AGREEMENT.

For detailed voting instructions, see Section X – "THE SOLICITATION; VOTING PROCEDURES" and the instructions on your Ballot.

\* \* \*

# I.  GENERAL INFORMATION

## A.  The Companies

Holdings operates as a holding company whose only material asset is the common stock of its wholly-owned subsidiary, ECI. ECI conducts substantial business operations, in addition to holding the equity interests of its wholly-owned subsidiaries, Cabind S.p.A. ("*Cabind*"), ECM Holding and Noma. ECM Holding is a wholly-owned subsidiary of ECI and serves as the holding company for a number of international operating subsidiaries. Noma does not hold any operating assets, but is a contract party to certain royalty agreements and other intellectual property arrangements. Attached hereto as Exhibit B is a current organizational chart of the Companies and their Subsidiaries.

### 1.  The Business

The Companies are leading designers, manufacturers and marketers of wire harnesses and providers of value-added assembly services to North American, European and Asian "white goods" appliance manufacturers. The Companies are the largest supplier of wire harnesses to the white goods appliance market in North America. Additionally, the Companies produce specialty wire harnesses for an expanding customer base in diverse markets including transportation; heating, ventilation and air conditioning ("*HVAC*"); construction and agriculture; vending and industrial. Wire harnesses are configurations of wires, cables, connectors, terminals and plugs that can be found in many electronic products, including home appliances; transportation, automotive and HVAC; construction and agricultural equipment; and vending and industrial machines.

The Companies are suppliers to over 90 original equipment manufacturers ("*OEMs*") in numerous end markets, including industry leaders Bosch, Chrysler, Case, Delphi, Electrolux, EZ GO, General Electric, General Motors, Haier, Mabe, Nissan, Whirlpool and Xerox. The Companies' success is derived from their long-term relationships with their customer base, advanced design and engineering expertise, low-cost structure, global production platform and commitment to quality, delivery and customer service.

The Companies have a low-cost global footprint with eleven facilities strategically located in five countries around the world. Approximately 98% of their 8,750 employees are located in low-cost regions, with six facilities in Mexico, two facilities in China and one facility in Poland. In addition, the Companies have one facility in Canada and one in Germany, which serve the local customer base. The Companies have consistently maintained a leading market position by proactively working with customers to migrate production to their low-cost facilities in Mexico, China and Poland. To advance the Companies' customer migration strategy, they have successfully expanded their presence in China through the construction of a new plant that became fully operational in September 2006. In addition, they have consolidated most of their European operations into a newly constructed greenfield facility in Poland, which began operating in the third quarter of 2008. The Companies' manufacturing facilities are strategically located to take advantage of low-cost manufacturing environments and to better serve their customers.

Due to their world-class manufacturing platform, strong presence in low-cost geographical regions and substantial economies of scale, the Companies generate leading margins compared to other wire harness manufacturers. Furthermore, the Companies have consistently achieved ongoing cost reductions and improvements in operational efficiencies to maintain significant cost and quality advantage.

The business was founded in the late 1950s as Burcliff Industries and later consolidated into International Wire Group, Inc., which was sold to Viasystems, Inc. in 2000. On May 1, 2006, Francisco Partners acquired the business from Viasystems and has since operated the business as an independent enterprise. In July 2006, Cabind, a leading European provider of wire harnesses and value-added

assembly services to the white goods industry, was acquired. In February 2007, to consolidate the business' leading market position in the North American wire harness market for home appliances, it acquired Noma, a leading manufacturer and marketer of wire harnesses for the white goods, automotive, HVAC, imaging system markets and provider of value-added assembly services to the white goods industry.

## 2. The Industry

a. ***Wire Harness Overview.*** The Companies supply wire harnesses to manufacturers of white goods, automotive equipment, transportation equipment, HVAC, construction and agricultural equipment, and vending and industrial machines. Their primary end market for the supply of wire harnesses is the white goods market, which accounted for approximately 75% of sales in 2009. The remaining 25% of sales were classified as specialty wire harnesses or assembly services.

b. ***North American Household Appliances.*** Management estimates that sales of wire harnesses to the major white goods manufacturers in North America will total approximately $390 million in 2010. North American demand for white goods has exhibited little historical volatility until the recent deterioration in economic conditions. According to the Association of Home Appliance Manufacturers ("*AHAM*"), demand for white goods increased at a compounded annual growth rate of 4.0% for the past 40 to 50 years, prior to the recent economic downturn. However, according to AHAM, demand has declined 17% since 2006.

Mature markets like the United States, Canada and Western Europe are characterized by high levels of white goods penetration. In such markets, unit sales are driven by replacements and housing starts. The replacement cycle for most appliances has historically been ten years. However, recent trends have accelerated the replacement cycle as OEMs look to improve the primary functions of appliances and create more energy efficient products. Replacements and upgrades are estimated to account for approximately 75-85% of sales. Management estimates that white goods sales related to the construction of new residential homes account for the remaining 15-25% of sales.

c. ***White Goods Industry Structure.*** The major appliance industry in North America and Europe is intensely competitive due to high penetration rates, geographic dispersion of consumers, and increasing market power of major retailers. In addition, many household appliances are based on standard designs and common manufacturing techniques, so it can be challenging for competitors to create a unique value proposition for customers. These factors have placed downward pressure on appliance prices worldwide. Finished product differentiation is achieved through aesthetic variety, brand strength and price.

Consumer demand for low-cost appliances and major retailers' demands for inexpensive, high-quality inventory are driving production to low-cost countries, such as Mexico for the North American market and Poland for the European market. Additionally, growing domestic demand in developing countries is also a driving force behind major appliance OEMs in North America and Europe locating in such countries, and seeking to extend their brands into new markets. These trends are expected to benefit the Companies since their production facilities are located in Mexico, Poland and China.

d. ***Specialty Harness Applications and Assembly Services.*** Management estimates a multi-billion dollar opportunity is available in the specialty harness markets, including automotive, transportation, HVAC, construction, agriculture, vending and industrial, and the Companies are pursuing new programs opportunistically.

The specialty wire harness industry is broad and highly fragmented. Many end markets are serviced by small harness producers. The Companies have a comparative advantage in meeting demand for specialty wire harnesses given their global low-cost production platform and relative

C:\NRPORTBL\US_ACTIVE\TREADWAY\43210445_13.DOC          2

economies of scale, which enable them to purchase materials at lower prices than smaller competitors and mitigate market pricing pressures. The Companies also differentiate themselves by emphasizing their sophisticated processes, world class tech support and ability to manufacture products built to precise customer specifications.

As part of management's strategy to leverage the Companies' customer relationships and capitalize on the growing trend among appliance manufacturers to outsource high-cost, unionized production operations, the Companies are expanding their assembly offering, which includes a variety of assembly services for products used in major household appliances.

### 3. Business Strategy

Management believes that the Companies are well positioned for growth in sales and operating income through a strategy based on the following:

- ***Take Advantage of Structurally Improved Cost Position.*** During the period of significant volume decline which occurred in late 2008 due to the unprecedented downturn in economic conditions, the Companies have greatly enhanced their cost position through cost reductions of over $40 million undertaken in 2008 and 2009, which included significant headcount reductions, plant closures and consolidations, as well as productivity improvements. Management believes these initiatives have structurally aligned the Companies to meet current market demand and achieve improved results once demand returns to historical levels. The Companies also completed the integration of the Noma acquisition and standardized their manufacturing processes throughout the Company.

- ***Leverage Low-Cost Geographic Footprint.*** To meet customers' demands for the highest quality, lowest cost products, the Companies continue to make significant investments in low-cost locations, the most recent being a new 140,000 square foot state-of-the-art manufacturing facility in Bielsko-Biala, Poland. The facility provides the Companies with a low-cost manufacturing platform that positions them to pursue opportunities with leading European white goods manufacturers as well as North American appliance OEMs serving the European markets. Through continued investments in countries with low production costs, the Companies plan to continue to develop their global market position while minimizing costs.

- ***Enhance Strong Customer Relationships.*** The Companies are focused on expanding relationships with customers by leveraging their reputation for high levels of quality, customer service and operational excellence, all of which provide them with the opportunity to bid for additional programs from the strong position of a preferred provider. The management team has created a culture that is focused on providing customers with high-quality service and technical support, and this is reflected in the Companies' continuing ability to obtain new business and expand current customer relationships.

- ***Expand Relationships with Customers through Cross-Selling.*** Building on its wire harness product offering, the Companies are pursuing cross-selling opportunities for assembly service solutions with existing customers and intend to continue leveraging customer relationships to expand the products and services they sell to customers.

- ***Diversify End Market Mix.*** To balance the revenue mix, the Companies are aggressively pursuing offerings into additional markets, including transportation, HVAC, construction, agriculture, vending and industrial. Over the past few years, they have been able to secure

a variety of new customers and expect to continue expanding their specialty product offerings.

- ***Pursue Market Penetration with Asian Manufacturers.*** Recently, the Companies have seen Asian manufactures, such as Samsung and LG, aggressively enter North American markets in both appliances and consumer goods and they believe the Companies are well-positioned to pursue opportunities with these leading Asian manufacturers both domestically and in China as a result of the Companies' operations in China and Mexico.

- ***Focus on Operational Excellence.*** Management continuously implements strategic initiatives designed to improve product quality while reducing manufacturing costs. The Companies continue to focus on opportunities to improve operating income, including: (i) further rationalization of manufacturing capacity; (ii) streamlining of marketing and general and administrative overhead; (iii) continued implementation of lean manufacturing and Six Sigma initiatives; (iv) efficient investment in new equipment and technologies and the upgrading of existing equipment; and (v) continued improvement of internal controls and centralization of certain aspects of accounting and finance functions. The management team is focused on maximizing the Companies' current asset base to improve operational efficiency while also adapting to the needs of customers and the market.

## B.     Current Officers

The following table sets forth the name and position of each of the current executive officers of ECI:

| Name | Position |
| --- | --- |
| David J. Webster...................................... | President and Chief Executive Officer |
| Mitch Leonard.......................................... | Executive Vice President and Chief Financial Officer |
| Carlo Alberto Caglieri ............................ | President of International Operations |
| Roberto Lopez.......................................... | President of North American Operations |
| Gary Gagstetter ....................................... | Executive Vice President of Sales and Marketing |
| Daris Foster............................................. | Executive Vice President of Global Business Services |

### *David J. Webster, Chief Executive Officer*

Mr. Webster is the Chief Executive Officer of ECI and has been responsible for the management oversight of the Companies since 1997. In 1997, Mr. Webster joined Mills & Partners, a management firm dedicated to the sourcing, management and operation of private equity investments exclusively for Hicks, Muse, Tate & Furst Incorporated ("*HMTF*"). In 2001, Mr. Webster was one of the founders of Hanley Partners, Inc., which succeeded Mills & Partners in the management of certain private equity investments for HMTF, including Viasystems. While at Hanley Partners and Mills & Partners, Mr. Webster was responsible for sourcing, negotiating and executing more than $5 billion of leveraged buyout and private equity transactions. In addition, during such tenure, Mr. Webster was responsible for the oversight and was a board member of Berg Electronics, Inc., Wirekraft Industries, Inc., Crain Industries, Inc., International Wire Group, Inc., Viasystems Group, Inc., and European PCB Group, Inc. Mr. Webster has participated in transactions in almost all industrialized countries in the world including developing countries such as Mexico and China. Mr. Webster has also led numerous asset redeployments whereby operations have been relocated to low-cost jurisdictions such as Mexico and China. Prior to joining Mills & Partners, Mr. Webster was a partner at Weil, Gotshal & Manges LLP where he

represented various private equity firms. Mr. Webster has participated in over $20 billion of merger and acquisition transactions. Mr. Webster received his BBA Summa Cum Laude from Kent State University and his JD Order of the Coif from Case Western Reserve University.

### Mitch Leonard, Executive Vice President and Chief Financial Officer

Mr. Leonard joined ECI in 1997 and was appointed Executive Vice President and CFO in 2006. He previously held various financial operations positions with Rohm and Hass, International Wire Group, Viasystems, General Cable and Warburton Valve. Mr. Leonard holds a BBA in Accounting from the University of Iowa.

### Carlo Alberto Caglieri, President of International Operations

Mr. Caglieri joined ECI in 2007 and is the President of International Operations, which includes Europe and the Asia Pacific. He previously worked as a consultant, working on different issues mainly related to efficiency recovery, cost reduction and revenue improvement for small and medium size companies. Prior to that, Mr. Caglieri served as the Vice President of European operations for Viasystems. His responsibilities included the operational control and coordination of four plants in the UK, two in Italy, one in Sweden, one in the Netherlands and one in France. Mr. Caglieri graduated with honours in 1983 with a degree in mechanical engineering at The Politecnico of Torino.

### Roberto Lopez, President of North American Operations

Mr. Lopez joined ECI in 1992 and is the President of North American Operations, where he oversees strategic initiatives and manufacturing excellence for the North American facilities. He previously held various positions in Quality, Purchasing, Manufacturing and Engineering with General Electric, Allen-Bradley, Delco Electronics, Ohio Medical Products, International Wire Group and Viasystems. Mr. Lopez holds a BS in Electrical Engineering from the University of Texas at El Paso.

### Gary Gagstetter, Executive Vice President of Sales and Marketing

Mr. Gagstetter joined ECI in 2000 and is the Executive Vice President of Sales and Marketing. He previously served as Vice President and Controller of the EMS Division when he joined Viasystems. Mr. Gagstetter previously held a variety of financial/operational positions at APW, Thomas and Betts, Schering-Plough and Deloitte & Touche from 1982 through 1999. Mr. Gagstetter holds a BA in Accounting from Michigan State University and an MBA from the University of Memphis.

### Daris W. Foster, Executive Vice President of Global Business Services

Mr. Foster joined ECI in 2006 and is the Executive Vice President of Global Business Services. Mr. Foster was previously employed by International Wire Group for eight years as head of Business Process Control, and GE Capital for thirteen years as VP of Information Technology. He holds a BS/BA in education from Tennessee Temple University, and has spent the last eleven years focused on process enhancements in international manufacturing.

### C. Prepetition Indebtedness and Capital Structure

#### 1. First Lien Credit Agreement

On September 23, 2008, ECI entered into that certain Amended and Restated First Lien Credit Agreement, by and among ECI, Holdings, the subsidiary guarantors party thereto, the lenders party thereto, and UBS AG, Stamford Branch, as administrative agent and as collateral agent (as amended or otherwise modified from time to time, the "***First Lien Credit Agreement***"). The obligations of ECI under the First Lien Credit Agreement are guaranteed by each of Holdings, ECM Holding and Noma. The indebtedness outstanding under the First Lien Credit Agreement is comprised of revolving loans in an

aggregate principal amount of approximately $35.0 million and term loans in an aggregate principal amount of approximately $226.4 million. The First Lien Credit Agreement is secured by a first priority security interest in substantially all of the assets of the Companies and a first priority pledge of 66% of the Companies' equity interests in their foreign subsidiaries. The priority of the security interests and related creditor rights between the First Lien Credit Agreement and the Second Lien Credit Agreement are set forth in that certain Intercreditor Agreement, dated as of May 1, 2006, among the First Lien Administrative Agent (as Collateral Agent under the First Lien Credit Agreement), the Second Lien Administrative Agent (as Collateral Agent under the Second Lien Credit Agreement) and ECI (as amended from time to time, the "*Intercreditor Agreement*"). The First Lien Credit Agreement matures with respect to revolving loans thereunder on May 1, 2012 and with respect to term loans thereunder on May 1, 2013.

### 2. Second Lien Credit Agreement

On September 23, 2008, ECI entered into that certain Amended and Restated Second Lien Credit Agreement, by and among ECI, Holdings, the subsidiary guarantors party thereto, the lenders party thereto, and NexBank, SSB, as successor administrative agent and collateral agent (as amended or otherwise modified from time to time, the "*Second Lien Credit Agreement*" and together with the First Lien Credit Agreement, the "*Credit Agreements*"). The obligations of ECI under the Second Lien Credit Agreement are guaranteed by each of Holdings, ECM Holding and Noma. The indebtedness outstanding under the Second Lien Credit Agreement is comprised of term loans in an aggregate principal amount of $60.0 million. The Second Lien Credit Agreement is secured by a second priority security interest in substantially all of the assets of the Companies and a second priority pledge of 66% of the Companies' equity interests in their first-tier foreign subsidiaries. The priority of the security interests and related creditor rights between the First Lien Credit Agreement and the Second Lien Credit Agreement are set forth in the Intercreditor Agreement. The Second Lien Credit Agreement matures on May 1, 2014.

### 3. Equity

There is no established public trading market for Holdings' capital stock. As of February 1, 2010, there were 200,000 shares of preferred stock of Holdings (the "*Holdings Preferred Stock*") authorized, of which 138,158.80 were issued and outstanding. As of February 1, 2010, there were 20,000,000 shares of common stock of Holdings (the "*Holdings Common Stock*") authorized, of which 15,350,967.00 were issued and outstanding. The ownership of the Holdings Preferred Stock and the Holdings Common Stock is identical, with Francisco Partners and its affiliates owning 98.5% of the capital stock. Of the remaining 1.5%, 0.2% is owned by David Webster, Chief Executive Officer of ECI, and 1.3% is owned by Antonio Cazzaniga, a former executive with Cabind, which was acquired by the Companies in 2006. There are also 1,266,100 shares of Holdings Common Stock reserved for restricted options and an additional 733,900 shares of Holdings Common Stock that may be utilized for options.

### D. Key Events Leading to the Chapter 11 Cases

Commencing in late 2007, the Companies experienced and continue to experience financial difficulties primarily due to the unprecedented downturn in the U.S. housing industry and global economic recession. The market downturn and other adverse macroeconomic factors have led to a sharp decline in demand in the Companies' key revenue segments such as appliance, HVAC and automotive. According to the Association of Home Appliance Manufacturers shipment data, unit shipments declined 26% in January 2009 from the same period in 2008. As a consequence, the Companies' customer base started taking out production days and drawing down inventory levels to meet the lower demand. The economic downturn affecting the Companies' customer base has resulted in lower sales and weaker cash flows than expected.

As a result, in 2008 the Companies began evaluating their financial position compared to anticipated levels for 2009 and beyond and determined that plant shutdowns and consolidations as well as headcount reductions were required to reduce costs to more appropriate levels in-line with expected customer demand. Despite the operational improvements and cost reduction initiatives over the last two years, the downturn continued to reduce sales at unprecedented levels and consequently reduce earnings. At the end of 2008, the Companies incurred losses from operations due primarily to impairment of goodwill and restructuring charges. In addition, the Companies' operating performance and liquidity had been negatively affected by economic and industry conditions related to the global economic recession and downturn in the appliance industry. As a result, the Companies' ability to service the $320 million in long term debt obligations became strained and ultimately led to defaults by ECI under the Credit Agreements.

As of December 31, 2008, ECI was not in compliance with the maximum leverage and minimum interest coverage ratios required by the Credit Agreements. Accordingly, ECI notified the First Lien Administrative Agent and the Second Lien Administrative Agent that, as of December 31, 2008, ECI was in breach of its financial covenants under the Credit Agreements. ECI received a reservation of rights letter from the First Lien Administrative Agent, reserving its rights, *inter alia*, to accelerate all outstanding loan obligations under the First Lien Credit Agreement and take enforcement action against the collateral securing such obligations.

ECI engaged Rothschild to provide financial advice and assistance in connection with a potential restructuring due to ECI's potential liquidity event. Additionally, discussions were held with the First Lien Lenders and the Second Lien Lenders in an attempt to restructure the obligations under the Credit Agreements.

**E.     The Restructuring**

**1.     Plan Support Agreement**

On February 12, 2010, the Companies and (i) certain holders (the "***Consenting Lenders***") representing a majority in number and greater than two-thirds in aggregate amount of each of the First Lien Lender Loans and the Second Lien Lender Loans, (ii) the New Money Investors, (iii) certain holders (the "***Equity Holders***" and, together with the Consenting Lenders, the "***Consenting Holders***") representing a majority of the outstanding shares of each of the Holdings Common Stock and the Holdings Preferred Stock, and (iv) the Agents entered into a Plan Support Agreement (the "***Plan Support Agreement***"), which is attached hereto as Exhibit C.

Pursuant to the Plan Support Agreement, (i) the Companies agreed to use their commercially reasonable efforts to implement the Restructuring by commencing the Solicitation of votes for the Prepackaged Plan and the filing of Chapter 11 Cases substantially in accordance with the terms of the Prepackaged Plan, (ii) certain of the First Lien Lenders committed to fund the DIP Facility and the Exit Facility Tranche A Term Loans, and (iii) the New Money Investors agreed to make the Primary Equity Contribution and the Secondary Equity Contribution, all on the terms and conditions set forth therein.

Upon consummation of the Prepackaged Plan (the "***Effective Date***") and pursuant to the Plan Support Agreement and the terms set forth in the Prepackaged Plan, among other things:

- Each holder of First Lien Lender Claims will receive the distributions set forth in Section 4.2 of the Prepackaged Plan, which are described in summary form in Section III hereof.

- Each holder of Second Lien Lender Claims will receive the distributions set forth in Section 4.3 of the Prepackaged Plan, which are described in summary form in Section III hereof.

- The New Money Investors have severally committed to purchase 22,500,000 shares of New Common Stock at a price of $1.00 per share on the Effective Date. In connection with the exercise of the Cash Election by the holders of the First Lien Lender Claims, the New Money Investors have also severally committed to purchase between 10,000,000 and 15,000,000 additional shares of New Common Stock at a price of $1.00 per share on the Effective Date.

- Each holder of Holdings Preferred Stock will receive the distributions set forth in Section 4.8 of the Prepackaged Plan, which are described in summary form in Section III hereof. FP will waive the Waived FP Claim pursuant to Section 11.12 of the Prepackaged Plan.

- All existing shares of Holdings Preferred Stock and Holdings Common Stock will be cancelled on the Effective Date.

The Plan Support Agreement provides termination rights to each of the parties thereto upon the occurrence of certain specified events or the failure to occur of certain specified events, including the failure to meet the milestones contained therein. Depending on the termination event, any of (i) the Companies, (ii) the holders of a majority in aggregate principal amount of the First Lien Lender Loans held by the First Lien Lenders party to the Plan Support Agreement, (iii) the holders of a majority in aggregate principal amount of the Second Lien Lender Loans held by the Second Lien Lenders party to the Plan Support Agreement, (iv) the New Money Investors, and/or (v) holders of a majority of the outstanding shares of Holdings Preferred Stock may have the right to terminate the Plan Support Agreement.

Until the Plan Support Agreement has been properly terminated, each Consenting Holder has agreed to vote any debt or equity securities held by such party in favor of the Prepackaged Plan and not to change, withdraw or revoke such vote.

The Plan Support Agreement can be amended (including with respect to the milestones included therein) with the consent of the Companies and the Requisite Consenting Parties (as defined in the Plan Support Agreement); provided, however, that amendments that materially and adversely affect any party require the consent of such affected party (other than the holders of the Holdings Preferred Stock whose amendment rights are limited to changes that affect the Rights). Except as otherwise set forth in the Plan Support Agreement, upon termination of the Plan Support Agreement, the parties are released from their obligations thereunder. If the Plan Support Agreement is terminated, it is likely that the Prepackaged Plan will not be confirmed.

### 2. Forbearance Agreements

Pursuant to that certain First Lien Forbearance Agreement, dated February 12, 2010, the First Lien Lenders agreed to forbear from exercising certain default-related rights and remedies that may exist against the Companies as a result of the failure of the Companies to make the interest and principal payments due and payable under the First Lien Credit Agreement and certain other specified defaults and events of default occurring, or that are anticipated to occur, thereunder until the earliest to occur of (i) April 12, 2010, (ii) the date of commencement of the Companies' Chapter 11 Cases, and (iii) the occurrence of certain defaults described therein.

Pursuant to that certain Second Lien Forbearance Agreement, dated February 12, 2010, the Second Lien Lenders agreed to forbear from exercising certain default-related rights and remedies that may exist against the Companies as a result of the failure of the Companies to make the interest payments due and payable under the Second Lien Credit Agreement and certain other specified defaults and events of default occurring, or that are anticipated to occur, thereunder until the earliest to occur of (i) April 12,

2010, (ii) the date of commencement of the Companies' Chapter 11 Cases, and (iii) the occurrence of certain defaults described therein.

### 3. Exit Facility

The Debtors contemplate ECI entering into an Exit Facility in the amount of $177,500,000, which if entered into would be utilized, *inter alia*, to fund distributions under the Prepackaged Plan and to provide post-Effective Date liquidity to the Reorganized Debtors.

The Exit Facility will consist of senior secured term loan facilities in an aggregate principal amount of $177.5 million, comprised of (i) a new money first-out term loan facility in an aggregate principal amount of $32.5 million, which is comprised of (x) an initial sub-tranche in the aggregate principal amount of $12.5 million (the "*Initial Term Loan A Sub-Tranche*"), and (y) an additional sub-tranche in the aggregate principal amount of $20.0 million (the "*Additional Term Loan A Sub-Tranche*" and together with the Initial Term Loan A Sub-Tranche, the "*Tranche A Term Loan Facility*") and (ii) a second-out term loan facility in an aggregate principal amount of $145.0 million (the "*Tranche B Term Loan Facility*" and together with the Tranche A Term Loan Facility, the "*Term Facilities*").

The Tranche A Term Loan Facility will be provided by BlackRock and certain other First Lien Lenders. The Initial Term Loan A Sub-Tranche will (a) have a five year maturity, (b) bear interest at a rate of either a base rate plus 6.75% per annum (subject to a base rate floor of 4.0% per annum) or LIBOR plus 7.75% per annum (subject to a LIBOR floor of 3.0% per annum) and (c) amortize in equal quarterly installments in annual amounts equal to 1.0% of the original principal amount of the Initial Term Loan A Sub-Tranche, with the balance due at maturity. The Additional Term Loan A Sub-Tranche will (x) have a two year maturity, (y) bear interest at a rate of either a base rate plus 6.75% per annum (subject to a base rate floor of 4.0% per annum) or LIBOR plus 7.75% per annum (subject to a LIBOR floor of 3.0% per annum) and (z) be payable in full at maturity.

The Tranche B Term Loan Facility will be comprised of the $145.0 million in aggregate amount of Exit Facility Tranche B Term Loans distributed to the First Lien Lenders on the Effective Date in partial exchange for their Allowed First Lien Lender Claims. The Tranche B Term Loan Facility will (a) become due on the fifth anniversary of the Effective Date, (b) bear interest at a rate of either a base rate plus 5.50% per annum (subject to a base rate floor of 4.0% per annum) or LIBOR plus 6.50% per annum (subject to a LIBOR floor of 3.0% per annum) and (c) amortize in equal quarterly installments in annual amounts equal to 1.0% of the original principal amount of the Tranche B Term Loan Facility, with the balance due at maturity.

The Term Facilities will be guaranteed by Holdings and all of the existing and future domestic and, to the extent no adverse tax consequences would or could result therefrom, foreign subsidiaries of ECI and will be secured by (i) a first priority pledge of all of the equity interests of ECI and each of its domestic and, subject to certain limitations, foreign subsidiaries and (ii) a first priority security interest in and mortgage on all tangible and intangible assets of ECI and each guarantor.

### 4. New Common Stock

The Prepackaged Plan contemplates the issuance of 72,500,000 shares of New Common Stock, which will consist of (i) the distribution by Reorganized ECI of up to 50,000,000 shares of the New Common Stock to the holders of Allowed First Lien Lender Claims, (ii) the issuance of 22,500,000 shares of the New Common Stock to the New Money Investors in exchange for the Primary Equity Contribution, and (iii) the issuance of between 10,000,000 and 15,000,000 shares of New Common Stock to the New Money Investors in exchange for the Secondary Equity Contribution. In respect of the distributions and issuances of New Common Stock contemplated by clauses (i) and (iii) above, holders of Allowed First Lien Lender Claims have the option to receive Cash on account of all or a portion of their distribution of the New Common Stock in an amount equal to $1.00 per share of New Common Stock up

to an aggregate amount of 15,000,000 shares, with the number of shares distributed pursuant to clause (i) above decreasing and the number of shares issued pursuant to clause (iii) above correspondingly increasing with respect to such portion of the New Common Stock that such holders (the "*Electing Lenders*") elect to receive in Cash; provided, that in the event the aggregate number of shares for which such Electing Lenders make a Cash Election exceeds 15,000,000, then the aggregate number of shares of New Common Stock on account of which such Electing Lenders receive Cash will be reduced on a *pro rata* basis (based upon the number of shares of New Common Stock on account of which each Electing Lender elected to receive Cash divided by the aggregate number of shares of New Common Stock on account of which all Electing Lenders elected to receive Cash) until the aggregate number of shares on account of which Cash will be distributed pursuant to the Cash Election is equal to 15,000,000.

### 5. Rights

The Prepackaged Plan contemplates the issuance of Rights to holders of Holdings Preferred Stock in exchange for such holder's Allowed Holdings Preferred Equity Interests on terms and conditions set forth in the Rights Agreement, which will provide such holders with (a) the right to receive 5% of any equity value in excess of $250 million (decreased by the amount of any cash dividends, cash redemptions or cash repurchases of the equity securities effected with respect to the Plan New Common Stock) distributed with respect to shares of Plan New Common Stock upon a Liquidity Event effected on or before the sixth anniversary of the consummation of the Prepackaged Plan (the "*Tranche A Rights*"), and (b) the right to receive 5% of any equity value in excess of $325 million (decreased by the amount of any cash dividends, cash redemptions or cash repurchases of the equity securities effected with respect to the Plan New Common Stock) distributed with respect to shares of Plan New Common Stock upon a Liquidity Event effected on or before the sixth anniversary of the consummation of the Prepackaged Plan (the "*Tranche B Rights*" and together with the Tranche A Rights, the "*Rights*"). The rights to payment under the Tranche A Rights and the Tranche B Rights are independent, separate and additional.

### 6. Employment Agreements and Management Retention and Incentive Plan

On the Effective Date, the Reorganized Debtors shall either enter into new employment agreements in form and substance acceptable to the Requisite Consenting Parties with existing members of management who are currently subject to written employment agreements with the Debtors, or assume such existing agreements.

The Reorganized Debtors will establish the Management Incentive Plan, which will be in form and substance reasonably acceptable to the Requisite Consenting Parties and provide for 10% of the fully diluted New Common Stock (which shall dilute the New Common Stock distributed and/or issued, as applicable, to the First Lien Lenders and the New Money Investors on the Effective Date and the New Common Stock issuable pursuant to the Rights) to be available for issuance to the officers and key employees of the Reorganized Debtors and their affiliates as determined by the board of directors of Reorganized Holdings after the Effective Date.

### 7. Shareholders Agreement

In connection with the Prepackaged Plan, on the Effective Date Reorganized Holdings will enter into a Shareholders Agreement with each holder of New Common Stock. The Shareholders Agreement, which will be included in the Prepackaged Plan Supplement, will contain provisions in form and substance acceptable to the Requisite Consenting Parties relating to, *inter alia*, corporate governance rights, restrictions on transfers, preemptive rights, information rights, tag along/drag along rights, board approval thresholds and shareholder consent requirements, supermajority voting requirements, specifications on independent directors, and such other terms as may be deemed necessary or appropriate.

### 8. Registration Rights Agreement

As set forth in the Prepackaged Plan, any holder receiving shares of Plan New Common Stock will be entitled to become party to the Registration Rights Agreement, which will be in form and substance acceptable to the Requisite Consenting Parties. The Registration Rights Agreement, which will be included in the Prepackaged Plan Supplement, will include certain demand registration rights for a privately-held company and piggyback rights subject to customary lock-ups and cut backs.

### 9. Purpose and Effect of the Prepackaged Plan

The primary purpose of the Prepackaged Plan is to effectuate the Restructuring of the Companies' capital structure in order to bring it into alignment with the Companies' present and future operating prospects and the present and future operating prospects of the customers for which it serves. Presently, the cash flow expected to be generated by the Companies and their Subsidiaries will not be sufficient to satisfy their debt service requirements and debt obligations unless the Restructuring is consummated. The Restructuring will reduce the amount of the Companies' outstanding indebtedness by approximately $165,000,000 by terminating the First Lien Credit Agreement and the Second Lien Credit Agreement, which currently have aggregate outstanding principal balances of approximately $261,375,000 and $60,000,000, respectively, and entering into the Exit Facility, which is expected on the Effective Date to have an outstanding principal balance of $177,500,000. By offering the New Common Stock to the First Lien Lenders, the Companies intend that such holders will benefit from the long-term appreciation of the Companies' businesses, which the Companies expect will be enhanced by the reduction of their debt obligations. In addition to the restructuring of the Companies' current debt obligations, the New Money Investors will invest up to $37,500,000 in Cash in exchange for shares of New Common Stock.

TRADE CREDITORS OF THE COMPANIES ARE INTENDED TO BE UNAFFECTED BY THE PREPACKAGED PLAN AND THE RESTRUCTURING, AND THE COMPANIES EXPECT TO BE ABLE TO CONTINUE TO PAY ALL TRADE CREDITORS OF THE COMPANIES WHO CONTINUE TO PROVIDE NORMAL TRADE CREDIT TERMS IN THE ORDINARY COURSE OF BUSINESS, SUBJECT TO ANY REQUIRED BANKRUPTCY COURT APPROVAL.

## II. ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

### A. Administration of the Prepackaged Plan

The Debtors intend to continue to operate their businesses in the ordinary course throughout their Chapter 11 Cases as they had prior to the commencement date of the Chapter 11 Cases. On the Petition Date, the Debtors intend to seek to have their Chapter 11 Cases assigned to the same bankruptcy judge and jointly administered. The Debtors do not anticipate that a statutory committee of creditors holding General Unsecured Claims will be appointed since the Class of General Unsecured Claims is unimpaired under the Prepackaged Plan.

### B. Commencement of the Chapter 11 Cases

On the Petition Date, the Debtors intend to request a series of orders from the Bankruptcy Court to minimize any disruption of their business operations and to facilitate their reorganization. These requests include, but are not limited to, those described below. There can be no assurance, however, that the Bankruptcy Court will grant the requested relief. Bankruptcy courts customarily provide various other forms of administrative and other relief in the early stages of chapter 11 cases. The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate their reorganization goals, including the matters described below. All votes to accept the Prepackaged Plan shall be deemed to constitute consents to relief to be sought by the Debtors upon the commencement of the Chapter 11 Cases as identified below.

1. **Schedules and Statement of Financial Affairs**

Section 521 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007 direct that, unless otherwise ordered by the court, the Debtors must prepare and file Schedules of claims, executory contracts and unexpired leases (the "*Schedules*") and related information and a statement of financial affairs (the "*Statement*"), within 15 days from the commencement of the Chapter 11 Cases. The purpose of this requirement is to provide the Debtors' creditors, equity security holders and other interested parties with sufficient information to make informed decisions with respect to the Debtors' reorganization. In appropriate circumstances, however, a Bankruptcy Court may modify or dispense with the requirement to file the Schedules and the Statement pursuant to section 521 of the Bankruptcy Code. The Debtors believe that such circumstances would exist in the Chapter 11 Cases and that they should not be required to file the Schedules and the Statement. The Debtors thus intend to request that the Bankruptcy Court waive the necessity of filing the Schedules and the Statement or defer such filing pending Confirmation of the Prepackaged Plan.

2. **Approval of Prepetition Solicitation and Scheduling of Confirmation Hearing**

The Debtors will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (1) approval of the prepetition Solicitation procedures, (2) the adequacy of the Disclosure Statement and the Solicitation of votes in connection therewith and (3) Confirmation of the Prepackaged Plan. The Debtors anticipate that notice of these hearings will be published in *The Wall Street Journal* (National edition) and will be mailed to all known holders of Claims and Equity Interests at least twenty-five (25) days before the date by which objections must be filed with the Bankruptcy Court. SEE SECTION VIII.A – "CONFIRMATION OF THE PREPACKAGED PLAN – Confirmation Hearing."

3. **Cash Management System**

Because the Debtors expect the entire Chapter 11 Cases to last for less than three months, and because of the administrative hardship that any operating changes would impose on the Debtors, the Debtors intend to seek Bankruptcy Court authority to continue using their existing cash management system, bank accounts and business forms. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtors' cash flow could be severely impeded, to the detriment of the Debtors' Estates and creditors.

4. **Investment and Deposit Policies**

Section 345 of the Bankruptcy Code establishes certain guidelines for the deposit and investment of funds of the Debtors' Estates. Upon an appropriate showing, such guidelines may be waived by the Bankruptcy Court, and the Debtors may be authorized to continue to deposit and invest their funds pursuant to an existing investment policy. The Debtors believe that strict adherence to the requirements of section 345 would cause significant disruption to their cash management system, to the detriment of the Debtors' businesses and creditors. The Debtors also believe that their existing investment policies provide for the secure and efficient investment and management of the Debtors' funds, and that the disruption that would result from compliance with section 345 is not warranted, particularly in light of the anticipated short duration of the Debtors' Chapter 11 Cases. Accordingly, the Debtors intend to seek a waiver of the requirements of section 345 so as to permit them to continue their existing deposit and investment policies.

5. **Payment of Prepetition Trade Claims**

The Debtors' trade claims are among the Claims included in the Class of Claims denominated Class 6 (General Unsecured Claims). Because the Prepackaged Plan does not impair such Claims, the Debtors' trade claims will be paid in full. Notwithstanding provisions of the Bankruptcy Code that would otherwise require the Debtors to defer payment of their trade claims until the Distribution Date, the

Debtors intend to seek authority from the Bankruptcy Court to pay, in the ordinary course of business, the Debtors' trade claims of those providers of goods and services that agree, in a manner satisfactory to the Debtors, to continue to provide the Debtors with customary trade terms on an ongoing basis. Because certain goods and services are essential to the Debtors' businesses, the relief sought in this motion is critical to the Debtors' uninterrupted operations during the Chapter 11 Cases.

### 6. Payment of Prepetition Employee Wages and Benefits

The Debtors believe that any delay in paying prepetition compensation or benefits would destroy their relationships with employees and irreparably harm employee morale at a time when the dedication, confidence and cooperation of the Debtors' employees is most critical. Accordingly, the Debtors will seek authority to pay compensation and benefits that had accrued but remained unpaid as of the Petition Date.

### 7. Retention of Professionals

The Debtors intend to seek Bankruptcy Court authority to retain and employ certain professionals to represent them and assist them in connection with the Chapter 11 Cases. Some of these professionals have been intimately involved with the negotiation and development of the Prepackaged Plan and include, among others: (i) Weil, Gotshal & Manges LLP and Richards, Layton & Finger, P.A. as counsel for the Debtors, and (ii) Rothschild Inc., as financial advisor to the Debtors. The Debtors may also seek authority to retain certain professionals to assist with the operations of their businesses in the ordinary course. These so-called "ordinary course professionals" will not be involved in the administration of the Chapter 11 Cases.

The Debtors have retained Epiq Bankruptcy Solutions, LLC to serve as the Solicitation Agent in connection with the Solicitation of votes to accept or reject the Prepackaged Plan. The Debtors will pay the Solicitation Agent reasonable and customary compensation for its services in connection with the Solicitation, plus reimbursement for its reasonable out-of-pocket disbursements. The Debtors also will pay any other fees and expenses attributable to the Solicitation.

### 8. Joint Administration

The Debtors will seek authority to consolidate all filings under a single case name, in a single docket, for convenience and administrative purposes and to reduce costs for parties making filings with the Bankruptcy Court.

### 9. Utilities

The Debtors intend to seek orders to restrain utilities from discontinuing, altering or refusing services and to establish appropriate procedures for the determination of requests by utilities for post-petition deposits.

### 10. Transactions with Affiliates

In the ordinary course of business, and in connection with its transfer pricing activities, ECI has entered into certain transactions with its foreign subsidiaries, including loans and other transactions pursuant to which ECI holds loan and other account balances with certain foreign subsidiaries. As of December 31, 2009, ECI has outstanding balances owing to certain of its foreign subsidiaries in an aggregate amount of approximately $40.6 million and has outstanding balances owed from certain of its foreign subsidiaries in an aggregate amount of approximately $31.7 million. The current account balances receivable or payable with affiliates of ECI include certain intercompany financing arrangements that, as of December 31, 2009, amount to a net balance payable by ECI of approximately $8.9 million. ECI intends to seek authority to continue transactions similar to those described above in the ordinary course of business and to collect interest and principal on loans with Subsidiaries as cash flow permits.

## C. Debtor In Possession Financing

On or immediately after the Petition Date, the Debtors expect to seek Bankruptcy Court approval of the DIP Facility to fund the Debtors' working capital needs during the pendency of the Chapter 11 Cases. The DIP Facility will be a delayed-draw term loan facility with a maximum borrowing capacity of $25,000,000 and an interest rate of either base rate plus 5.5% (subject to a base rate floor of 3.0% per annum) or LIBOR plus 6.5% per annum (subject to a LIBOR floor of 2.0% per annum). The DIP Facility will contain representations, warranties, covenants, conditions and events of default that are customary for debtor-in-possession credit facilities. The Debtors' obligations under the DIP Facility will be secured by (i) a first priority priming pledge of all of the equity interests of ECI and each of its domestic and, subject to certain limitations, foreign subsidiaries, (ii) a first priority priming security interest in and lien on all tangible and intangible assets of ECI and each of its domestic subsidiaries, which priming security interest and lien will be senior to the security interests and liens securing both the First Lien Lender Claims and the Second Lien Lender Claims and (iii) a junior lien on all other assets of ECI and its subsidiary guarantors that are subject to valid, perfected, non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases. The DIP Facility will be entitled to super-priority administrative expense status.

## D. Anticipated Timetable for the Chapter 11 Cases

Assuming that the Bankruptcy Court approves the scheduling motion with respect to the Confirmation Hearing, the Debtors anticipate that the Confirmation Hearing will occur within approximately forty-five days of the Petition Date. The Debtors do not currently anticipate any significant objections to Confirmation. If such objections were to be raised, the anticipated timing for the Confirmation Hearing could be delayed, perhaps substantially.

## III. THE PREPACKAGED PLAN

## A. Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and equity holders. In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors and equity holders who hold substantially similar claims against or interests in the debtor and its assets. In furtherance of these two goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person or entity acquiring property under the plan, and any creditor of or equity holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity holders.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PREPACKAGED PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PREPACKAGED PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE

PREPACKAGED PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PREPACKAGED PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PREPACKAGED PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PREPACKAGED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PREPACKAGED PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PREPACKAGED PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PREPACKAGED PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PREPACKAGED PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PREPACKAGED PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**B.     Classification and Treatment of Claims and Equity Interests Under the Prepackaged Plan**

Section 1123 of the Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified. Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on a plan of reorganization and the right to receive thereunder no less value than the holder would receive if the debtor were liquidated in a case filed under chapter 7 of the Bankruptcy Code. A chapter 11 plan cannot be confirmed if there has been improper classification of claims and interests.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the Effective Date or the date on which amounts owing are actually due and payable, payment in full, in Cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Under certain circumstances, a Class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a Class is deemed to reject a plan of reorganization under section

1126(g) of the Bankruptcy Code if the holders of claims or interests in such Class do not receive or retain any property under the plan of reorganization on account of their claims or equity interests. Under this provision of the Bankruptcy Code, certain Classes are deemed to reject the Prepackaged Plan because they receive no distribution under the Prepackaged Plan as such plan discharges the Debtors from obligations to these holders. Because certain Classes are deemed to reject the Prepackaged Plan, the Debtors are required to demonstrate that the Prepackaged Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the plan be "fair and equitable" and not "discriminate unfairly" against the holders of claims or equity interests in such Class. For a more detailed description of the requirements for confirmation, see Section VIII.C. below, entitled "CONFIRMATION OF THE PREPACKAGED PLAN – Requirements for Confirmation of the Prepackaged Plan – Non-Consensual Confirmation."

The Debtors believe that the Prepackaged Plan classifies all claims and interests in compliance with the provisions of the Bankruptcy Code. However, after commencement of the chapter 11 proceeding, a claim holder or interest holder could challenge the Debtors' classification and the Bankruptcy Court could determine that a different classification is required for the Prepackaged Plan to be confirmed. In such event, the Debtors may seek to modify the Prepackaged Plan to provide for whatever classification may be required by the Bankruptcy Court and to use the sufficient acceptances received, to the extent permitted by the Bankruptcy Court, to demonstrate the acceptance of the class or classes which are affected. Any such reclassification could affect a class's acceptance of the Prepackaged Plan by changing the composition of such class and the required vote for Acceptance of the Prepackaged Plan and could potentially require a resolicitation of votes on the Prepackaged Plan.

The Prepackaged Plan provides for the classification and treatment of holders of claims and interests allowed under section 502 of the Bankruptcy Code. Only the holder of an Allowed Claim or an Allowed Equity Interest is entitled to receive a distribution under the Prepackaged Plan.

Consistent with these requirements, the Prepackaged Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following classes:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | First Lien Lender Claims | Impaired | Yes |
| Class 3 | Second Lien Lender Claims | Impaired | Yes |
| Class 4 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 8 | Holdings Preferred Equity Interests | Impaired | Yes |
| Class 9 | Equity Interests in Subsidiary Debtors | Unimpaired | No (deemed to accept) |
| Class 10 | Holdings Common Equity Interests | Impaired | No (deemed to reject) |

## C.     Treatment of Unclassified Claims

Generally, the Prepackaged Plan provides for the payment in full of Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Tax Claims and DIP Claims (as defined below). The Debtors estimate that the amount of Administrative Expense Claims will be approximately $83.6 million, which primarily consists of accounts payable, payroll expenses and other operating expenses during the Chapter 11 Cases. As described above, the Debtors intend to request orders on the Petition Date authorizing them to continue to pay trade claims, employee wages and benefits, and intercompany financing arrangements during the Chapter 11 Cases. The Debtors estimate that the amount of Professional Compensation and Reimbursement Claims will be approximately $2.8 million, the amount of Priority Tax Claims will be less than $100,000 and the amount of DIP Claims will be approximately $18.2 million, assuming the Prepackaged Plan becomes effective within 50 days after the Petition Date. Delays in the case due to litigation, regulatory approvals, or unforeseen events could materially increase the amount of such Claims.

### 1.     Administrative Expense Claims

Administrative expenses are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases that are allowed under sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases and (d) any Expense Claims. Those expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases and tax obligations incurred after the Petition Date. Other Administrative Expense Claims include the actual, reasonable and necessary Professional Fees and expenses of the Debtors' advisors, which fees and expenses are incurred

during the pendency of the Chapter 11 Cases, and any Claims arising under or in respect of the DIP Facility.

Allowed Administrative Expense Claims representing the First Lien Expense Claims, the Second Lien Expense Claims, the DIP Expense Claims, the New Money Expense Claims, the Exit Facility Expense Claims and the Equity Holder Expense Claims (collectively, the "*Expense Claims*") will be paid in full in Cash in the ordinary course of business, if applicable, without the requirement to provide detailed invoices or to file a fee or other application with the Bankruptcy Court. Allowed Administrative Expense Claims representing professional fees and expenses for other advisors will receive payment in full in Cash of any unpaid portion as soon as practicable after Bankruptcy Court approval thereof, or, in the case of professionals retained by the Debtors in the ordinary course of their businesses, if any, on such terms as are customary between the Debtors and such professionals, and with respect to all other holders of Allowed Administrative Expense Claims, on the later of the Effective Date and the date on which the payment would be made in the ordinary course of the Debtors' businesses, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions, or as otherwise agreed by the holder of such Claim and the Debtors. Disputed but not yet Allowed Administrative Expense Claims shall receive payment on the later of (i) the date such Disputed Allowed Administrative Expense Claim becomes Allowed and (ii) following the date such Disputed Allowed Administrative Expense Claim becomes Allowed, the date on which such payment would be made in the ordinary course of the Debtor's business, consistent with past practice and in accordance with their terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions.

### 2. Professional Compensation and Reimbursement Claims

Except as provided in Section 2.1 of the Prepackaged Plan, all parties seeking compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code must file an application for compensation for services and reimbursement of expenses with the Bankruptcy Court on or before ninety (90) days after the Effective Date. Upon Bankruptcy Court approval, the Prepackaged Plan provides that these parties will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date until the Effective Date in each case in the ordinary course and without the need for Bankruptcy Court approval.

### 3. Priority Tax Claims

Priority Tax Claims essentially consist of unsecured claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes and employment and withholding taxes. These unsecured claims are given a statutory priority in right of payment. The Debtors do not intend to set a bar date, and therefore it is difficult to estimate the number and amount, if any, of Priority Tax Claims that will be filed with the Bankruptcy Court.

With respect to any Priority Tax Claims not paid pursuant to prior order of the Bankruptcy Court, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business;

or (c) be treated on such other terms and conditions as are acceptable to the Debtors and the holder of such Claim.

### 4. DIP Claims

On the Effective Date, all DIP Claims, and to the extent not previously paid, all DIP Expense Claims (including, without limitation, any estimated invoices therefor) payable in Cash shall be indefeasibly paid in full in Cash from, *inter alia*, the proceeds of the Exit Facility. Upon payment and satisfaction in full of all DIP Claims, the commitments under the DIP Facility shall terminate and all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

### 5. Class 1 – Priority Non-Tax Claims

a.     Class 1 consists of any Allowed Claim against any of the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

b.     *Impairment and Voting*: Class 1 is unimpaired by the Prepackaged Plan. Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan.

c.     *Distributions*: Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, each such holder will receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the holder of such Claim.

### 6. Class 2 – First Lien Lender Claims

a.     Class 2 consists of any Claim or Obligation (as defined in the First Lien Credit Agreement) arising under or in connection with the First Lien Credit Agreement.

b.     *Impairment and Voting*: Class 2 is impaired by the Prepackaged Plan. The First Lien Lender Claims are Allowed in full, and, for the avoidance of doubt, not subject to avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), defense, counterclaim, cross-claim, disallowance, impairment, credit, objection or any challenges of any kind whatsoever under any applicable law or regulation by any Person, in the aggregate amount of (i) $261,375,000, plus (ii) all accrued and unpaid interest thereon at the applicable contract rate under the First Lien Credit Agreement as of the Petition Date, except to the extent such interest is otherwise specifically provided the Prepackaged Plan or in another order of the Bankruptcy Court to be paid or satisfied, plus (iii) all other Obligations (as defined in the First Lien Credit Agreement), except to the extent that such other Obligations are otherwise provided to be paid or satisfied. Each holder of an Allowed First Lien Lender Claim is entitled to vote to accept or reject the Prepackaged Plan.

c.     *Distributions*: (i) On the Effective Date or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed First Lien Lender Claim agrees to less favorable treatment, each holder of an Allowed First Lien Lender Claim will receive, in full satisfaction of such Claim, such holder's *pro rata* share (based upon the principal amount of First Lien Lender Loans held by each holder divided by the aggregate outstanding principal amount of First Lien Lender Loans) of: (x) 50,000,000 shares of the New Common Stock of Reorganized Holdings unless a Cash Election is

made with respect to an Allowed First Lien Lender Claim pursuant to Section 4.2(b)(ii) of the Prepackaged Plan and (y) the Exit Facility Tranche B Term Loans.

(ii) In lieu of a distribution of its *pro rata* share of 50,000,000 shares of the New Common Stock pursuant to Section 4.2(b)(i)(x) of the Prepackaged Plan, each holder of an Allowed First Lien Lender Claim may elect to receive Cash on account of all or a portion of its distribution of New Common Stock in an amount equal to $1.00 per share of New Common Stock (the "Cash Election", and each holder that exercises the Cash Election, an "Electing Lender"); provided, that the aggregate amount of shares of New Common Stock on account of which the Electing Lenders may receive Cash distributions pursuant to the Cash Election shall not exceed 15,000,000 (the "Subscription Limit"). In the event that the Electing Lenders elect to receive Cash on account of shares of New Common Stock in an aggregate number in excess of the Subscription Limit (the number of shares in excess of the Subscription Limit, the "Oversubscribed Election Shares"), then the number of shares of New Common Stock on account of which each Electing Lender shall receive Cash pursuant to the Cash Election shall be reduced on a *pro rata* basis (based upon the number of shares of New Common Stock on account of which each Electing Lender elected to receive Cash divided by the aggregate number of shares of New Common Stock on account of which all Electing Lenders elected to receive Cash) until the aggregate number of shares on account of which Cash will be distributed pursuant to the Cash Election is equal to the Subscription Limit, and the Electing Lenders shall receive the Oversubscribed Election Shares as if there had been no Cash Election available with respect to such Oversubscribed Election Shares.

(iii) Pursuant to the Plan Support Agreement, holders of an aggregate amount of First Lien Lender Loans equal to $231,518,760 have agreed to elect to receive $10,359,764 in Cash for a portion of their Allowed First Lien Lender Claims. Pursuant to Sections 6.2(b) and 6.2(d) of the Prepackaged Plan, BKC and Sankaty will each acquire half the shares of New Common Stock otherwise distributable to holders of Allowed First Lien Lender Claims that elect to receive Cash for their shares in accordance with Section 4.2(b)(ii) of the Prepackaged Plan.

7.    **Class 3 – Second Lien Lender Claims**

a.    Class 3 consists of any Claim or Obligation (as defined in the Second Lien Credit Agreement) arising under or in connection with the Second Lien Credit Agreement.

b.    *Impairment and Voting*: Class 3 is impaired by the Prepackaged Plan. The Second Lien Lender Claims are Allowed in full, and, for the avoidance of doubt, not subject to avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), defense, counterclaim, cross-claim, disallowance, impairment, credit, objection or any challenges of any kind whatsoever under any applicable law or regulation by any Person, (i) in the aggregate principal amount of $60,000,000, plus (ii) all accrued and unpaid interest thereon at the applicable contract rate under the Second Lien Credit Agreement as of the Petition Date, except to the extent such interest is otherwise specifically provided in the Prepackaged Plan or in another order of the Bankruptcy Court to be paid or satisfied, plus (iii) all other Obligations (as defined in the Second Lien Credit Agreement), except to the extent that such other Obligations are otherwise provided to be paid or satisfied. Each holder of an Allowed Second Lien Lender Claim is entitled to vote to accept or reject the Prepackaged Plan.

c.    *Distributions*: On the Effective Date or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Second Lien Lender Claim agrees to less favorable treatment, each holder of an Allowed Second Lien Lender Claim will receive, in full satisfaction of such Claim, such holder's *pro rata* share (based upon the principal amount of Second Lien Lender Loans held by each holder divided by the aggregate outstanding principal amount of Second Lien Lender Loans) of $10.0 million in Cash.

8. **Class 4 – Secured Tax Claims**

a.      Class 4 consists of any Allowed Secured Claim that, absent its secured status, would be entitled to priority and right of payment under section 507(a)(8) of the Bankruptcy Code.

b.      *Impairment and Voting*: Class 4 is unimpaired by the Prepackaged Plan. Each holder of an Allowed Secured Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan.

c.      *Distributions*: Except to the extent that a holder of an Allowed Secured Tax Claim against any of the Debtors agrees to a different treatment, each such holder will receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the holder of such Claim.

9. **Class 5 – Other Secured Claims**

a.      Class 5 consists of any Allowed Secured Claim other than a First Lien Lender Claim, a Second Lien Lender Claim or a Secured Tax Claim.

b.      *Impairment and Voting*: Class 5 is unimpaired by the Prepackaged Plan. Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan.

c.      *Distributions*: On the Effective Date or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, each Allowed Other Secured Claim shall  (i) be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision of applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default, (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code or (iii) receive the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

10. **Class 6 – General Unsecured Claims**

a.      Class 6 consists of any Allowed Claim against any Debtor that (a) is not an Administrative Expense Claim, Priority Non-Tax Claim, First Lien Lender Claim, Second Lien Lender Claim, Secured Tax Claim, Other Secured Claim, Intercompany Claim, DIP Claim, Other Priority Claim or Waived FP Claim or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

b.      *Impairment and Voting*: Class 6 is unimpaired by the Prepackaged Plan. Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan.

c.      *Distributions*: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim will, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, in the sole discretion of the

Debtors: (i) to the extent such Allowed General Unsecured Claim is due and owing on the Effective Date, (a) be paid in full in Cash on the later of the Effective Date and the date such claim becomes an Allowed General Unsecured Claim, or, in each case, as soon as practicable thereafter, or (b) otherwise be paid in accordance with the terms of any agreement between the Debtors and such holder; (ii) to the extent such Allowed General Unsecured Claim is not by its terms due and owing on the Effective Date, be paid in full in Cash when and as such Allowed General Unsecured Claim becomes due and owing in the ordinary course of business; or (iii) receive treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim.

**11. Class 7 – Intercompany Claims**

a. Class 7 consists of any Allowed Claim held by (i) a Debtor against another Debtor or (ii) a non-Debtor subsidiary against a Debtor.

b. *Impairment and Voting*: Class 7 is unimpaired by the Prepackaged Plan. Each holder of an Allowed Intercompany Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to accept the Prepackaged Plan.

c. *Distributions*: The legal, equitable and contractual rights of the holders of Allowed Intercompany Claims will be unaltered by the Prepackaged Plan, or such Intercompany Claims will otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. Any such transaction may be effected on or subsequent to the Effective Date without any further authorization from the Bankruptcy Court or other action by the holders of New Common Stock.

**12. Class 8 – Holdings Preferred Equity Interests[1]**

a. Class 8 consists of holders of Allowed Holdings Preferred Equity Interests.

b. *Impairment and Voting*: Class 8 is impaired by the Prepackaged Plan. The Holdings Preferred Equity Interests are hereby Allowed in full, and, for the avoidance of doubt, not subject to avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), defense, counterclaim, cross-claim, disallowance, impairment, credit, objection or any challenges of any kind whatsoever under any applicable law or regulation by any Person; provided, however, that no Holdings Preferred Equity Interest will be Allowed if (A) the holder of such Holdings Preferred Equity Interest (i) votes against the Prepackaged Plan or objects to it in any capacity or (ii) fails to waive the Waived FP Claims or (B) Class 8 fails to vote to accept the Prepackaged Plan (which vote will not have been changed, withdrawn or revoked); provided, further, that nothing in the Prepackaged Plan will or will be deemed to provide for the Allowance of the Waived FP Claims. Each holder of an Allowed Holdings Preferred Equity Interest is entitled to vote to accept or reject the Prepackaged Plan.

---

[1]    Antonio Cazzaniga purchased shares of Holdings Preferred Stock and Holdings Common Stock pursuant to a Subscription Agreement dated July 19, 2006. Pursuant to the Subscription Agreement, Mr. Cazzaniga had the right to exercise a put option and require Holdings to repurchase such shares in certain cases, including upon the termination of his employment. Mr. Cazzaniga ceased to work for the Companies as an employee in 2006. Mr. Cazzaniga delivered an exercise notice in 2009 but the requisite conditions for the exercise of the put option were not met so the Companies are not recognizing any claim of Mr. Cazzaniga other than those asserted in his capacity as a holder of Holdings Preferred Equity Interests and Holdings Common Equity Interests.

c.   *Distributions*: On the Effective Date or as soon thereafter as is reasonably practicable, all shares of Holdings Preferred Stock will be cancelled, whether surrendered for cancellation or otherwise, and each holder of Allowed Holdings Preferred Equity Interests shall receive its *pro rata* share (based upon the number of shares of Holdings Preferred Stock held by each holder divided by the aggregate outstanding number of shares of Holdings Preferred Stock) of the Rights. FP has waived the Waived FP Claim pursuant to Section 11.12 of the Prepackaged Plan.

**13.   Class 9 – Equity Interests in Subsidiary Debtors**

a.   Class 9 consists of holders of Allowed Equity Interests in Subsidiary Debtors.

b.   *Impairment and Voting*: Class 9 is unimpaired by the Prepackaged Plan. Each holder of an Allowed Equity Interest in Subsidiary Debtors is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan.

c.   *Distributions*: On the Effective Date, all of the Equity Interests in Subsidiary Debtors will continue to be owned by Reorganized Holdings or Reorganized ECI, as applicable.

**14.   Class 10 – Holdings Common Equity Interests**

a.   Class 10 consists of holders of Allowed Holdings Common Equity Interests.

b.   *Impairment and Voting*: Class 10 is impaired by the Prepackaged Plan. Each holder of an Allowed Holdings Common Equity Interest is deemed to have rejected the Prepackaged Plan.

c.   *Distributions*: On the Effective Date or as soon thereafter as is reasonably practicable, all shares of Holdings Common Stock will be cancelled, whether surrendered for cancellation or otherwise, and each holder of Allowed Holdings Common Equity Interests will not be entitled to, and will not receive or retain, any property or interest in property on account of such Allowed Holdings Common Equity Interests.

**D.   Means for Implementation of the Prepackaged Plan**

**1.   Consolidation for Distribution Purposes**

The Prepackaged Plan is premised upon the consolidation of the Debtors for purposes of the Prepackaged Plan only. Accordingly, on the Effective Date, all of the Debtors and their Estates shall, for purposes of the Prepackaged Plan only, be deemed merged and (i) all assets and liabilities of the Debtors shall be treated as though they were merged, (ii) all joint obligations of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors and receive a single distribution, and (iii) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the Debtors on a consolidated basis on and after the Effective Date. Such consolidation shall not (other than for voting, treatment, and distribution purposes under the Prepackaged Plan) affect (x) the legal and corporate structures of the Debtors (including the corporate ownership of the Subsidiary Debtors) and (y) any Intercompany Claims.

**2.   New Money Contributions**

On the Effective Date, the following transactions shall be effectuated simultaneously in accordance with Article VI of the Prepackaged Plan:

a.   BKC shall make the BKC New Money Equity Contribution in exchange for 13,100,000 shares of the New Common Stock;

b.     BKC shall make the BKC Secondary Equity Contribution in exchange for at least an additional 5,000,000 shares and up to 7,500,000 shares of the New Common Stock;

c.     Sankaty shall make the Sankaty New Money Equity Contribution in exchange for 9,400,000 shares of the New Common Stock; and

d.     Sankaty shall make the Sankaty Secondary Equity Contribution in exchange for at least an additional 5,000,000 shares and up to 7,500,000 shares of the New Common Stock.

In respect of clauses (b) and (d) above, such shares of New Common Stock distributed to BKC and Sankaty, respectively, shall correspondingly reduce the number of shares distributed to the holders of Allowed First Lien Lender Claims as set forth in Section 4.2(b) of the Prepackaged Plan.

**3.     General Corporate Actions**

a.     General

Upon the Effective Date, all actions contemplated by the Prepackaged Plan shall be deemed authorized and approved in all respects, including (i) adoption or assumption, as applicable, of the agreements with existing management, (ii) the issuance and distribution of the New Common Stock and the Rights, (iii) the distribution of the Exit Facility Tranche B Term Loans, (iv) selection of the directors and officers for the Reorganized Debtors, (v) the adoption of the Management Incentive Plan, and (vi) all other actions contemplated by the Prepackaged Plan (whether to occur before, on or after the Effective Date). All matters and transactions provided for in the Prepackaged Plan concerning the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Prepackaged Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, the managing member, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated by the Prepackaged Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (u) the Shareholders Agreement, (v) the Rights Agreement, (w) the Registration Rights Agreement, (x) the Exit Facility Documents, and (y) any and all other agreements, documents, securities and instruments related to the foregoing (including, without limitation, security documents). Such authorizations and approvals shall be effective notwithstanding any requirements under non-bankruptcy law.

b.     Restated Organizational Documents of the Reorganized Debtors

On the Effective Date, Reorganized Holdings shall adopt the Restated Certificate of Incorporation and the Restated Bylaws and shall file the Restated Certificate of Incorporation with the Secretary of State of the State of Delaware. In addition, on or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Restated Certificate of Incorporation, the Certificate of Incorporation for Debtors that are corporations and the organizational documents for the Debtors that are limited liability companies will also be amended (and as to the corporate Debtors, filed with the Secretary of State of their respective states of incorporation) as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power. On the Effective Date, the managing member or the board of directors of the Reorganized Debtors, as applicable, shall be deemed to have adopted the restated organizational documents for such Reorganized Debtor.

c.     Boards of Directors of the Reorganized Debtors

On the Effective Date, the operations of Reorganized Holdings shall become the general responsibility of its board of directors, subject to and in accordance with the Restated Certificate of Incorporation and Restated Bylaws, which shall provide that Reorganized Holdings shall continue to operate under the laws of Delaware and in accordance with the Shareholders Agreement. On the Effective Date, the operations of each of the other Reorganized Debtors shall become the general responsibility of its respective board of directors, subject to and in accordance with its restated organizational documents and the Shareholders Agreement. The initial board of directors of Reorganized Holdings shall consist of seven (7) directors, one of whom shall be the chief executive officer of Reorganized ECI, two of whom shall be designated by BKC, two of whom shall be designated by Sankaty and two of whom shall be independent directors designated by the holders of a majority of the outstanding shares of New Common Stock (other than the shares held by BKC and Sankaty). The initial boards of directors of the Reorganized Debtors shall be disclosed in the Prepackaged Plan Supplement.

d.      Officers of the Reorganized Debtors

The officers of the respective Reorganized Debtors immediately prior to the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

**4.      Delivery of Exit Facility Documents; Distribution of Exit Facility Tranche B Term Loans**

On the Effective Date, the Exit Facility Documents shall be executed and delivered, and Reorganized ECI shall be authorized to distribute the Exit Facility Tranche B Term Loans and the Reorganized Debtors shall be authorized to execute, deliver and enter into, *inter alia*, the Exit Facility Documents without the need for any further corporate action and without further action by the holders of Claims or Equity Interests. On the Effective Date, the Exit Facility Tranche B Term Loans shall be issued by Reorganized ECI to holders of Allowed First Lien Lender Claims, as set forth in Section 4.2(b) of the Prepackaged Plan. Summaries of the Exit Facility Documents are contained in this Disclosure Statement and copies will be filed as part of the Prepackaged Plan Supplement.

**5.      Issuance of New Common Stock**

The New Common Stock shall consist of (i) a class of full-voting common equity (the "*Class A-1 Common Stock*") and (ii) a class of limited-voting common equity (the "*Class A-2 Common Stock*"). The issuance by Reorganized Holdings of 72,500,000 shares of New Common Stock pursuant to the Prepackaged Plan is authorized without further need for any corporate action. On the Effective Date, the New Common Stock shall be (i) contributed by Reorganized Holdings to Reorganized ECI and then distributed to holders of Allowed First Lien Lender Claims and (ii) issued to BKC and Sankaty for their New Money Contributions; provided that each Person receiving New Common Stock under the Prepackaged Plan shall execute the Shareholders Agreement as a condition to receiving any distribution of New Common Stock. Each First Lien Lender shall have the option to choose to take shares of Class A-1 Common Stock or shares of Class A-2 Common Stock. The economic rights of the Class A-1 Common Stock and Class A-2 Common Stock shall be identical and each share of Class A-2 Common Stock shall be convertible at the option of the holder into one share of Class A-1 Common Stock. The terms of the Class A-1 Common Stock and the Class A-2 Common Stock shall be as described in the Restated Certificate of Incorporation.

**6.      Issuance of Rights**

The issuance of the Rights and the issuance of any New Common Stock pursuant to the Rights are hereby authorized without further need for any corporate action. On the Effective Date, the Rights

may be distributed to the holders of Allowed Holdings Preferred Equity Interests; provided, that each Person receiving Rights under the Prepackaged Plan shall execute the Rights Agreement as a condition to receiving any distribution pursuant to the Rights Agreement.

### 7.  Cancellation of Existing Securities and Agreements

Except (i) as otherwise expressly provided in the Prepackaged Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (iii) for purposes of evidencing a right to distributions under the Prepackaged Plan, or (iv) with respect to any Claim that is reinstated and rendered unimpaired under the Prepackaged Plan,  on the Effective Date, all of the agreements and other documents evidencing (a) the Claims or rights of any holder of a Claim against the Debtors, including all credit agreements and notes evidencing such Claims and any security agreements and filings attendant thereto, (b) any Equity Interests in Holdings, (c) any options or warrants to purchase Equity Interests of any of the Debtors, or obligating such Debtors to issue, transfer or sell Equity Interests or any other capital stock of such Debtors, shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

### 8.  Other Transactions

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may, to the extent approved by the Requisite Consenting Parties: (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Prepackaged Plan.

### 9.  Cancellation of Liens

Except as otherwise specifically provided in the Prepackaged Plan with respect to Classes 4 and 5 as may be applicable, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 10.  Agreements with Existing Management

On the Effective Date, the Reorganized Debtors shall either enter into new employment agreements in form and substance acceptable to the Requisite Consenting Parties with existing members of management who are currently subject to written employment agreements with the Debtors, or assume such existing agreements.

### 11.  Management Incentive Plan

As of the Effective Date, the Reorganized Debtors shall establish the Management Incentive Plan, which shall be in form and substance reasonably acceptable to the Requisite Consenting Parties and provide for 10% of the fully-diluted New Common Stock (which shall dilute the New Common Stock distributed and/or issued, as applicable, to the First Lien Lenders, BKC and Sankaty on the Effective Date and the New Common Stock that may be issued pursuant to the Rights) to be available for issuance to the officers and key employees of the Reorganized Debtors and their affiliates as determined by the board of directors of Reorganized Holdings after the Effective Date.

### E.    Provisions Governing Distributions

#### 1.    Date of Distributions on Account of Allowed Claims

Except as otherwise specifically provided in the Prepackaged Plan, any distributions and deliveries to be made under the Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter. In the event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

#### 2.    Sources of Cash for the Prepackaged Plan Distribution

Except as otherwise specifically provided in the Prepackaged Plan or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations and cash on hand, the New Money Contribution and the Exit Facility.

#### 3.    Disbursing Agent

All distributions under the Prepackaged Plan shall be made by Reorganized ECI as the Disbursing Agent or such other Person designated by Reorganized ECI as a Disbursing Agent in the Prepackaged Plan Supplement. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

#### 4.    Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Prepackaged Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Prepackaged Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

#### 5.    Expenses of the Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

#### 6.    Record Date for Distributions

The record date for distributions shall be the Distribution Record Date.

#### 7.    Delivery of Distributions

a.    *Last Known Address.* Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the Debtors, unless the applicable Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected on such schedules for such holder. In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the

expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

b. *Distributions by First Lien Administrative Agent.* The First Lien Administrative Agent shall be the Disbursing Agent for the Allowed First Lien Lender Claims. Distributions under the Prepackaged Plan to holders of such Allowed First Lien Lender Claims shall be made by the Reorganized Debtors to the First Lien Administrative Agent, which, in turn, shall make the distributions to the holders of such Allowed Claims. The First Lien Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions. Upon delivery by the Reorganized Debtors of the distributions in conformity with Sections 4.2 of the Prepackaged Plan to the First Lien Administrative Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

c. *Distributions by the Second Lien Administrative Agent.* The Second Lien Administrative Agent shall be the Disbursing Agent for the Allowed Second Lien Lender Claims. Distributions under the Prepackaged Plan to holders of Allowed Second Lien Lender Claims shall be made by the Reorganized Debtors to the Second Lien Administrative Agent which, in turn, shall make the distributions to the holders of such Allowed Second Lien Lender Claims. The Second Lien Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of any distributions. Upon delivery by the Reorganized Debtors of the distributions in conformity with Section 4.3 of the Prepackaged Plan to the Second Lien Administrative Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

### 8. Manner of Payment Under the Prepackaged Plan

a. All distributions of the New Common Stock, the Rights and the Exit Facility Tranche B Term Loans to the holders of Claims and Equity Interests under the Prepackaged Plan shall be made by the Disbursing Agent on behalf of the applicable Debtors.

b. All distributions of the New Common Stock to BKC and Sankaty under the Prepackaged Plan shall be made by the Disbursing Agent on behalf of Holdings.

c. All distributions of Cash under the Prepackaged Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor.

d. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 9. Fractional Shares

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Prepackaged Plan would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed pursuant to the Prepackaged Plan shall be adjusted as necessary to account for the foregoing rounding.

### 10. Setoffs and Recoupment

Except as otherwise specifically provided for in the Prepackaged Plan, the Debtors may, but shall not be required to, setoff against or recoup from any Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim they may have against such claimant.

### 11. Distributions After Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 12. Allocations of Payments under the Prepackaged Plan

In the case of distributions with respect to holders of Claims pursuant to the Prepackaged Plan, the amount of any Cash and the fair market value of any other consideration received by the holder of such Claim shall be allocable first to the principal amount of such Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Claim.

### 13. No Postpetition Interest on Claims

Except as otherwise specifically provided for in the Prepackaged Plan, in the Confirmation Order or in any other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### F. Procedures for Treating Disputed Claims under the Prepackaged Plan

### 1. Disputed Claims

On and after the Effective Date, except as otherwise specifically provided in the Prepackaged Plan (including pursuant to Section 8.2 thereof), all Claims shall be paid in the ordinary course of business of the Reorganized Debtors. If the Debtors dispute any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of General Unsecured Claims and holders of Other Secured Claims subject to Section 4.5(b) of the Prepackaged Plan, under the Prepackaged Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under Section 8.1 of the Prepackaged Plan to assert their claims in any proper forum as though the Chapter 11 Cases had not been commenced.

### 2. Objections to Claims

Except insofar as a Claim is Allowed under the Prepackaged Plan, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to Claims. Any objections to Claims shall be served and filed (i) on or before the ninetieth (90th) day following the later of (x) the Effective Date and (y) the date that a proof of Claim is filed or amended or the Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court.

### 3. No Distribution Pending Allowance

If the Debtors object to any Claim, no payment or distribution provided under the Prepackaged Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 4. Distributions After Allowance

To the extent that a Disputed Claim or Disputed Equity Interest ultimately becomes an Allowed Claim or Allowed Equity Interest, respectively, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Equity Interest, respectively, in accordance with the provisions of the Prepackaged Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Equity Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Equity Interest the distribution (if any) to which such holder is entitled under the Prepackaged Plan as of the Effective Date, without any interest to be paid on account of such Claim or Equity Interest unless required under applicable bankruptcy law.

### 5. Resolution of Disputed Claims

Notwithstanding any prior order of the Bankruptcy Court, on and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals.

## G. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumption of Contracts and Leases

Except as otherwise specifically provided in the Prepackaged Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Prepackaged Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) was previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, filed as part of the Prepackaged Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or

unexpired lease, without regard to whether such agreement, instrument or other document is listed on such schedule.

### 2. Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder are in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors upon assumption thereof. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### 3. Claims Based on Rejection of Executory Contracts or Unexpired Leases

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the applicable Debtor and its counsel within 30 days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Confirmation Date. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates and their property.

### 4. Compensation and Benefit Plans and Treatment of Retirement Plan

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and employee benefit plans of the Debtors, including employee benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Prepackaged Plan. The Debtors' obligations under such plans and programs shall survive confirmation of the Prepackaged Plan, except for (i) executory contracts or benefit plans specifically rejected pursuant to the Prepackaged Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

### 5. Insurance Policies

Notwithstanding anything contained in the Prepackaged Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, shall be continued. Nothing contained in Section 9.5 of the Prepackaged Plan shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' insurance policies.

## H. Conditions Precedent to Effective Date

### 1. Conditions to Effective Date of Prepackaged Plan

The occurrence of the Effective Date of the Prepackaged Plan is subject to satisfaction of the following conditions precedent:

#### a. Confirmation Order

The Clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Cases and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto. The

Confirmation Order in the Chapter 11 Cases shall be in form and substance reasonably acceptable to the Debtors, the Requisite Consenting Parties, the DIP Lenders, the DIP Agent, the Exit Facility Tranche A Lenders and the Exit Facility Agent.

b.     Execution and Delivery of Other Documents

All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Prepackaged Plan shall have been effectuated, including the documents comprising the Prepackaged Plan Supplement and, in each case, (i) shall have been approved, (ii) all conditions to their effectiveness shall have been satisfied or waived and (iii) shall be consistent in all material respects with the Plan Support Agreement, the term sheets attached to the Plan Support Agreement and the Prepackaged Plan (in each case, as amended, supplemented or otherwise modified as provided in the Plan Support Agreement) and shall otherwise be reasonably satisfactory in form and substance to the Requisite Consenting Parties.

c.     Regulatory Approvals

The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Prepackaged Plan and that are required by law, regulations or order.

d.     Consents

All authorizations, consents and approvals determined by the Debtors to be necessary to implement the terms of the Prepackaged Plan shall have been obtained.

e.     Corporate Formalities

The Restated Certificate of Incorporation of Reorganized Holdings shall be filed with the Secretary of State for Delaware contemporaneously with the Effective Date.

f.     Cash Contributions

Proceeds of the New Money Contribution and the Exit Facility shall be made available to the Reorganized Debtors.

g.     Other Acts

Any other actions the Debtors and the Requisite Consenting Parties reasonably determine are necessary to implement the terms of the Prepackaged Plan shall have been taken.

h.     Expense Claims

All Expense Claims (including, without limitation, any estimated invoices therefor), shall have been paid in full in Cash.

## 2.     Waiver of Conditions Precedent

Each of the conditions precedent in Section 10.1(a) through (g) of the Prepackaged Plan may be waived, in whole or in part, by the Debtors without notice or order of the Bankruptcy Court, provided that the Requisite Consenting Parties give their prior written consent to any such waiver. The condition precedent in Section 10.1(h) of the Prepackaged Plan may be waived, in whole or in part, by the Debtors without notice or order of the Bankruptcy Court, provided that (i) the DIP Agent and DIP Lenders holding a majority in principal amount of the DIP Claims give their prior written consent to any such waiver if the DIP Expense Claims have not been paid in full in Cash, (ii) the First Lien Administrative Agent and Requisite Consenting First Lien Lenders give their prior written consent to any such waiver if the First Lien Expense Claims have not been paid in full in Cash, (iii) the Second Lien Administrative

Agent and Requisite Consenting Second Lien Lenders give their prior written consent to any such waiver if the Second Lien Expense Claims have not been paid in full in Cash, (iv) the New Money Investors give their prior written consent to any such waiver if the New Money Expense Claims have not been paid in full in Cash, (v) the Exit Facility Tranche A Lenders and the Exit Facility Agent have given their prior written consent to any such waiver if the Exit Facility Expense Claims have not been paid in full in Cash, and (vi) FP gives its prior written consent to any such waiver if the Equity Holder Expense Claims have not been paid in full in Cash up to an aggregate amount of $75,000.

### 3. Effect of Failure of Conditions

If the conditions specified in Section 10.1 of the Prepackaged Plan have not been satisfied or waived in the manner provided in Section 10.2 of the Prepackaged Plan by the date specified in Section 4(a)(i)(H) of the Plan Support Agreement (unless otherwise waived by the Debtors with the prior written consent of the Requisite Consenting Parties), then: (i) the Confirmation Order shall be of no further force or effect; (ii) no distributions under the Prepackaged Plan shall be made; (iii) the Debtors and all holders of Claims and Equity Interests in the Debtors shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (v) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Prepackaged Plan and nothing contained in the Prepackaged Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors and the Prepackaged Plan shall be deemed withdrawn.

### 4. Reservation of Rights

The Prepackaged Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Prepackaged Plan, any statement or provision contained in the Prepackaged Plan, or action taken by the Debtors with respect to the Prepackaged Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtors or any other party with respect to any Claims or Equity Interests or any other matter.

### 5. Substantial Consummation

Substantial consummation of the Prepackaged Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## I. Effect of Confirmation

### 1. Vesting of Assets

Except as otherwise provided in the Prepackaged Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate Person with all of the powers available to such legal entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. The property of the Debtors' Estates, together with any property of the Debtors that is not property of their Estates and that is not specifically disposed of pursuant to the Prepackaged Plan, shall vest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims, encumbrances, Equity Interests, charges, and Liens except as specifically provided in the Prepackaged Plan or the Confirmation Order. Without limiting the generality of the foregoing, the Reorganized Debtors may, without application to or approval by the Bankruptcy Court, pay professional fees and expenses incurred after the Effective Date.

## 2. Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Prepackaged Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Prepackaged Plan and whether or not such holder has accepted the Prepackaged Plan.

## 3. Discharge of the Debtors

Except as otherwise specifically provided in the Prepackaged Plan, the treatment of all Claims against or Equity Interests in the Debtors under the Prepackaged Plan shall be in exchange for and in complete satisfaction, discharge and release of, all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon, from and after the Petition Date, or against their Estate or properties or interests in property. Except as otherwise provided in the Prepackaged Plan, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full in exchange for the consideration provided under the Prepackaged Plan. Except as otherwise provided in the Prepackaged Plan, all Persons shall be precluded from asserting against the Debtors, the Reorganized Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

## 4. Exculpation

To the extent permitted by applicable law and approved by the Bankruptcy Court, the Debtors (including as reorganized), the First Lien Lenders, the First Lien Administrative Agent, the First Lien Administrative Parties, the Second Lien Lenders, the Second Lien Administrative Agent, the Second Lien Administrative Parties, the DIP Lenders, the DIP Agent, the DIP Administrative Parties, the New Money Investors, the lenders, administrative agents, collateral agents, syndication agents and arrangers under the Exit Facility Documents, FP, and their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) shall not have any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the negotiation of the Plan Support Agreement, the negotiation and the pursuit of approval of the Disclosure Statement, the Prepackaged Plan, the Prepackaged Plan Supplement or the solicitation of votes for, or confirmation of, the Prepackaged Plan, the funding of the Prepackaged Plan, the consummation of the Prepackaged Plan, or the administration of the Prepackaged Plan or the property to be distributed under the Prepackaged Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Prepackaged Plan. Notwithstanding the foregoing, (i) this exculpation shall have no force and effect with respect to FP and its affiliates if FP or any of its affiliates, as a holder of any Equity Interest for which it is entitled to vote, votes against the Prepackaged Plan or objects to it and (ii) this exculpation shall have no force and effect with respect to any First Lien Lender or Second Lien Lender if such Person, as a holder of a Claim, objects to the Prepackaged Plan.

## 5. Releases by the Debtors

Except for the right to enforce the Prepackaged Plan, the Debtors shall, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge the Released Parties of and from any and all Claims, demands, causes of action and the like, relating to the Debtors and/or their affiliates, advisors, officers, directors and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to

the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise. Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any Released Party in respect of any contractual obligations of any Released Party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Debtors pursuant to the Prepackaged Plan or a final order of the Bankruptcy Court or (ii) any causes of action unknown to the Debtors as of the Petition Date arising out of willful misconduct or gross negligence of any such Released Party as determined by a Final Order of the Bankruptcy Court.

**6. Releases By Holders of Claims and Equity Interests**

Except for the right to enforce the Prepackaged Plan, each Person who votes to accept the Prepackaged Plan, or who, directly or indirectly, is entitled to receive a distribution under the Prepackaged Plan, including Persons entitled to receive a distribution via an attorney, agent or securities intermediary, shall be deemed to forever release, waive and discharge the Released Parties of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise. Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any Released Party in respect of any contractual obligations of any Released Party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Debtors pursuant to the Prepackaged Plan or a final order of the Bankruptcy Court or (ii) any causes of action unknown to such Person as of the Petition Date arising out of willful misconduct or gross negligence of any such Released Party as determined by a Final Order of the Bankruptcy Court.

**7. Waiver of Avoidance Actions**

To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession against the Released Parties relating to distributions made on account of interest or other obligations under and relating to the First Lien Credit Agreement or Second Lien Credit Agreement.

**8. Term of Injunctions or Stays**

a.     Except as otherwise specifically provided in the Prepackaged Plan, all Persons who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Reorganized Debtor or Released Party, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor or Released Party with respect to any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or Released Party, or against the property or interests in property of any Reorganized Debtor or Released Party, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor or Released Party, or against the property or interests in property of any